ORIGINAL

1   SEYFARTH SHAW LLP
    Robert S. Niemann (SBN 087973)
2   E-mail: rniemann@seyfarth.com
    Althea V. Bovell (SBN 200240)
3   E-mail: abovell@seyfarth.com
    Krista L. Mitzel (SBN 221002)
4   E-mail: kmitzel@seyfarth.com
    560 Mission Street, Suite 3100
5   San Francisco, California 94105
    Telephone: (415) 397-2823
6   Facsimile: (415) 397-8549

7   Attorneys for Plaintiff
    GALLAGHER BENEFIT SERVICES, INC.

8

9                   UNITED STATES DISTRICT COURT

10          IN AND FOR THE NORTHERN DISTRICT OF CALIFORNIA

11  GALLAGHER BENEFIT SERVICES, INC., a )    Case No.
    Delaware Corporation,               )
12                                      )    **COMPLAINT FOR DAMAGES AND**
                Plaintiff,              )    **INJUNCTIVE RELIEF; DEMAND FOR**
13                                      )    **JURY TRIAL**
        v.                              )
14                                      )
                                        )
15  JAMES DE LA TORRE, an individual, and )
    ANDREINI & COMPANY, a California    )
16  corporation,                        )
                                        )
17              Defendants.             )
                                        )
18

19          Plaintiff Gallagher Benefit Services, Inc. ("Gallagher" or the "Company") for its

20  Complaint against Defendants James De La Torre ("De La Torre") and Andreini & Company

21  ("Andreini") (collectively "Defendants") states as follows:

22                            **NATURE OF ACTION**

23      1.      This is an action for an emergency temporary restraining order, preliminary

24  injunction, permanent injunction and damages arising out of De La Torre and Andreini's use of

25  Gallagher's confidential, proprietary, and trade secret information to improperly terminate

26  relationships between Gallagher and its clients or potential clients, and move the current or

27  potential clients into a relationship with Andreini. Defendant De La Torre is a former Vice

28  President with Gallagher who recently left Gallagher's employ on October 15, 2007 and has

    COMPLAINT OF GALLAGHER BENEFIT SERVICES; DEMAND FOR TRIAL BY JURY

1   systematically used Gallagher's proprietary and confidential information for the benefit of

2   Andreini and himself. Gallagher seeks to enjoin De La Torre and Andreini to return to Gallagher

3   its confidential information in electronic form and hard copy, to enjoin De La Torre and Andreini

4   from utilizing or disclosing Gallagher's information, to enjoin De La Torre and Andreini to

5   account for the whereabouts of Gallagher's information, to enjoin De La Torre and Andreini, and

6   those in concert with them, from soliciting Gallagher's current or potential clients with whom De

7   La Torre previously dealt while working at Gallagher, to enjoin De La Torre to participate in an

8   expedited deposition to assist in the transition of his position to a new Gallagher employee as

9   required by his Executive Agreement, among other things, and also to order De La Torre and

10  Andreini to produce for inspection all computers and other media on which Gallagher's

11  proprietary information resided or may have resided. Finally, Gallagher asks this Court to award

12  all damages Gallagher has suffered as a result of De La Torre and Andreini's violations of the

13  Computer Fraud and Abuse Act, misappropriation, breach of contract, breach of the covenant of

14  good faith and fair dealing, breach of the duty of loyalty, unfair competition, conversion and

15  tortious interference with contractual relationships and economic expectancy, and Gallagher's

16  efforts to recover its property.

17                          **PARTIES, JURISDICTION AND VENUE**

18      2.      Gallagher is a Delaware corporation, with its principal place of business in

19  Chicago, Illinois. Gallagher's primary focus is to provide supplemental benefit plans that were

20  not provided by the federal benefit plans.

21      3.      De La Torre is domiciled at and resides at 449 Cedar Avenue, San Bruno,

22  California 94066. De La Torre was employed by Gallagher on or about October 5, 1998 as an

23  account executive and voluntarily resigned from Gallagher on or about October 15, 2007 in the

24  position of Vice President. De La Torre was employed by Gallagher in order to sell insurance

25  products to federal court and other federal employees and volunteers in the United States and its

26  territories.

27      4.      Andreini & Company is a California corporation with its principal place of

28  business at 220 West Twentieth Avenue, San Mateo, California 94403. On information and

1   belief, Andreini is in the business of private insurance brokerage. Andreini conducts business in
2   this District and this Division. On information and belief, De La Torre is very recently employed
3   by Andreini.

4       5.      This Court has Federal question jurisdiction pursuant to 28 U.S.C. § 1331,
5   based on a claim arising under the Computer Fraud and Abuse Act, Title 18 U.S.C. § 1030, *et*
6   *seq.* and this Court has original jurisdiction of this action under 28 U.S.C. § 1332 because the
7   parties are citizens of different states and the matter in controversy exceeds $75,000.00,
8   excluding interest and costs. This Court also has supplemental jurisdiction pursuant to 28 U.S.C.
9   § 1367. This Court has personal jurisdiction over De La Torre, and venue is proper in this
10  District and this Division under 28 U.S.C. § 1391(a), because De La Torre is a resident of this
11  District, he has breached and threatens to breach duties to Gallagher in this District, and a
12  substantial part of the events giving rise to these claims occurred in this District and Division.
13  This Court has jurisdiction over Andreini in that Andreini conducts business in this District and
14  this Division, employs De La Torre in this District and a substantial part of the events giving rise
15  to these claims occurred in this District and Division.

16  ## BACKGROUND

17      6.      Arthur J. Gallagher & Co., the parent company of Gallagher, was founded in
18  1927 to provide services worldwide in the area of risk management and general insurance
19  brokerage services, managing the assets of companies, providing insurance, including managing
20  their workers compensation programs, furnishing similar services in areas of risk management
21  and general insurance brokerage. In 1999, Gallagher established an innovative and proprietary
22  service called Gallagher Benefits Services ("Gallagher") as a separate entity. Gallagher initially
23  sold these supplemental benefit plans under the name Federal Employees Group Long Term
24  Disability. In 2005, Gallagher rebranded the program as "Federal First," a trademarked brand it
25  currently uses to provide supplemental benefits and education seminars across the country to
26  help participants understand the full scope of federal benefits, in addition to maintaining a
27  website for these purposes. Federal First's primary focus is to provide to federal employees
28  supplemental benefits and programs that are not provided directly by the employers' plan.

3

1  Federal First intends to expand its services beyond long term disability plans.

2       7.      Federal First provides plan sponsors (e.g. National Conference of Bankruptcy
3  Clerks) with the best products based on Gallagher's experience and knowledge of the
4  marketplace, to help clients identify the best insurers, engage in competitive bidding on their
5  behalf, communicates with plan participants, and coordinates compliance activities under
6  HIPAA and ERISA. In addition, Federal First's educational workshops—which are all created,
7  funded and supported by Gallagher—provide information to integrate members' federal benefit
8  programs with their personal financial and retirement objectives. The workshops range from one
9  to two days, and sometimes include a supplemental one-on-one session with members and/or
10  prospective members and their spouses.

11       8.      There is no comparable program in the marketplace that combines the
12  administration, marketing, and website and member support as Gallagher's Federal First
13  business. Gallagher has spent extensive resources and time collecting and analyzing data about
14  special insurance packages that the Company has negotiated with various underwriters and the
15  peculiar risks inherent in their operations. Gallagher maintains a large database of highly
16  confidential information regarding participating underwriters, insurance carriers, current clients
17  and their members and prospective clients and potential members. This includes proprietary,
18  confidential data which has been accumulated, refined and developed over many years and at
19  great expense.

20       9.      Gallagher's breadth and depth of experience in selling insurance products to
21  federal employees and federal associations sets it apart from its competitors.

22       10.     Through its efforts, Gallagher has invested substantial time and money in
23  developing information and knowledge about the aforementioned industry, its employees,
24  volunteers and preferences with regard to a wide range of insurance products. Much of the
25  information and data that Gallagher has developed, discovered, and cultivated over a long period
26  of time at a substantial expense and is not publicly available. The confidential and proprietary
27  data accumulated by Gallagher includes that which is not known either to its competitors or
28  within the insurance agency and brokerage business generally and which has independent

1 | economic value to the Company.

2 |     11.      Specifically, Gallagher creates and maintains confidential information
3 | regarding: data related to Gallagher's unique marketing and servicing programs, procedures and
4 | techniques; business, management and personnel strategies; criteria and formulae used by
5 | Gallagher in pricing its insurance products and claims management, loss control, and information
6 | management services; the structure and pricing of special insurance packages and products that
7 | Gallagher has negotiated with various underwriters; lists of prospective clients, their interests
8 | and needs; the identity, authority and responsibility of key contacts at Gallagher accounts and at
9 | prospective client companies and associations; highly sensitive details concerning the structure,
10 | conditions and extent of their existing insurance coverages; policy expiration dates and renewal
11 | information, if applicable; premium accounts; commission rates; risk management service
12 | arrangements; loss histories; and other data showing the particularized insurance requirements
13 | and preferences of the accounts. Gallagher also uses confidential strategies and business plans to
14 | market its services, create new products and bring value to its clients. In addition, Gallagher
15 | provides a national platform for carriers which is unique because of its size, expertise, proven
16 | track record and accumulated goodwill.

17 |     12.      All of this data is only accessible to Gallagher's employees on a need to know
18 | basis through Gallagher's computer network. Gallagher's employees are issued Gallagher-
19 | owned laptop computers with access through a handheld Blackberry. Gallagher's "Goldmine"
20 | database and other computer network and systems afford its employees numerous and extensive
21 | resources to assist in the solicitation, production, enrollment and servicing of its nationwide
22 | clients and prospective clients. All efforts expended in soliciting, producing and servicing of
23 | these existing and prospective client accounts are for the permanent benefit of the Company and
24 | the Company secures and retains the proprietary interest in all such accounts subject to its
25 | confidentiality restrictions.

26 |     13.      Gallagher's computer network and systems have Internet capabilities and are
27 | used to provide insurance services in interstate commerce throughout the United States and
28 | across state lines. Gallagher has servers located outside the State of California. De La Torre's

1  computer routinely accessed or had access to Gallagher's computer network, Gallagher's out of

2  state servers and Gallagher's proprietary information.

3      14.      In the course of serving Gallagher's clients, Gallagher's employees gain access

4  to confidential information about participating clients, financial information about participating

5  clients, as well as confidential and proprietary information about Gallagher.

6      15.      The information given to Gallagher by its clients and potential clients, the

7  information developed by Gallagher about participating clients and prospective clients, the

8  provisions of its services and the internal financial and performance information about Gallagher

9  is confidential.  This information is provided to Gallagher, developed by Gallagher and utilized

10 by Gallagher for the purpose of allowing Gallagher employees to effectively and efficiently sell,

11 deliver and manage its services and products.

12     16.      Gallagher requires that its information be kept strictly confidential by its

13 current and former employees and restricts access to this information.  Gallagher takes specific

14 measures to preserve the confidentiality of this information, including, but not limited to:

15              A.      Gallagher, through its Handbook, Gallagher's Code for Business
                        Conduct and Ethics, and Executive Agreements, requires its files,
16                      electronic systems and data to be maintained securely;

17              B.      Gallagher prohibits the removal or borrowing of Gallagher's property
                        without permission;
18
                C.      Gallagher restricts access to Gallagher's offices;
19
                D.      Gallagher restricts access to its computerized information, computer
20                      network, and computer through the use of passwords; and

21              E.      Gallagher requires its employees to sign several acknowledgements
                        and an agreement requiring its employees to maintain the
22                      confidentiality of its business and customer information and in order to
                        further maintain confidentiality, refrain from soliciting Gallagher's
23                      customers and employees upon departing Gallagher;

24     17.      Gallagher also rigorously maintains the confidentiality of its business

25 information because the information provides Gallagher a competitive advantage in the

26 marketplace from which Gallagher derives economic value.

27     18.      Gallagher's customer and business information is of great value to Gallagher

28 and would give any competitor of Gallagher who acquired that information an unfair competitive

6
COMPLAINT

1    advantage. A competitor could use Gallagher's information to unfairly identify potential

2    customers, unfairly bid for business against Gallagher, unfairly move business away from

3    Gallagher and unfairly gain knowledge of the procedures which result in the delivery of excellent

4    services and products.

5        19.      Gallagher has spent many years and has invested substantial resources

6    developing its member and business information and has invested considerable amounts of time,

7    money and effort in developing and maintaining a solid relationships with, and the goodwill of,

8    each of its participating clients and its potential clients. Gallagher enjoys long-standing,

9    prosperous relationships with its clients.

10       20.      Only as a result of his position at Gallagher, De La Torre received and was

11    given access to extensive confidential and proprietary information of the type described herein.

12                        **DE LA TORRE'S OBLIGATIONS OWED TO GALLAGHER**

13       21.      In October 1998, as a condition of, and as consideration for his employment by

14    Gallagher, and in order to protect both De La Torre's and Gallagher's interests in the

15    employment relationship, and to protect Gallagher's legitimate business interest in its

16    confidential and proprietary information and customer relationships, De La Torre was required

17    to, and did, sign Gallagher's Executive Agreement. A copy of that Agreement is attached hereto

18    at **Exhibit A**.

19       22.      De La Torre was also required to abide by and did acknowledge Gallagher's

20    Code of Business Conduct and Ethics. A copy of Gallagher's Code of Business Conduct and

21    Ethics is attached hereto as **Exhibit B**. A copy of De La Torre's signed acknowledgement of the

22    Code of Ethics is attached hereto as **Exhibit C**.

23       23.      De la Torre also signed and acknowledged receipt of keys to Gallagher's office

24    space and confidential files, as well as Gallagher's electronic information policy which prohibits

25    the disclosure of confidential information. A copy of each signed acknowledgment is attached

26    hereto as **Exhibit D.**

27       24.      Specifically, Exhibit A, the Executive Agreement De la Torre signed in 1998

28    provides, in part:

1
2
3
4
5
6

**Paragraph Five:** The Executive recognized that, by virtue of his employment by the Company and to assist him in the solicitation, production and servicing of accounts, he will be granted otherwise prohibited access to confidential and proprietary data of the Company which is not known either to its competitors or within the insurance agency and brokerage business generally and which has independent economic value to the Company...The Executive recognizes that this Confidential Information constitutes a valuable property of the Company, developed over a long period of time and at substantial expense. Accordingly, the Executive agrees that he will not, at any time during his employment by the Company, divulge such Confidential Information or make use of it for his own purposes or the purposes of another.

7
8
9
10
11

**Paragraph Six:** The Executive recognizes that by virtue of his employment by the Company, he will be afforded numerous and extensive resources to assist him in the solicitation, production and servicing of accounts. The Executive understands and agrees that all efforts that he expends in this regard shall be for the permanent benefit of the Company, that the Company shall secure and retain indefinitely the proprietary interest in all such accounts, and that the Executive will not undertake any action which could in any way disturb the Company's relationship with said accounts...

12
13
14
15
16
17
18
19
20
21

**Paragraph Thirteen.** A.    The Executive recognizes the highly sensitive nature of the Confidential Information to which he will have access during his employment, and acknowledges the Company's legitimate interest in safeguarding same from disclosure. Accordingly, the Executive agrees that, for a period of two (2) years following the termination of his employment for any reason whatsoever, he will not divulge the Company's Confidential Information or make use of it for his own purpose or the purpose of another. In addition, the Executive understands and agrees that for a period of two (2) years following the termination of his employment for any reason whatsoever, he will not, directly or indirectly, solicit, place, accept, aid, counsel or consult in the renewal, discontinuance or replacement of any insurance by, or handle self-insurance programs, insurance claims or other insurance administrative functions for, any existing Company account or any actively solicited prospective account of the Company for which he performed any of the foregoing functions during the two-year period immediately preceding such termination, if the loyal and complete fulfillment of his duties in connection with the performance of any of the foregoing functions would likely call upon the Executive to reveal, make judgments upon, or to otherwise use or divulge any of the Confidential Information or to otherwise violate any provision of this Agreement....

22   25.    Pursuant to his Executive Agreement with Gallagher, De La Torre was

23 prohibited from using or disclosing Gallagher's confidential and proprietary business and client

24 information. De La Torre was also prohibited from soliciting any of Gallagher's clients or

25 prospective clients, and from placing or accepting their insurance requirements. In addition, De

26 La Torre was required to return all Gallagher's confidential information upon his termination of

27 employment.

28

1    26.    Pursuant to the Executive Agreement, the Employee Handbook, Code of

2    Ethics, and other agreements, De La Torre was required to maintain the confidentiality of

3    Gallagher's information and not use such information for his own purposes.

4    ## DE LA TORRE'S EMPLOYMENT AT GALLAGHER

5    27.    De La Torre began his employment with Gallagher on or about October 5, 1998

6    as an Account Executive.  Prior to joining Gallagher, on information and belief, De La Torre had

7    never been responsible for selling insurance consisting of the type and extent of the programs

8    offered by Federal First.  Prior to joining Gallagher, De La Torre did not have access to

9    Gallagher's proprietary information.  Upon joining Gallagher, De La Torre was entrusted with

10   developing clients for the already existing Federal First program on behalf of Gallagher.

11   28.    During the course of De La Torre's employment, Gallagher financed a

12   computer purchase for De La Torre and funded his Blackberry service. De La Torre's computer

13   and Blackberry gave him access to Gallagher's computer network and he routinely stored

14   Gallagher's confidential information on the local hard drive and in his Blackberry.

15   29.    For more than nine years, De La Torre was given access to Gallagher's

16   proprietary information about its clients and he was provided with electronic files or printouts of

17   sales leads, inside information regarding Gallagher's current clients, their preferences, needs,

18   contact information, and history.

19   30.    De La Torre covered the entire United States and its territories and developed

20   relationships on behalf of Gallagher.  De La Torre learned about the needs and services that

21   Gallagher's could provide to participating ad prospective clients and learned confidential

22   information about each client's needs and preferences.

23   31.    While employed at Gallagher, De La Torre would hold seminars for

24   Gallagher's clients in order to inform members and/or prospective members and their spouses of

25   the products available to them through Gallagher.  In order to schedule, plan, and prepare for

26   these seminars for current and prospective clients, De La Torre utilized confidential and

27   proprietary information of Gallagher.

28

9
COMPLAINT

1        32.      De La Torre had confidential and proprietary information about Gallagher's

2  existing clients who receive benefits services under the Federal First program. De La Torre was

3  also in negotiations with many prospective clients in order to gain their business on behalf of

4  Gallagher. De La Torre had confidential and proprietary information with regard to these

5  potential clients in order to gain their business.

6        33.      On or about October 15, 2007, De La Torre resigned from Gallagher. In his

7  resignation letter, De La Torre acknowledged his obligations owed to Gallagher under the

8  Executive Agreement and company policies. A copy of De La Torre's email resignation is

9  attached hereto as **Exhibit E.** Upon giving notice, Gallagher reminded De La Torre of the

10  confidentiality obligations owed to Gallagher.

11        34.      Upon his resignation Gallagher attempted to work with De La Torre regarding

12  his requirement to help Gallagher transition his position to a new employee, but De La Torre did

13  not cooperate. De La Torre initially agreed to meet but then reneged on his agreement. A true

14  and correct copy of the correspondence between De la Torre and Dave Brown is attached hereto

15  as **Exhibit F.**

16        35.      In addition, upon his resignation, De La Torre continued to use his Blackberry

17  to access Gallagher's confidential and proprietary information, email programs, and servers,

18  among other things. Therefore, even though De La Torre understood and acknowledged his

19  obligation to abide by the terms of his Executive Employment and refrain from using Gallagher's

20  confidential and proprietary information, and solicit, contact, or confer with Gallagher's current

21  or prospective clients, De La Torre continued to do so.

22                       **EVENTS GIVING RISE TO THIS ACTION**

23        36.      Gallagher recently learned that De La Torre has become employed by Andreini.

24        37.      Since leaving Gallagher, De La Torre utilized or disclosed Gallagher's

25  confidential information about current clients and contacts in this niche market to solicit those

26  clients on behalf of Andreini, and for himself, in order to terminate Gallagher's contracts with

27  certain of Gallagher's contracts with certain existing clients and to persuade prospective clients

28  to sign contracts with Andreini. Specifically, De La Torre has utilized Gallagher's confidential

1 and proprietary information to target existing clients and persuaded them to terminate their

2 business with Gallagher and follow De La Torre to Andreini. De La Torre has also utilized

3 Gallagher's confidential and proprietary information to target Gallagher's prospective clients

4 who had not yet purchased coverage through Gallagher to follow De La Torre to Andreini.

5      38.     Specifically, De La Torre has utilized Gallagher's confidential and proprietary

6 information to unfairly target an existing client and succeeded in diverting the client's business

7 from Gallagher to Andreini, resulting in a estimated loss of $750,000.00 per year in business for

8 Gallagher.

9      39.     On October 25, 2007, Gallagher received an email from Aetna informing it that

10 Aetna received a "Broker of Record" letter from Gallagher's client, FLEOA. The Broker of

11 Record letter indicated that Andreini was named the broker of record for FLEOA immediately,

12 the effect of which was to terminate its insurance coverage with Gallagher, that it named De La

13 Torre through Andreini as its broker of record and that FLEOA will seek identical benefits and

14 coverage from Andreini. A copy of the related correspondence regarding the Broker of Record

15 letter is attached as hereto as **Exhibit G**.

16      40.     De La Torre has also inappropriately solicited Gallagher's prospective clients

17 in that De La Torre has used his personal cell phone number as the "contact" on a prospective

18 clients website, as opposed to a Gallagher contact number, thereby diverting any prospective

19 business from Gallagher to De La Torre and Andreini. A true and correct copy of the FLEOA

20 website page downloaded from the internet is attached hereto as **Exhibit H.**

21      41.     After leaving Gallagher, De La Torre continued inappropriately solicit

22 Gallagher's clients by going forward with informational seminars that De La Torre had planned

23 and scheduled while working for Gallagher. De La Torre is intending to conduct an educational

24 Retirement Financial Seminar with the U.S. Bankruptcy Court in Delaware that was scheduled

25 when he was still employed by Gallagher, in an effort to divert that business from Gallagher to

26 Andreini. In October 2007, De La Torre conducted similar educational seminars in Puerto Rico

27 and the Virgin Islands. Gallagher fully supported these seminars as part of its services to the

28 policy holder. Gallagher is informed and believes that De La Torre intends to conduct similar

1  seminars for the USBC scheduled for November and December 2007 in New Mexico also in an

2  effort to steal Gallagher's current and potential clients away from it.

3       42.      Gallagher is informed and believes that De La Torre has also utilized

4  Gallagher's confidential and proprietary information to target and inappropriately solicit at least

5  two existing clients who he serviced before leaving Gallagher to move their business to

6  Andreini, and has succeeded in persuading them to terminate their business with Gallagher and

7  follow De La Torre to Andreini, thereby illegally diverting business from Gallagher to Andreini

8  and De La Torre.

9       43.      Gallagher is not fully aware of the extent of De La Torre's wrongful contact

10  with its existing and prospective clients.

11       44.      After receiving De La Torre's resignation, Gallagher demanded that he comply

12  with his Executive Agreement, the confidentiality requirements therein and the requirement for a

13  fourteen (14) day transition period.  De La Torre initially agreed to meet with Gallagher on

14  October 18, 2007, but he reneged.  A copy of the related correspondence regarding Gallagher's

15  demand that De La Torre comply with the Executive Agreement and transition period required

16  thereunder is attached as hereto as **Exhibits I and J**.  De La Torre has yet to return the electronic

17  files and information, and is not authorized to access Gallagher's information.

18  45.      De La Torre and Andreini have not spent the time and resources to cull through

19  thousands of prospective clients to determine which federal agencies or associations are

20  amenable to the services Gallagher has to offer.  Instead, with little or no effort or cost, De La

21  Torre and Andreini utilized Gallagher's confidential information to identify current and

22  prospective clients of Gallagher and have and will steal those current and prospective clients that

23  are attractive targets to be moved to Andreini.

24       46.      On information and belief, current clients previously serviced by De La Torre

25  alerted Gallagher to De La Torre's solicitations.  On information and belief, De La Torre may be

26  misleading current clients regarding the services provided by Andreini as compared to Gallagher.

27       47.      An immediate temporary restraining order is necessary to enjoin De La Torre

28  and Andreini from their unlawful conduct.  As a result of Defendants' misappropriation of

1   Rewards' confidential and proprietary information, Gallagher has already had two or more

2   existing and prospective clients serviced by De La Torre before he left Gallagher terminate their

3   contracts with Gallagher by member votes to utilize Andreini for similar services and by the

4   "Broker of Record" letter indicating that Andreini, through De La Torre, is its broker of record.

5   Gallagher  has cultivated its relationships with its current and prospective clients and their

6   members over the years.  De La Torre and Andreini's conduct threatens to destabilize

7   Gallagher's stable and productive relationships with its existing and prospective clients.

8       48.    Gallagher has invested considerable time and money in the development of its

9   confidential and proprietary trade secret information which has been misappropriated by De La

10   Torre.  If De La Torre and Andreini are not immediately restrained as prayed for herein, De La

11   Torre and Andreini will have an immeasurable and unfair competitive advantage over Gallagher

12   and will be likely to improperly utilize the relationships and information about Gallagher's

13   existing and prospective clients for themselves.  In addition, if unrestrained, De La Torre and

14   Andreini threaten to continue to exploit the confidential and proprietary information of Gallagher

15   and to continue to cause the unfair cancellation and termination of contracts with Gallagher.

16   Further, unless De La Torre and Andreini are immediately restrained, the loss of goodwill that

17   Gallagher has engendered over the years with many of its existing and prospective clients will be

18   irreparably harmed.  De La Torre's breaches of his contractual and other duties to Gallagher, if

19   not enjoined, will cause Gallagher further damage.  Gallagher does not have an adequate remedy

20   at law.

21   **COUNT ONE**

22   **(Breach of Contract against De La Torre)**

23       49.    Gallagher repeats and realleges the allegations contained in paragraphs 1

24   through 48 above as if fully set forth herein.

25       50.    Upon his employment with Gallagher, De La Torre entered into several

26   agreements with Gallagher, including, but not limited to, the Executive Agreement and Code of

27   Ethics.

28

1    51.    De La Torre's agreements with Gallagher required him to maintain the

2    confidentiality of Gallagher's information, to not use Gallagher's property for any unauthorized

3    purpose, and to not use Gallagher's property without authorization or to return Gallagher's

4    property upon his termination.

5    52.    De La Torre's agreements with Gallagher also prohibited him from soliciting,

6    placing or accepting Gallagher's current or prospective clients upon his termination.

7    53.    Under the terms of De La Torre's agreements with Gallagher, all client

8    information and Gallagher's business information were to remain at all times the property of

9    Gallagher, were not to be accessed without authority and were to be returned to Gallagher.

10    54.    Under the terms of De La Torre's agreements with Gallagher, De La Torre was

11    required to provide fourteen (14) days written notice of termination, wherein during that fourteen

12    day transition period, De La Torre was obligated to cooperate fully with Gallagher in all matters

13    relating to the winding up of any pending work and the orderly transfer to other Gallagher

14    employees of the accounts and prospective account for which De La Torre was responsible.

15    55.    Gallagher has fully performed its duties to De La Torre.

16    56.    De La Torre's actions are a breach of his agreements with Gallagher.

17    57.    Gallagher has suffered or will suffer damages as a result of De La Torre's

18    actions in an amount to be determined at trial, and because its remedy at law is inadequate, seeks

19    temporary, preliminary, and permanent injunctive relief to recover and protect its property as

20    well as enjoin De La Torre from using its confidential information and from soliciting any

21    current or prospective client with whom he worked during his tenure at Gallagher.

22    58.    Pursuant to Exhibit A, the Executive Agreement, any breach of the contract by

23    De La Torre allows Gallagher to seek immediate injunctive relief and also attorneys' fees and

24    costs.

25    **COUNT TWO**

26    **(Breach of Implied Covenant of Good Faith and Fair Dealing against De La Torre)**

27    59.    Gallagher repeats and realleges the allegations contained in paragraphs 1

28    through 56 above as if fully set forth herein.

60.    The agreements between Gallagher, on the one hand, and De La Torre, on the other hand, contained an implied covenant of good faith and fair dealing. Such implied covenants obligated De La Torre to refrain from doing any act that would deprive Gallagher of the benefits of agreements or impede Gallagher from performing any or all of the conditions of the agreements that it agreed to perform.

61.    De La Torre has deprived Gallagher of the benefit of the agreements in that he, among other things, intentionally misappropriated Gallagher's confidential, proprietary and/or trade secret information as described above and threatens, among other things, to unfairly compete with Gallagher and to use such information for his own benefit and/or for the benefit of others, all to the detriment of Gallagher.

62.    As a direct and proximate result of the aforementioned acts, De La Torre has deprived Gallagher of a fundamental expected benefit of the agreements.

63.    As a proximate result of De La Torre's conduct as alleged herein, Gallagher has suffered actual and/or consequential damages in an amount to be proven at the time of trial, but which are in excess of the minimum jurisdictional amount of this Court.

64.    As a further proximate result of De La Torre's wrongful conduct, Gallagher has been injured, irreparably and otherwise, and is threatened with additional and on-going injuries as a result of De La Torre's breaches of the agreements.

65.    Because its remedy at law is inadequate, and because De La Torre agreed pursuant to the agreements that injunctive relief was appropriate in such situations, Gallagher also seeks, in addition to any other remedy available to it, temporary, preliminary, and permanent injunctive relief against De La Torre as described herein.

### COUNT THREE

**(Breach of Duty of Loyalty Under Cal. Labor Code §§ 2854 & 2859 against De La Torre)**

66.    Gallagher repeats and realleges the allegations contained in paragraphs 1 through 63 above as if fully set forth herein.

67.    By virtue of the employment relationship existing between Gallagher, on the one hand, and De La Torre, on the other hand, De La Torre owed to Gallagher, during the course

1  of his employment relationships, a duty of loyalty to act, at all times, in the best interests of

2  Gallagher.

3      68.      De La Torre breached the duty of loyalty that he owed to Gallagher by, among

4  other things, misappropriating confidential, proprietary and/or trade secret information from

5  Gallagher, and using that confidential, proprietary and/or trade secret information for the benefit

6  of himself and/or the benefit of others.

7      69.      As a proximate result of the breach of the duty of loyalty owed to Gallagher,

8  De La Torre has caused injuries and damages to Gallagher, all in an amount to be proven at the

9  time of trial, but which are in excess of the minimum jurisdictional amount of this Court.

10     70.      Gallagher is informed and believes, and based upon such information and belief

11 alleges, that at all times herein mentioned, the aforesaid conduct of De La Torre was intentional

12 and done with malice, fraud and oppression. Gallagher is further informed and believes, and

13 based upon such further information and belief alleges, that in engaging in the aforesaid conduct,

14 De La Torre knew that he was acting in breach of the duty of loyalty which he owed to his

15 employer, Gallagher. Nevertheless, as herein alleged, De La Torre intentionally, and with

16 conscious disregard for the rights of Gallagher, set upon a course of conduct which placed his

17 own interests above Gallagher's interests at a time when De La Torre was in Gallagher's employ.

18 As a consequence of this conduct, Gallagher is entitled to an award of punitive or exemplary

19 damages in an amount sufficient to punish or set an example of De La Torre.

20

21

22                            **COUNT FOUR**

23     **(Violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 *et seq.*,**

24                     **against De La Torre and Andreini)**

25     71.      Gallagher repeats and realleges the allegations contained in paragraphs 1

26 through 68 above as if fully set forth herein.

27

28

1    72.    Gallagher's computer system is a protected computer which is used across state

2  lines in interstate commerce, has Internet access across state lines and was used to transfer

3  Gallagher's information for sales in interstate commerce.

4    73.    At the time of De La Torre's and Andreini's improper activities detailed above,

5  De La Torre was not authorized by Gallagher to access its computer systems, access its

6  computerized information, assemble files, copy files, download files to disc, or continue to

7  possess Gallagher's electronic files and data or utilize its e-mail system and Internet access for

8  his personal gain or that of a competitor, and most certainly not after his voluntary resignation of

9  employment from Gallagher.

10    74.    Through these actions De La Torre and Andreini have:

11        A.    intentionally accessed a computer system without authorization or

12            exceeded the authority to obtain information from a protected computer in

13            violation of 18 U.S.C. § 1030(a)(2)(C);

14        B.    knowingly and with intent to defraud, accessed a protected computer

15            without authorization or exceeded the authority, and by means of such

16            conduct furthered the intended fraud and obtained valuable information

17            resulting in damages exceeding $5000.00 in violation of 18 U.S.C. §

18            1030(a)(4); or

19        C.    intentionally accessed a protected computer without authorization or

20            exceeded the authority, and, as a result of such conduct, caused damage in

21            violation of 18 U.S.C. § 1030(a)(5)(A)(iii).

22    75.    Gallagher has suffered damages as a result of De La Torre's actions in an

23  amount to be determined at trial and, because its remedy at law is inadequate, seeks injunctive

24  relief to recover and protect its information, its goodwill and other legitimate business interests.

25                    **COUNT FIVE**

26        **(Misappropriation of Trade Secrets, Cal. Civ. Code § 3426 *et seq.***

27            **against De La Torre and Andreini)**

28

1    76.    Gallagher repeats and realleges the allegations contained in paragraphs 1
2  through 73 above as if fully set forth herein.

3    77.    The confidential and proprietary business and client information entrusted to
4  De La Torre by Gallagher constitutes trade secrets because Gallagher derives independent
5  economic value from that information not being generally known to the public and not being
6  readily ascertainable by proper means by other persons who can obtain economic value from its
7  disclosure or use, and because the information was the subject of reasonable efforts to maintain
8  its secrecy.

9    78.    De La Torre was obligated by his agreements with Gallagher and by applicable
10  law to maintain the secrecy of that information.  Nonetheless, De La Torre breached these duties
11  to Gallagher by removing or utilizing this information from Gallagher and threatens to or has
12  disclosed this information to others.

13    79.    Andreini threatens to or has actually misappropriated Gallagher's trade secrets.
14  Andreini should know, has reason to know or knows that proprietary information that will be
15  supplied to Andreini or was supplied to Andreini by De La Torre was improperly acquired or
16  acquired without the consent of Gallagher.

17    80.    Andreini knows or should have known that information supplied to Andreini or
18  that will be supplied to Andreini by De La Torre was acquired under circumstances giving rise to
19  a duty to maintain its secrecy or is derived from a person having a duty to maintain its
20  confidentiality.

21    81.    Defendants have been or will be unjustly enriched by their misappropriation of
22  Gallagher's trade secrets, and, unless restrained, Defendants will continue to use, divulge,
23  threaten to and otherwise misappropriate Gallagher's trade secrets.

24    82.    On information and belief, Defendants' misappropriation of trade secrets have
25  been willful and malicious.

26    83.    Gallagher has been injured, irreparably and otherwise, and is threatened with
27  additional and on-going injuries as a result of Defendants' misappropriation of trade secrets, as
28  alleged above.

1    84.    Gallagher has suffered damages as a result of Defendants' actions in an amount

2    to be determined at trial, and because its remedy at law is inadequate, seeks temporary,

3    preliminary, and permanent injunctive relief to recover and protect its information, its goodwill

4    and other legitimate business interests.  Gallagher also seeks to recover from Defendants any

5    gains, profits and advantages Defendants have obtained as a result of their wrongful acts in an

6    amount to be determined and an award of treble damages and attorney's fees pursuant to

7    California Civil Code § 3426.3(c) and § 3426.4.

8                                          **COUNT SIX**

9              **(Common Law Unfair Competition against De La Torre and Andreini)**

10   85.    Gallagher repeats and realleges the allegations contained in paragraphs 1

11   through 82 above as if fully set forth herein.

12   86.    Defendants willfully undertook acts to gain an unfair competitive advantage

13   over Gallagher, with knowledge of and disregard for Gallagher's rights, and with the intention of

14   causing harm to Gallagher and benefiting each of themselves.

15   87.    Defendants are unfairly competing by utilizing Gallagher's confidential

16   information in the marketplace and/or soliciting Gallagher's current or prospective clients.

17   88.    As a result of Defendants' actions, Gallagher has been injured and faces

18   irreparable injury.  Gallagher is threatened with losing goodwill, clients and income in amounts

19   which may be impossible to determine unless Defendants are enjoined and restrained by order of

20   this Court, as alleged above.  Gallagher has no adequate remedy at law.

21                                        **COUNT SEVEN**

22             **(Unfair Business Practices Under Cal. Bus. & Prof. Code § 17200 *et seq.***

23                            **against De La Torre and Andreini)**

24   89.    Gallagher repeats and realleges the allegations contained in paragraphs 1

25   through 86 above as if fully set forth herein.

26   90.    Defendants willfully undertook unlawful and unfair acts to harm Gallagher,

27   with knowledge of and disregard of Gallagher's rights, and with the intention of causing harm to

28   Gallagher and benefiting De La Torre, Andreini and/or others.

1     91.    Defendants' conduct as alleged herein constitutes "unlawful," "unfair" and/or

2  "fraudulent" business practices in violation *California Business & Professions Code* Section

3  17200, *et seq.*

4     92.    As a proximate result of the above-mentioned acts, Gallagher has been injured

5  and faces irreparable injury.  Further, De La Torre and Andreini have been unjustly enriched in

6  an amount to be proven at the time of trial, but which are in excess of the minimum jurisdictional

7  amount of this Court, entitling Gallagher to restitution, disgorgement and/or equitable relief.

8     93.    By reason of Defendants' unfair and unlawful competition as alleged herein,

9  Gallagher is also entitled to a temporary restraining order as well as a preliminary and permanent

10  injunction against Defendants.

11                    **COUNT EIGHT**

12      **(Tortious Interference With Contractual Relationship Or Business Expectancy**

13                 **against De La Torre and Andreini)**

14     94.    Gallagher repeats and realleges the allegations contained in paragraphs 1

15  through 91 above as if fully set forth herein.

16     95.    On information and belief, Defendants individually or in concert with one

17  another had knowledge of Gallagher's contracts with its current clients or Gallagher's

18  expectancy that its current clients would continue to work with Gallagher.

19     96.    Gallagher has reasonably come to expect that its current clients will continue to

20  use its services and remain in its programs and Gallagher has invested substantial resources in

21  maintaining the relationships.

22     97.    Despite having knowledge of  the continuing obligations and expectancies,

23  Defendants individually or in concert with one another interfered with Gallagher's contracts or

24  the business expectancies of Gallagher by utilizing or disclosing Gallagher's confidential

25  information and by taking steps to move Gallagher's customers to Andreini.

26     98.    As a result of any of the Defendants' actions, Gallagher has been injured and

27  faces irreparable injury.  Gallagher is threatened with losing or has lost customers, income, value

28  of proprietary information and/or goodwill.

1

## COUNT NINE

2

**(Tortious Interference With Contractual Relationship against Andreini)**

3    99.    Gallagher repeats and realleges the allegations contained in paragraphs 1

4    through 96 above as if fully set forth herein.

5    100.    On information and belief, Andreini had knowledge of Gallagher's contracts

6    with De La Torre to maintain the confidentiality of Gallagher's proprietary information and to

7    return Gallagher's property.

8    101.    On information and belief, despite having knowledge of De La Torre's

9    continuing obligations, Andreini interfered with Gallagher's contracts by assisting or allowing

10   De La Torre to utilize or disclose Gallagher's confidential information, by assisting or allowing

11   De La Torre to move Gallagher's customers to Andreini or by assisting De La Torre to

12   improperly retain Gallagher's property.

13   102.    As a result of Andreini's actions, Gallagher has been injured and faces

14   irreparable injury.  Gallagher is threatened with losing or has lost clients, income, value of

15   proprietary information and/or goodwill.

16

17

18

19

## COUNT TEN

20

**(Conversion against De La Torre)**

21   103.    Gallagher repeats and realleges the allegations contained in paragraphs 1

22   through 100 above as if fully set forth herein.

23   104.    De La Torre wrongfully removed from Gallagher or has improperly retained

24   property (information and electronic files) without authorization, and converted it to his own use.

25   105.    Gallagher has demanded from De La Torre the return of its property through its

26   Executive Agreement, Code of Ethics, other agreements, by written correspondence and orally.

27   106.    De La Torre has failed to return to Gallagher its property.

28

1     107.    As a direct and proximate result of De La Torre's actions, Gallagher has been

2   damaged.

3     108.    Gallagher has suffered damages as a result of De La Torre's actions in an

4   amount to be determined at trial, and because its remedy at law is inadequate, seeks temporary,

5   preliminary, and permanent injunctive relief to recover and protect its property. Because De La

6   Torre's actions have been willful, malicious, outrageous, oppressive or done in complete

7   disregard of the consequences they might have upon Gallagher, the award of exemplary and

8   punitive damages in an amount to be proven at trial are proper.

9                              **PRAYER FOR RELIEF**

10        WHEREFORE, Plaintiff, Gallagher Benefit Services seeks judgment in its favor and an

11   Order granting the following relief:

12    1.    That De La Torre, Andreini, and all parties in active concert or participation with

13          them be temporarily, preliminarily and permanently enjoined from using or

14          disclosing any information De La Torre obtained from Gallagher, including but

15          not limited to, current and prospective client contact information, contract dates,

16          contract terms, agreed to percentages and the current business plans to be rolled

17          out;

18    2.    That De La Torre, Andreini, and all parties in active concert or participation with

19          them be enjoined and ordered to return to Gallagher all originals and electronic

20          formats of all copies of files, data and information removed from Gallagher or in

21          their possession, including, but not limited to, all information in electronic format;

22    3.    That De La Torre be enjoined and ordered to provide a sworn statement and

23          accounting of the whereabouts of all files, data and information removed from

24          Gallagher or possessed by De La Torre, including, but not limited to, all

25          information maintained in an electronic or hard copy format;

26    4.    That De La Torre and Andreini be enjoined and ordered to produce for inspection

27          and imaging all computers belonging to, under the control of, accessible to, or

28

1   operated by De La Torre to verify the use, disclosure, printing, copying and return

2   of Gallagher's information;

3   5.   That De La Torre and Andreini be enjoined for a period of two years from

4   conducting business with all clients of Gallagher or potential clients with whom

5   De La Torre conducted business or attempted to conduct business during the

6   twenty-four months preceding his departure from Gallagher;

7   6.   That De La Torre and Andreini rescind all existing "Broker of Record" letters

8   with all clients of Gallagher.

9   7.   That De La Torre be forced to return to Gallagher and conduct a transition with

10   Gallagher personnel as required by his Executive Agreement with Gallagher or

11   otherwise submit to an expedited deposition to fulfill his obligations under the

12   agreement;

13   8.   That Gallagher be awarded compensatory damages to be proven at trial;

14   9.   That Gallagher be awarded exemplary or punitive damages in an amount to be

15   proven at trial sufficient to punish or set an example of De La Torre and Andreini;

16   10.   That Gallagher be awarded treble damages pursuant to the misappropriation of

17   trade secrets statute;

18   11.   That De La Torre and Andreini be ordered to disgorge all monies paid to De La

19   Torre and Andreini during the time he was breaching his duties to Gallagher and

20   all monies received as a result of those breaches;

21   12.   That Gallagher be awarded its attorneys' fees pursuant to the misappropriation of

22   trade secrets statute and as allowed by law;

23   13.   That Gallagher be awarded its attorneys' fees and costs pursuant to the terms of

24   the Executive Agreement;

25   14.   That Gallagher be awarded costs of suit incurred herein; and

26   15.   That the Court grant such further relief as the Court deems just.

27

28

1 | DATED: October 29, 2007

SEYFARTH SHAW LLP

2

3

By_____

Robert S. Niemann

4

Althea V. Bovell

Krista L. Mitzel

5

Attorneys for Plaintiff

6

GALLAGHER BENEFIT SERVICES, INC.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT

1

## DEMAND FOR JURY TRIAL

2      Pursuant to Fed. R. Civ. Proc. 38(b) and Local Civil Rule 3-6, Plaintiff Gallagher Benefit

3    Services demands a trial by jury.

4    DATED: October 29, 2007                    SEYFARTH SHAW LLP

5

6                                              By_____
                                                    Robert S. Niemann
7                                                    Althea V. Bovell
                                                    Krista L. Mitzel
8
                                               Attorneys for Plaintiff
9                                              GALLAGHER BENEFIT SERVICES, INC.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

25

## EXECUTIVE AGREEMENT

This AGREEMENT is made and entered into as of the 5th day of OCTOBER , 1998, by and between    Jim De La Torre      (hereinafter referred to as the "Executive") and ARTHUR J. GALLAGHER & CO. ("Corporation"), its subsidiaries, divisions and affiliated and related companies (hereinafter collectively referred to as the "Company").

IN CONSIDERATION of the mutual covenants hereinafter made by each party to the other, the Executive and the Company agree as follows:

### EMPLOYMENT AND REMUNERATION

**Paragraph One.** The Company agrees to employ and to continue to employ the Executive in accordance with the terms of this Agreement. Such employment shall include the sales and servicing of accounts and prospective accounts of Company. Company shall provide Executive with access to the resources and data of the Company to assist Executive in such sales and servicing activities.

**Paragraph Two.** The Company agrees that the Executive shall be entitled to the semi-monthly payment of compensation, an annual paid vacation, and various employee benefit plans. It is understood and agreed that the Company may from time to time modify the specific terms and conditions of these entitlements.

**Paragraph Three.** The Company agrees that the Executive shall be entitled to reimbursement for traveling, entertainment and other expenses reasonably incurred by the Executive in the performance of his employment obligations and responsibilities. It is understood and agreed that the Company's liability in this regard shall be limited by the terms and conditions of the Company policy in effect on the date that the expense is incurred.

### FIDUCIARY OBLIGATIONS
### OF THE EXECUTIVE

**Paragraph Four.** The Executive agrees to devote his full energies, abilities, attention and business time to the performance of his employment obligations and responsibilities. The Executive further agrees that he will not engage in any activity which conflicts or interferes with, or in any way compromises, his performance of those obligations and responsibilities.

**Paragraph Five.** The Executive recognizes that, by virtue of his employment by the Company and to assist him in the solicitation, production and servicing of accounts, he will be granted otherwise prohibited access to confidential and proprietary data of the Company which is not known either to its competitors or within the insurance agency and brokerage business generally and which has independent economic value to the Company. This information (hereinafter referred to as "Confidential Information") includes, but is not limited to: data relating to the Company's unique marketing and servicing programs, procedures and techniques; business, management and personnel strategies; the criteria and formulae used by the Company in pricing its insurance products and claims management, loss control and information management services;

the structure and pricing of special insurance packages that the Company has negotiated with various underwriters; lists of prospects; the identity, authority and responsibilities of key contacts at Company accounts; the composition and organization of accounts' businesses; the peculiar risks inherent in their operations; highly sensitive details concerning the structure, conditions and extent of their existing insurance coverages; policy expiration dates; premium amounts; commission rates; risk management service arrangements; loss histories; and other data showing the particularized insurance requirements and preferences of the accounts. The Executive recognizes that this Confidential Information constitutes a valuable property of the Company, developed over a long period of time and at substantial expense. Accordingly, the Executive agrees that he will not, at any time during his employment by the Company, divulge such Confidential Information or make use of it for his own purposes or the purposes of another.

**Paragraph Six.** The Executive recognizes that by virtue of his employment by the Company, he will be afforded numerous and extensive resources to assist him in the solicitation, production and servicing of accounts. The Executive understands and agrees that all efforts that he expends in this regard shall be for the permanent benefit of the Company, that the Company shall secure and retain indefinitely the proprietary interest in all such accounts, and that the Executive will not undertake any action which could in any way disturb the Company's relationship with said accounts.

## TERMINATION OF
## EMPLOYMENT RELATIONSHIP

**Paragraph Seven.** The Executive and the Company understand and agree that each has the right, upon fourteen (14) days' written notice (hereinafter referred to as the "Notice Period"), to terminate the employment relationship for any reason whatsoever. The Company may, at its option, pay the Executive for the Notice Period in lieu of active employment during the Notice Period. It is further agreed that Company may terminate such employment without any notice in the event Executive breaches this Agreement, commits any dishonest or fraudulent act or is unable to lawfully perform his duties hereunder.

**Paragraph Eight.** The Company agrees to continue in effect during the Notice Period the compensation and benefits to which the Executive may be entitled under Paragraphs One, Two and Three of this Agreement. It is understood and agreed that at the expiration of the Notice Period, the Executive's entitlement to the remuneration described in the aforementioned three (3) paragraphs shall cease.

**Paragraph Nine.** The Executive agrees that during the Notice Period, he will cooperate fully with the Company in all matters relating to the winding up of any pending work and the orderly transfer to other Company employees of the accounts and prospective accounts for which he has most recently been responsible. The Executive further agrees that, during the Notice Period (whether or not active employment continues during the Notice Period), Executive's fiduciary duties to Company shall remain in effect.

**Paragraph Ten.** The Executive agrees that, prior to the expiration of the Notice Period, he will return to the Company all literature, correspondence, memoranda, reports, summaries,

manuals, proposals, contracts and other documents of any kind which relate in any way to the business of the Company, including specifically all materials which comprise or refer to the Company's Confidential Information. It is understood and agreed that the Executive will not retain any copy, facsimile or note intended to memorialize any such data.

**Paragraph Eleven.** The Executive understands and agrees that, during or at the expiration of the Notice Period, he will attend any meeting the Company may convene to: (i) review the status of accounts for which the Executive has most recently been responsible; (ii) ensure that the Executive has fully obtained his entitlements under this Agreement; and/or (iii) confirm that the Executive clearly understands the nature and scope of his post-employment obligations.

## POST-EMPLOYMENT OBLIGATIONS
## OF THE PARTIES

**Paragraph Twelve.** The Company agrees that the Executive, upon the termination of his employment, shall be entitled to such severance pay, if any, as may then be provided for under the Company's personnel policies. It is understood and agreed that the Company may, in its discretion, increase both the amount of severance pay due the Executive, and the time period for distributing same.

### Paragraph Thirteen.

A.       The Executive recognizes the highly sensitive nature of the Confidential Information to which he will have access during his employment, and acknowledges the Company's legitimate interest in safeguarding same from disclosure. Accordingly, the Executive agrees that, for a period of two (2) years following the termination of his employment for any reason whatsoever, he will not divulge the Company's Confidential Information or make use of it for his own purpose or the purpose of another. In addition, the Executive understands and agrees that for a period of two (2) years following the termination of his employment for any reason whatsoever, he will not, directly or indirectly, solicit, place, accept, aid, counsel or consult in the renewal, discontinuance or replacement of any insurance by, or handle self-insurance programs, insurance claims or other insurance administrative functions for, any existing Company account or any actively solicited prospective account of the Company for which he performed any of the foregoing functions during the two-year period immediately preceding such termination, if the loyal and complete fulfillment of his duties in connection with the performance of any of the foregoing functions would likely call upon the Executive to reveal, make judgments upon, or to otherwise use or divulge any of the Confidential Information or to otherwise violate any provision of this Agreement.

B.       The Executive recognizes that employees of the Company are a valuable resource of the Company. Accordingly, the Executive agrees that, for a period of two (2) years following the termination of his employment for any reason whatsoever, he will not, directly or indirectly, solicit, induce or recruit any employee of the Company to leave the employ of the Company.

3

**Paragraph Fourteen.** Notwithstanding anything contained herein to the contrary, the Post-Employment obligations of the Executive contained in Paragraph Thirteen shall become null and void and have no further effect immediately upon a Hostile Change in Control of the Corporation as defined herein. The Company shall send written notice to the Executive within ten (10) days of a Hostile Change in Control of the Corporation, notifying the Executive that such event has taken place. Failure of the Company to send such notice shall not preclude the release of the Executive from the Post-Employment Obligations contained in Paragraph Thirteen. For the purposes of this Paragraph Fourteen, the following definitions apply:

A.     The term "Hostile Change in Control" means a transaction, event or election constituting a Change in Control, which was not approved by, or, in an election, the directors elected were not nominated by, at least two-thirds of the members of the Board of Directors of the Corporation in office immediately prior to the Change in Control who have not died or become permanently disabled.

B.     The term "Change in Control" of the Corporation means and includes each and all of the following occurrences:

1.     A Business Combination, unless:

(a)     the Business Combination is approved or authorized by the affirmative vote of the holders of not less than 80% of the outstanding shares of voting stock of the Corporation and the affirmative vote of the holders of not less than 67% of the outstanding shares of the voting stock held by shareholders other than Related Persons; or

(b)     the Continuing Directors of the Corporation by a two-thirds vote (i) have expressly approved in advance the acquisition of outstanding shares of voting stock of the corporation that caused the Related Person to become a Related Person, or (ii) have approved the Business Combination prior to the Related Person involved in the Business Combination having become a Related Person; or

(c)     the Business Combination is solely between this corporation and another corporation, 50% or more of the voting stock of which is owned by the Corporation and none of which is owned by the Related Person; or

(d)     all of the following conditions are satisfied:

(i)     The cash or fair market value of the property, securities or "other consideration to be received" per share by holders of common stock in the Corporation in the Business Combination is not less than the higher of:

4

(A)    the highest per share price (including brokerage commissions, transfer taxes and soliciting dealers' fees) paid by the Related Person in acquiring any of its holdings of the Corporation's common stock, or

(B)    an amount that bears that same percentage relationship to the market price of the Corporation's common stock immediately prior to the announcement of such Business Combination as the highest per share price determined in (A) above bears to the market price of the Corporation's common stock immediately prior to the commencement of the acquisition of the Corporation's voting stock that caused such Related Person to become a Related Person, or

(C)    an amount calculated by multiplying the earnings per share of the Corporation's common stock for the four fiscal quarters immediately preceding the record date for determination of stockholders entitled to vote on such Business Combination by the price/earnings multiple of the Related Person as of the record date as customarily computed and reported in the financial press.

Appropriate adjustments shall be made with respect to (A), (B) and (C) above for recapitalizations and for stock splits, stock dividends, and like distributions; and

(ii)    A timely mailing shall have been made to the stockholders of the Corporation containing in a prominent place (x) any recommendations as to the advisability (or inadvisability) of the Business Combination that the Continuing Directors or Outside Directors may choose to state, if there are at the time any such directors, and (y) the opinion of a reputable nationally recognized investment banking or financial services firm as to the fairness from the financial point of view of the terms of the Business Combination to the stockholders of the Corporation other than the Related Person (such firm to be engaged solely on behalf of such other stockholders, to be paid a reasonable fee for its services by the Corporation upon receipt of such opinion, to be a firm that has not previously been significantly associated with the Related Person and, if there are at the time any such directors, to be selected by a majority of the Continuing Directors and Outside Directors).

2.    The acquisition of outstanding shares of the Corporation's voting stock that causes an individual, a corporation, partnership or other person or entity to become a Related Person.

3.    Individuals who at the beginning of any period of three consecutive years constitute the entire Board of Directors of the Corporation shall for any

5

reason other than death or permanent disability during such period cease to constitute a majority thereof.

4.      A change in control of a nature that would be required to be reported in response to Item 6(e) of Schedule 14A of Regulation 14A promulgated under the Securities Act of 1934, as amended.

C.      The term "Business Combination" shall mean (i) any merger or consolidation of the Corporation or a subsidiary of the Corporation with or into a Related Person, (ii) any sale, lease, exchange, transfer or other disposition, including without limitation a mortgage or any other security device, of all or any Substantial Part of the assets either of the Corporation (including without limitation any voting securities of a subsidiary) or of a subsidiary, to a Related Person, (iii) any merger or consolidation of a Related Person with or into the Corporation or a subsidiary of the Corporation, (iv) any sale, lease, exchange, transfer or other disposition of all or any Substantial Part of the assets of a Related Person to the Corporation or a subsidiary of the Corporation, (v) the issuance of any securities of the Corporation or a subsidiary of the Corporation to a Related person, (vi) the acquisition by the Corporation or a subsidiary of the Corporation of any securities issued by a Related Person, (vii) any reclassification of securities, recapitalization or other transaction designed to decrease the number of holders of the Corporation's voting securities remaining, if there is a Related Person, and (viii) any agreement, contract or other arrangement providing for any of the transactions described in this definition of Business Combination.

D.      The term "Related Person" shall mean and include any individual, corporation, partnership or other person or entity which, together with their "Affiliates" and "Associates" (as defined as of November 1, 1983, in Rule 12b-2 under the Securities Exchange Act of 1934), "Beneficially Owns" (as defined as of November 1, 1983, in Rule 13d-3 under the Securities Exchange Act of 1934) in the aggregate 20% or more of the outstanding shares of the voting stock of the Corporation, and any Affiliate or Associate of any such individual, corporation, partnership or other person or entity; provided that Related Person shall not include any person who beneficially owned 20% or more of the outstanding shares of the voting stock of the Corporation on November 1, 1983. Without limitation, any shares of voting stock of the Corporation that any Related Person has the right to acquire pursuant to any agreement, or upon exercise of conversion rights, warrants or options, or otherwise, shall be deemed beneficially owned by the Related Person.

E.      The term "Substantial Part" shall mean more than 30% of the fair market value of the total assets of the corporation in question, as of the end of its most recent fiscal year ending prior to the time the determination is being made.

F.      The term "other consideration to be received" shall include, without limitation, capital stock of the Corporation retained by its existing public stockholders in the event of a Business Combination in which the Corporation is the surviving corporation.

G.      The term "Continuing Director" shall mean a director who was a member of the board of directors of the Corporation immediately prior to the time that the Related Person

6

involved in a Business Combination became a Related Person, and the term "Outside Director" shall mean a director who is not (a) an officer or employee of the Corporation or any relative of an officer or employee or (b) a Related Person or an officer, director, employee, Associate or Affiliate of a Related Person, or a relative of any of the foregoing.

### ENFORCEMENT

**Paragraph Fifteen.** The Executive and the Company understand and agree that any breach or evasion of any term of this Agreement will give rise to an action for breach of contract, which may be brought in any court of competent jurisdiction.

**Paragraph Sixteen.** The Executive recognizes that the services provided by him pursuant to this Agreement are of a special, unique and extraordinary character. The Executive further recognizes that a breach of the covenants of Executive set forth in Paragraph Thirteen (A) hereof will result in losses that cannot be reasonably estimated or easily calculated by either Executive or Company and may further result in future losses which cannot be adequately compensated for by damages. In recognition of the foregoing, the Executive agrees that:

A. In the event of a breach of the covenants of Executive referred to above which results in the loss of a customer or account that produced commission or fee revenues to the Company, Executive shall pay Company, as liquidated damages for, and as a reasonable forecast of, such loss, an amount equal to one hundred thirty-five percent (135%) of such revenues derived by Company attributable to such lost customer or account in the one year immediately preceding the date of breach, payable upon demand by Company;

B. In the event of a breach of the covenants of Executive referred to above which results in Executive or any person, corporation or other entity affiliated with Executive ("Executive's Affiliates") receiving commission or fee revenues attributable to an actively solicited prospective account of the Company, Executive shall pay Company, as liquidated damages and as received, forty-five percent (45%) of such revenues received by Executive or by Executive's Affiliates during the three (3) year period following the date of the first receipt of such revenues attributable to such prospective account of the Company; and

C. In the event of a breach or threatened breach of the covenants of Executive referred to above, the Company shall be entitled to equitable relief, including a temporary restraining order and preliminary and permanent injunctive relief to prevent a future breach of such covenants.

**Paragraph Seventeen.** This Agreement shall be governed by and construed in accordance with the laws of the State of California.

**Paragraph Eighteen.** The provisions of this Agreement are intended to be interpreted and construed in a manner which makes such provisions valid, legal and enforceable. In the event any provision of this Agreement is found to be partially or wholly invalid, illegal or unenforceable, such provision shall be modified or restricted to the extent and in the manner necessary to render

7

such provision valid, legal and enforceable. It is expressly understood and agreed between the parties that this modification or restriction may be accomplished by mutual accord between the parties or, alternatively, by disposition of a court of law. If such provision cannot under any circumstances be so modified or restricted, it shall be excised from this Agreement without affecting the validity, legality or enforceability of any remaining provisions.

**Paragraph Nineteen.** The Executive understands and agrees that, in the event of his breach of this Agreement, he shall be liable for any attorneys' fees and costs incurred by the Company in enforcing its rights hereunder. The Executive further agrees that, in the event of a breach of the provisions of Paragraph Thirteen, the time period specified in such paragraph shall be extended by the number of days between the date of such breach and the date such breach is enjoined or other relief is granted the Company by a court of competent jurisdiction. It is the intention of the parties that the Company shall enjoy the faithful performance by Executive of the covenants specified in said paragraph for the full time period specified therein.

## MISCELLANEOUS

**Paragraph Twenty.** Except as hereinafter provided, this Agreement supersedes all existing Company policies, and all previous agreements between the parties, to the extent that such policies and agreements consider subject matters herein addressed. Any and all prior covenants entered into by Executive for the benefit of Company and relating to restrictions on Executive's business activities after termination of employment with Company remain in full force and effect. Company, however, agrees that the contingent release of Post-Employment obligations contemplated by Paragraph Fourteen shall apply with like force and effect to any such prior covenants.

**Paragraph Twenty-One.** This Agreement shall inure to the benefit of and shall be binding upon the successors and assigns of the Company and may be enforced by any subsidiary of the Company for whom Executive has provided services hereunder.

**Paragraph Twenty-Two.** As used in this Agreement, all terms of masculine gender shall be construed, where appropriate, to be of the feminine gender.

## ACKNOWLEDGEMENT

The Executive and the Company, by its designated representative, hereby acknowledge that they have read and understand each of the provisions of this Agreement, that they have executed

**8**

his Agreement voluntarily and with full knowledge of its significance, and that they intend to be fully bound by the same.

**THE EXECUTIVE**

**ARTHUR J. GALLAGHER & CO.**

Vice President

Witness:

Attest:

Carl E. Fasig
Secretary

**9**

## CODE OF BUSINESS CONDUCT AND ETHICS

### ARTHUR J. GALLAGHER & CO.

This Code of Business Conduct and Ethics applies to all of the employees, officers and directors of Arthur J. Gallagher & Co. and its subsidiaries. Any employee or officer who violates the letter or spirit of these policies is subject to disciplinary action, up to and including termination of employment.

Every employee, officer and director has the responsibility to obey the law and act honestly and ethically. To that end, this Code of Business Conduct and Ethics is a guide that is intended to sensitize employees, officers and directors to significant legal and ethical issues that arise frequently and to the mechanisms available to report illegal or unethical conduct. It is not, however, a comprehensive document that addresses every legal or ethical issue that an employee, officer or director may confront, nor is it a summary of all laws and policies that apply to Gallagher's business. Ultimately, no code of business conduct and ethics can replace the thoughtful behavior of an ethical employee, officer or director.

Please read this Code of Business Conduct and Ethics carefully and consider how the provisions relate to your daily business interactions. Each employee, officer and director should also read and be familiar with the portions of our other company policies applicable to such employee, officer and director, none of which are a part of this Code of Business Conduct and Ethics.

Any questions you may have on this Code of Business Conduct and Ethics or its administration should be referred to your immediate supervisor or a member of the Legal Department. No one at Arthur J. Gallagher & Co. has the authority to make exceptions to these policies, other than our Board of Directors.

## I.    COMPLIANCE WITH LAWS, RULES AND REGULATIONS

All employees, officers and directors must comply fully with all applicable foreign, federal, state and local laws, rules and regulations that govern Gallagher's business activities and conduct, including, without limitation, antitrust laws, employee health and safety laws, insider trading laws, the Foreign Corrupt Practices Act and any applicable trade restrictions, export controls, or antiboycott laws and regulations. All governmental inquiries or investigations must be referred to our Legal Department. It is our policy to fully cooperate with any governmental or regulatory investigation, and all employees, officers and directors are expected to fully cooperate with any internal or external investigations. Since the laws governing our activities are often complex, any questions that you may have regarding their applicability and interpretation, should, after review with your supervisor, be referred to our Legal Department.

In general, employees, officers and directors who have access to, or knowledge of, material nonpublic information from or about our company are prohibited from buying, selling or otherwise trading in our company's stock or other securities. "Material nonpublic" information includes any information, positive or negative, that has not yet been made available or disclosed

to the public and that might be of significance to an investor, as part of the total mix of information, in deciding whether to buy or sell stock or other securities.

Such insiders also are prohibited from giving "tips" on material nonpublic information, that is directly or indirectly disclosing such information to any other person, including family members, relatives and friends, so that they may trade in our stock or other securities. Furthermore, if, during the course of your service with our company, you acquire material nonpublic information about another company, such as one of our customers or suppliers, or you learn that we are planning a major transaction with another company (such as an acquisition), you are restricted from trading in the securities of the other company as well as ours.

Such "insider trading" is both unethical and illegal, with criminal penalties of up to $5 million and a jail term of up to 20 years and civil penalties of up to three times the illegal profit gained or loss avoided.

Please refer to our Insider Trading Policy for a more complete description of our company's policies on insider trading which can be found on our web portal.

## II.    CONFLICTS OF INTEREST

Business decisions must be made in the best interest of our company, not motivated by personal interest or gain. Therefore, as a matter of Gallagher policy, all employees, officers and directors must avoid any actual or perceived conflict of interest.

A "conflict of interest" occurs when an individual's personal interests interfere or conflict in any way (or even appear to interfere or conflict) with the interests of our company. A conflict of interest situation can arise when an employee, officer or director takes actions or has interests (financial or other) that may make it difficult to perform his or her company work objectively and effectively. Conflicts of interest also may arise when an employee, officer or director, or a member of his or her family, receives improper personal benefits as a result of his or her position in Gallagher, regardless of whether such benefits are received from us or a third party. Loans to, or guarantees of obligations of, employees, officers and directors and their respective family members are of special concern. Federal law currently prohibits Gallagher from making loans to directors and executive officers.

It is difficult to identify exhaustively what constitutes a conflict of interest. For this reason, employees, officers and directors must avoid any situation in which their independent business judgment might appear to be compromised. Questions about potential conflicts of interest situations, and disclosure of these situations as they arise, should be addressed and reported to the Legal Department.

## III.    ACCURATE ACCOUNTING AND PUBLIC DISCLOSURE

The accurate and full recording of company business activities is essential to our ability to fulfill our financial and legal obligations. Under no circumstances should you alter any business record or destroy any records except in conformity with our policy on records retention.

2

Financial transactions are to be recorded in accordance with generally accepted accounting principles and applicable governmental rules and regulations. You are expected to comply fully with internal accounting and audit policies and procedures designed to protect the integrity of our corporate records and are also to cooperate with the Accounting Department and internal and external auditors.

All employees, officers and directors are encouraged to report any concerns that they may have regarding the accounting, internal accounting controls, or auditing matters of the company directly to the Audit Committee. All submissions by employees of concerns regarding questionable accounting or auditing matters will be received by the Audit Committee on a confidential and anonymous basis. We want to assure all of our employees, officers and directors that they have no need to fear retaliation or retribution for having acted in good faith in reporting their concerns.

As a result of our status as a public company, Gallagher is required to file periodic and other reports with the Securities and Exchange Commission. Gallagher takes its public disclosure responsibility seriously to ensure that these reports and other public communications furnish the marketplace with full, fair, accurate, timely and understandable disclosure regarding the financial and business condition of the company.

## IV.     CONFIDENTIALITY

Employees, officers and directors must maintain the confidentiality of all information entrusted to them by us, our clients or suppliers, or others with whom we may conduct business, except when disclosure of such information is specifically authorized by our Legal Department or required as a matter of law. Confidential information includes all non-public information that might be of use to competitors, or harmful to us or our clients, if disclosed.

## V.     PROTECTION AND PROPER USE OF COMPANY ASSETS

All employees, officers and directors must protect our assets and ensure their efficient use. Such assets include, without limitation, intellectual property such as the Gallagher name, logos, trademarks, patents, copyrights, confidential information, ideas, plans and strategies. Theft, carelessness and waste have a direct impact on our profitability. All company assets must be used for legitimate business purposes. Any misuse or infringement of our assets should be reported to the Legal Department.

## VI.     CORPORATE OPPORTUNITIES

Employees, officers and directors are prohibited from: (a) taking for themselves personally opportunities that properly belong to the company or are discovered through the use of corporate property, information or position; (b) using corporate property, information or position for personal gain; and (c) competing with the company. Employees, officers and directors owe a duty to the company to advance its legitimate interests when the opportunity to do so arises. Any questions as to the appropriateness of the conduct of any employee, officer or director should be brought to the attention of the Legal Department immediately.

3

## VII.    FAIR DEALING

Each employee, officer and director must endeavor to deal fairly and in good faith with our customers, suppliers, competitors, stakeholders and employees. No employee, officer or director shall take unfair advantage of anyone through manipulation, concealment, abuse of privileged information, misrepresentation of material facts or any other unfair dealing practices.

## VIII.   EQUAL EMPLOYMENT OPPORTUNITY AND HARASSMENT

Through specific policies issued by our Human Resource Department, we strive to select, place and work with all our employees and officers without discrimination based on race, color, national origin, gender, age, religion, disability, veteran's status, or actual or perceived sexual orientation. Equal opportunity is one of our firmest and most basic beliefs. Please see the Company's Human Resources Manual for a fuller description of the Company's Equal Employment Opportunities, Anti-Discrimination and Americans With Disabilities Act policies.

Further, it is the responsibility of each of us to help the company provide a work atmosphere free of harassing, abusive, disrespectful, disorderly, disruptive or other nonprofessional conduct. Sexual harassment in any form, verbal or physical, by any employee, officer or director will not be tolerated. It is also a violation of our policy to retaliate against anyone who in good faith complains about harassing behavior or participates in an investigation. A violation of the Company's harassment policy will be treated with appropriate discipline, up to and including termination of employment. Please see the Company's Sexual Harassment policy found in the Company's Human Resources Manual for further details.

## IX.    REPORTING VIOLATIONS AND COMPLIANCE

All of our employees, officers and directors have a duty to adhere to this Code of Business Conduct and Ethics. It is our intention to enforce the policies expressed in this Code of Business Conduct and Ethics. If confronted with an ethical question, employees are strongly urged to discuss this matter either with their supervisor or the Human Resources Department. As discussed in Section III of this Code of Business Conduct and Ethics, concerns regarding questionable accounting or auditing matters should be brought to the attention of the Audit Committee. We will respect the confidentiality of all such discussions, and we further want to assure all of our employees, officers and directors that they need have no fear of retaliation or retribution for having acted in good faith in calling unethical conduct to the attention of our management.

All allegations will be investigated by the proper corporate, business unit or department personnel, and, upon the advice and approval of the Legal Department, will be reported to the appropriate authorities. In order to facilitate implementation of this Code of Business Conduct and Ethics, employees, officers and directors have a duty to cooperate fully with the investigation process and to maintain the confidentiality of investigative information unless specifically authorized to disclose such information.

4

Employees, officers and directors who provide information to or assist in any investigation or proceeding by the Company, federal governmental or law enforcement agency regarding any alleged violation of fraud laws or SEC rules and regulations will not be subject to retaliatory action for their cooperation in such matters. It is a violation of this policy and federal law for any employee, officer or director to retaliate against an employee because the employee provides such cooperation. Any employee who believes he or she has been the subject of retaliation should report the matter to his or her supervisor or the Human Resources Department. If the employee's manager is involved in the alleged retaliation, the employee should contact the Human Resources Department directly.

Employees, officers or directors who fail to comply with the standards of behavior that we have described in this booklet are subject to disciplinary action that may include termination of service, referral for criminal prosecution, and reimbursement to Arthur J. Gallagher & Co. for any losses or damages resulting from the violation. Discipline may also be imposed for conduct that is considered unethical or improper even if the conduct is not specifically covered by our Code of Business Conduct and Ethics.

No code or set of values can address every ethical choice we face in business; no communication system or oversight group can ensure complete compliance. Each of us must use good common sense and judgment in our personal conduct.

## X.    AMENDMENT, MODIFICATION AND WAIVER

This Code of Business Conduct and Ethics may be amended, modified or waived by the Board of Directors of the Company. Any change to, or waiver of, this Code of Business Conduct and Ethics for executive officers or directors must be disclosed promptly to our stockholders either by a Form 8-K filing or by publishing a statement on our website.

6

## CODE OF ETHICS SIGNATURE CARD

I hereby acknowledge that I have read the Arthur J. Gallagher & Co.
Code of Ethics, have become familiar with its contents, am presently
in compliance with the Code and will comply with it in the future,
subject to any exceptions noted below.

(Use Only Ballpoint Pen)

_JAMES DE LA TORRE_

Name (please print)

_Signature_

Your Signature

_SALLA SHER - HETTEBNALI_

Organization (AJGCo, GB, GBS, etc.)

_SAN FRANCISCO_

Location

_10/9/98_

Date

Exceptions:

**Return to the Home Office Human Resource Department**



# CODE OF BUSINESS CONDUCT AND ETHICS
## SIGNATURE CARD

I hereby acknowledge that I have read the Arthur J. Gallagher & Co. Code of Business Conduct and Ethics, have become familiar with its contents, and agree not to violate the spirit or letter of the Code.

(Use Only Ballpoint Pen)

Name (please print)

*JAMES DE LA TORRE*

Your Signature

Organization (AJGCO, GB, GBS, etc.)

*GBS*

Location

*SAN FRANCISCO*

Date

*12-29-03*

PRINT
# CODE OF BUSINESS CONDUCT AND ETHICS
## SIGNATURE CARD .

I hereby acknowledge that I have read the Arthur J. Gallagher & Co. Code of Business
Conduct and Ethics, have become familiar with its contents, and agree not to violate the
spirit or letter of the Code.

(Use Only Ballpoint Pen)

Name (please print)  *JAMES DE LA TORRE*

Your Signature  *James W. de la Torre*

Organization (AJGCO, GB, GBS, etc.)  *GBS*

Location  *SAN FRANCISCO*

Date  *2/21/05*

## LOCK REGISTRATION / CONSENT FORM

I hereby request that the company provide me with a key to the office door, desk, drawer or file cabinet listed below for my convenience. I understand that the company provides desks, drawers and file cabinets for the convenience of its employees during work. I also understand that I must not place any lock on desks, drawers or file cabinets other than the lock furnished by the company. Further, I understand that the desks, drawers and file cabinets are and shall remain the sole property of the company and that the company reserves the right to open and inspect the desks, drawers and file cabinets; as well as any contents, effects or articles in the desk, drawer or file cabinet, at any time with or without advance notice of my further consent. Such an inspection may be conducted during or after my working hours by a supervisor, manager or any security personnel designated by the company. I understand that I must, if asked, cooperate with the company or its designated representative in connection with any such inspection and hereby consent to such inspections.

I certify I have read the Desk/Drawer Inspection Policy and the consent form, understand it, and voluntarily agree to its provisions.

**KEY NUMBER:**  **SBA 3 & SCA 28**

**EMPLOYEE NAME (PRINT):**  **JIM DE LA TORRE**

**SIGNATURE:**

**DATE:**  **OCTOBER 24, 2005**

Restroom Key——➔

Office Suite Key——➔

Returned to Garcia 10/15/5?

**REVISED 3/18/96**

## Gallagher Benefit Services, Inc.
# PRIVACY POLICY ACKNOWLEDGEMENT

Certain privacy laws and related regulations require records, documents and other materials pertaining to services rendered by Gallagher Benefit Services, Inc. (GBS) be held in strict confidence. Therefore, GBS requires its employees to acknowledge and agree that:

- You have read and understand the privacy policies and procedures established by GBS;
- You acknowledge and agree that you have access to certain information in the form of confidential financial information, Protected Health Information, and other information, including but not limited to information such as addresses, phone numbers, and group health plan enrollment status ("Information"), provided by clients and vendors that should be treated in a confidential manner;
- You shall not during your employment or at any time thereafter, disclose any confidential or Protected Information to any person, firm, corporation, or other business association unless such disclosure is necessary to perform my duties as a GBS employee;
- You will maintain Information in a confidential manner by exercising a reasonable degree of care over the control and dissemination of such information; and
- You will use any and all information accessed as a result of your employment with GBS only for internal business purposes, unless otherwise directed to do so in writing by GBS. Such Information may not be disclosed except (i) as provided in a written authorization from the individual subject to said records; (ii) to the extent permitted or required by law; (iii) to the extent permitted or required by administrative or judicial order.

This acknowledgement does not evidence any contractual term of employment and it does not in any way limit your employment at will status, and is effective as of the date it is executed by you under the laws of the State of Illinois.

Executed this _____ day of _____, 20___.

BY: _____

_____
(Print Name)

1-3/17/03

## ONE MARKET
## ACCESS CARD RECEIPT
## GALLAGHER HEFFERNAN INSURANCE BROKERS

Here is your new access card.  Please carry it with you for entry into the
building, elevators and offices during the following times:

**MONDAY THROUGH FRIDAY:   6:30 PM – 7:00 AM**
**(Building & Elevators)**

**MONDAY THROUGH FRIDAY:  BEFORE 8:00AM**
**(Office Access)**

**SATURDAY & SUNDAY:     24 HOURS**

**HOLIDAYS:     24 HOURS**

If your card is lost or stolen, please report it to Human Resources
immediately.  There is a $10.00 charge for lost or stolen cards.

I acknowledge receipt of the following card.  I am aware of the fee for a
lost or stolen card.

SIGNATURE: _____

PRINT NAME:        **JIM DE LA TORRE**

CARD NUMBER:       **809222**

DATE:              **June 29, 2001**



Human Resource
Administrative and Policy Guide

| Chapter: | Other Policies/Procedures | | |
|---|---|---|---|
| Title: | Electronic Information Policy | | |
| Original Issue Date: 12/18/97 | Date of this Revision: 06/29/2005 | | Next Review Date: |
| Revision #: 1.0 | Authorized Readers: All Employees | | |

# Electronic Information Policy

## PURPOSE

To inform employees of the Company's expectations concerning use of the Company's electronic information resources.

### 1.0 Employee Responsibilities

The Company's electronic information resources shall be used primarily for the Company's business. Each employee is expected to : (i) adhere to the Gallagher Code of Business Conduct and Ethics Policy, (ii) communicate in a professional and appropriate manner, (iii) protect access to the Company's electronic information resources and (iv) protect the confidentiality of the Company's material.

### 2.0 Use of Company's Intellectual Property

Use of any Company name, trademark or service mark in electronic media must adhere to relevant Company standards, be approved by the employee's manager, and is subject to the approval of the Vice President - CIS, before release.

### 3.0 Right to Monitor

The Company reserves the right to monitor any electronic communication which utilizes any of the Company's resources, in accordance with applicable law. Even though you may use a private password to access the Company's electronic resources, monitoring by authorized personnel may occur at any time without additional notice.

### 4.0 Internet Posting of Employee Information

Employees' personal information, including photos, may not be posted on public, unsecured Web pages, but may be posted on appropriately secured Web pages, such as password-protected pages for the benefit of clients. Also permitted is the posting of information/photos related to a timely news article or an award announcement.

Please note it is also prohibited to post a branch contact list on public, unsecured Web pages.

### 5.0 Violation of Policy

Employees who fail to comply with this policy shall be subject to disciplinary action including possible termination.

Dear Dave,

This e-mail is to inform you that I am concluding my employment with Arthur J. Gallagher effective immediately, today October 15, 2007.

The time I have spent here has been rewarding and helpful in my career development.  My contributions to the company have been constructive and our relationship has been mutually rewarding and professional.  I am grateful for having the opportunity to work with you.

I have accepted a position that will enhance my career growth and expose me to challenges and opportunities that are in my and my family's best interest.

You will find my desk, files and all materials in order.  I am leaving by honoring all terms and conditions of my executive agreement with Gallagher.

Dave,  I have the utmost respect for you and wish nothing but the best for you and Gallagher.

Sincerely,

James De La Torre

James De La Torre, CRPC
Area Vice President
Gallagher Benefit Services of California
One Market, Spear Tower, Suite 200
San Francisco, CA 94105

10/26/2007

(650) 224-3993 - Cell
(415) 536-8402 - Office
(415) 536-8499
License #0D36879

**"Jim De LaTorre" <jdelatorre@andreini.com>**

10/19/2007 11:00 AM

To <David_Brown@AJG.com>

cc <Norbert_Chung@ajg.com>, <Joe_Tixier@ajg.com>

Subject RE: Our meeting today and another item

Dave,

As I mentioned before, all the information you are requesting is in your office, not mine. I have nothing.

I am no longer an employee of Gallagher, and therefore, not able to access Gallagher proprietary software, I expect me expense reports to be re-imbursed to me. If I am not in receipt of my expenses in a reasonable time period you will be hearing from my legal council.

Also, I expect that you will pack up my personal belongs and I will arrange to have them removed from your office.

James A. De La Torre, CRPC
Andreini & Company
220 West Twentieth Avenue
San Mateo, CA 94403-1339
650.378.4384 - Direct
650.573.1111 - Main
650.378.4361 - Fax
jdelatorre@andreini.com
License 0208825

**From:** David_Brown@AJG.com [mailto:David_Brown@AJG.com]
**Sent:** Thursday, October 18, 2007 3:02 PM
**To:** Jim De LaTorre
**Cc:** Norbert_Chung@ajg.com; Joe_Tixier@ajg.com
**Subject:** Our meeting today and another item

Jim we need to talk in person asap. When we spoke on Monday, you agreed to meet this afternoon -- a representation that I trusted.

You possess a great deal of GBS' intellectual property that needs to be shared with us per the Executive Agreement that you signed. This cannot be adequately shared in the method you suggest. For example, we have many questions regarding the educational seminars that you arranged on GBS' behalf. Unless you left us complete sets of materials and scripts -- and anticipated and left us answers for every question we may have, then you haven't fulfilled that obligation -- as you stated you would in your termination email.

It's in the best interests of the clients that you served to have this meeting today (tomorrow at the latest). Please reconsider.

Thank you.

DB

PS. If you want your expenses reimbursed, you will need to talk to us about the current method for doing so -- that is being used by all employees, regardless of the incurred date for the expenses. Long story short, you'll have to use the Concur system.

David W. Brown
Area President, San Francisco Branch
Gallagher Benefit Services
One Market Plaza, Spear St. Tower, Suite 200
San Francisco, CA 94105
(415) 536-8405
david_brown@ajg.com
CA Corp. Lic. #0D36879

"Thinking Ahead"

**David Brown/GBS/AJG**

10/25/2007 09:10 AM

To "Boettger, Peg" <BoettgerP@AETNA.com>
cc "Bahlo, Tracey L" <BahloT@aetna.com>, MillerSL@aetna.com, Norbert
Chung/GBS/AJG@AJG, John Evans/GBS/AJG, Joe Tixier/CORP/AJG@AJG
Subject Re: FLEOA Life Plan $\text{Link}$

Peg,

We should talk asap. Please recall that Aetna executed a non-disclosure agreement with GBS prior to the bid process. We should review those implications before you have any conversations about anything with Andreini.

DB

David W. Brown
Area President, San Francisco Branch
Gallagher Benefit Services
One Market Plaza, Spear St. Tower, Suite 200
San Francisco, CA 94105
(415) 536-8405
david_brown@ajg.com
CA Corp. Lic. #0D36879

"Thinking Ahead"

**"Boettger, Peg" <BoettgerP@AETNA.com>**

10/24/2007 07:45 PM

To <David_Brown@AJG.com>
cc "Bahlo, Tracey L" <BahloT@aetna.com>
Subject FLEOA Life Plan

Dave- we have rec'd a properly executed Broker of Record letter from FLEOA naming Andreini as the broker of record effective immediately. It is signed by John Bottone who is the V.P. of Benefit programs. We will be honoring this letter as requested. Please feel free to call me if you have any concerns. Thanks!

Peg Boettger
Vice President- National Account Sales
Group Insurance
Aetna, Inc.
1 Front Street, Suite 600
San Francisco, CA 94111
p 415 645 8216
f 415 645 8276
boettgerp@aetna.com

This e-mail may contain confidential or privileged information. If you think you have received this e-mail in error, please advise the sender by reply e-mail and then delete this e-mail immediately. Thank you. Aetna



HOME        OFFICERS        GIFTS        JOIN FLEOA NOW!    CONTACT US        Search This Site

PROTECTING AND SERVING THOSE WHO PROTECT AND SERVE



## Corporate Sponsors



The following are official FLEOA Corporate Sponsors. These companies fully support FLEOA in all our events. They have programs specially designed for our members. Please visit their websites for more information.

Members Only

**Use your 2007 password.**
Click Here for Info

LINKS

- NATIONAL OFFICERS
- CALENDAR OF EVENTS
- NATIONAL POLICE WEEK
- FLEOA STORE
- MEMBERSHIP INFO
- MEMBER INFORMATION UPDATE FORM
- MEMBER NEWS
- CHAPLAINS
- FLEOA FOUNDATION
- LEGAL
- LEGISLATIVE
- PRESS PASS
- LINKS

| | | |
|---|---|---|
|  | Professional liability insurance, government co-pay 50% and $10,000 LOD life coverage, 24-hour payout | Rod Ayer, President (732) 530-5757 |
|  | Online logo store | Office: 212-393-1002 Email: HipWearUSA@aol.com Contact: Wendy, President Jenny, Manager Nancy, Manager |
|  | Dental/medical professional insurance | Jim Delatore (650) 224-3993 |
|  | Online university, 4 full scholarships ear year to members | Valerie Beal (703) 538-6713 |
|  | Full service home mortgage, discounted rates, % back at closing | Michael Lanning (212) 805-1023 |





**Joe Tixier/CORP/AJG**

10/19/2007 01:23 PM

To "Jim De LaTorre" <jdelatorre@andreini.com>

cc David_Brown@AJG.com, Norbert_Chung@ajg.com

Subject RE: Our meeting today and another item Link

Jim--

You have a great deal of information that Gallagher does not. I have sent you a copy of your Executive Agreement, which I expect that you had previously. It very clearly calls for a two week notice period during which you are required to work with us on transition issues. We require your assistance. This must be real assistance as contemplated by the agreement. You have not fulfilled your obligation. I believe Gallagher would be successful in obtaining a court order requiring that you follow the terms of the agreement. We would seek an order that, among other things, requires that you provide us the two week transitional period that was agreed upon (and of course that you not work for your new employer during this two week period), and that you pay our attorneys' fees. We have legitimate and pressing concerns that need to be addressed. To the extent that Gallagher is adversely impacted by your breach, we intend to hold you accountable. We reserve all rights.

As for your expenses, all Gallagher expenses are now paid through the Concur system, and yours are no exception. Gallagher will pay your legitimate expenses as long as they are in line with our policies and procedures, including submission procedures. Simply handing over receipts is insufficient. As your expenses have been submitted currently, they do not meet with our procedures and you should consider them rejected in their entirety. We will be happy to work with you to submit them properly, and encourage you to do so.

We will be happy to pack your personal items for you since that is your wish. We will alert you when they are ready for you to pick up.

Jim, I hope we are able to work these things out. However, we have important business needs that must be met. We suggest that you come into the office tomorrow to meet Dave and answer his questions. As you know, he will be out of the country next week. Please have your attorney let me know your position. Thank you.

Joe Tixier
Senior Counsel

Arthur J. Gallagher & Co.
(630) 285-3452
(630) 285-3483 (fax)
joe_tixier@ajg.com

====================
This email and any attachments are confidential, solely for the use of the intended recipient and may contain
privileged material. If you are not the intended recipient, please return or destroy it immediately. Thank you.
====================


"Jim De LaTorre" <jdelatorre@andreini.com>

10/19/2007 11:00 AM

To <David_Brown@AJG.com>

cc <Norbert_Chung@ajg.com>, <Joe_Tixier@ajg.com>
Subject RE: Our meeting today and another item


Dave,

As I mentioned before, all the information you are requesting is in your office, not mine. I have nothing.

I am no longer an employee of Gallagher, and therefore, not able to access Gallagher proprietary software, I
expect me expense reports to be re-imbursed to me. If I am not in receipt of my expenses in a reasonable time
period you will be hearing from my legal council.

Also, I expect that you will pack up my personal belongs and I will arrange to have them removed from your office.


James A. De La Torre, CRPC
Andreini & Company
220 West Twentieth Avenue
San Mateo, CA 94403-1339
650.378.4384 - Direct
650.573.1111 - Main
650.378.4361 - Fax
jdelatorre@andreini.com
License 0208825


**From:** David_Brown@AJG.com [mailto:David_Brown@AJG.com]
**Sent:** Thursday, October 18, 2007 3:02 PM
**To:** Jim De LaTorre
**Cc:** Norbert_Chung@ajg.com; Joe_Tixier@ajg.com
**Subject:** Our meeting today and another item

Jim we need to talk in person asap. When we spoke on Monday, you agreed to meet this afternoon -- a
representation that I trusted.

You possess a great deal of GBS' intellectual property that needs to be shared with us per the Executive Agreement that you signed. This cannot be adequately shared in the method you suggest. For example, we have many questions regarding the educational seminars that you arranged on GBS' behalf. Unless you left us complete sets of materials and scripts -- and anticipated and left us answers for every question we may have, then you haven't fulfilled that obligation -- as you stated you would in your termination email.

It's in the best interests of the clients that you served to have this meeting today (tomorrow at the latest). Please reconsider.

Thank you.

DB

PS.  If you want your expenses reimbursed, you will need to talk to us about the current method for doing so -- that is being used by all employees, regardless of the incurred date for the expenses.  Long story short, you'll have to use the Concur system.

David W. Brown
Area President, San Francisco Branch
Gallagher Benefit Services
One Market Plaza, Spear St. Tower, Suite 200
San Francisco, CA 94105
(415) 536-8405
david_brown@ajg.com
CA Corp. Lic. #0D36879

"Thinking Ahead"

**Joe Tixler/CORP/AJG**

10/21/2007 12:32 PM

To  jdelatorre@andreini.com

cc  David Brown/GBS/AJG@AJG, Norbert Chung/GBS/AJG@AJG

Subject  Contractual obligations

Jim,

Below please see our initial minimum requiremens for cooperation, based on what we know thus far.  After you have answered these inquiries in detail, we will deermine whether the scope will expand and if so, whether we require additional assistance.  We reserve the righto do so.  Remember, you have a contractual obligation to provide us with two weeks worth of transitional assttance.  We are providing this list as you requested in a good faith gesture to work this matter out with you.  We expect good faith cooperation in return.  Please review this list and provide your detailed responses directly to Dava.

- Updates to include, but not be limited to -- dates,descriptions, and status of past, current and future intended discussions for each of the following grups:
    - All clients
    - All prospects
    - All locations -- including but not limitedfolistorical records regarding past, current and future education seminar activities and expeations
    - Identified location for all client governaœe, vendor contract and general correspondence documents
    - Updates on all activities with all currennd prospective vendors serving Federal First, including but not limited to Aetna, marketing consults, education material vendors, seminar coordinators, etc.
    - Copies of all presentations, scripts, arany other adaptation or training materials developed for client education programs of any typecusing on those used in the past year and intended for

future use with client locations where activities are scheduled or pending. We will also need a 5-year history of seminar locations, dates and general content description.
- o Any other information related to the FederalFirst program that may become visible during the exchange of information.
- o All compliance activities related to FederalFirst, it's policyholders, members or vendors

As for your personal items and expense reimbursement:
- o Your personal items will be neatly packed and available for you to pick up at the time we meet to review all the information above.
- o This re-affirms that you must comply with the requirement to submit your expenses via Concur, as do all other GBS employees subsequent to Fred Figge's announcement on September 25, 2007, and the training conducted on several dates in the branch in September. I suggest you log on to the following link:

https://c000100.concursolutions.com/ces00186pibp/expense/?
entity=p0001397jx2s&ORIG=V1:Ddir:T2:W0150151192903078848
If the link doesn't work, please advise immediately and we'll get it fixed so you can use it. We are returning your receipts to you via express delivery on Monday. For your future reference, you may want to keep the Concur Help Line available -- it is 800-232-6909 -- in case you need help completing the report.

Jim, to sum it up, we need to have a thorough understanding of current program operations from you in order to fulfill your contractual obligations. We expect your immediate response.

Joe Tixier
Senior Counsel
Arthur J. Gallagher & Co.
(630) 285-3452
(630) 285-3483 (fax)
joe_tixier@ajg.com

====================
This email and any attachments are confidential, solely for the use of the intended recipient and may contain privileged material. If you are not the intended recipient, please return or destroy it immediately. Thank you.
====================