1   SEYFARTH SHAW LLP
    Robert S. Niemann (SBN 087973)
2   E-mail: rniemann@seyfarth.com
    Althea V. Bovell (SBN 200240)
3   E-mail: abovell@seyfarth.com
    Krista L. Mitzel (SBN 221002)
4   E-mail: kmitzel@seyfarth.com
    560 Mission Street, Suite 3100
5   San Francisco, California 94105
    Telephone: (415) 397-2823
6   Facsimile: (415) 397-8549

7   Attorneys for Plaintiff
    GALLAGHER BENEFIT SERVICES, INC.

8

9                   UNITED STATES DISTRICT COURT

10          IN AND FOR THE NORTHERN DISTRICT OF CALIFORNIA

11  GALLAGHER BENEFIT SERVICES, INC., a )   Case No.
    Delaware Corporation,                )
12                                        )
                 Plaintiff,               )   **PLAINTIFF'S MEMORANDUM OF**
13                                        )   **POINTS AND AUTHORITIES IN**
           v.                             )   **SUPPORT OF EX PARTE**
14                                        )   **APPLICATION FOR TEMPORARY**
                                          )   **RESTRAINING ORDER AND FOR**
15  JAMES DE LA TORRE, an individual,     )   **ORDER TO SHOW CAUSE**
    ANDREINI & COMPANY, a California      )   **REGARDING PRELIMINARY**
16  Corporation,                          )   **INJUNCTION**
                                          )
17               Defendants.              )
                                          )
18

19

20

21

22

23

24

25

26

27

28

PLAINTIFF'S MEMO. OF POINTS & AUTHORITIES I/S/O EX PARTE APPLICATION FOR TRO AND OSC
                    REGARDING PRELIMINARY INJUNCTION

# I.     INTRODUCTION

This is an action for an emergency temporary restraining order, preliminary injunction, permanent injunction and damages arising out of James De La Torre ("Torre") and Andreini & Company's ("Andreini") (collectively "Defendants") use of Plaintiff Gallagher Benefit Services, Inc.'s ("Gallagher") confidential, proprietary, and trade secret information to improperly terminate relationships between Gallagher and its clients or potential clients, and move the current or potential clients into a relationship with Andreini.

De La Torre is a former Vice President with Gallagher who recently left Gallagher's employ on October 15, 2007 and has systematically used Gallagher's proprietary and confidential information for the benefit of Andreini and himself.  No question exists that De La Torre knew he was wrongfully taking Gallagher's confidential and propriety information and trade secrets.  At the commencement of his employment, De La Torre executed several documents in which he acknowledge and agreed to maintain the confidentiality of Gallagher's confidential and proprietary information and trade secrets.  These documents include: (a) an Executive Agreement; (b) Gallagher's Code for Business Conduct and Ethics; (c) the Electronic Information Policy; and (d) Lock Registration/Consent Form; among other practices and procedures of Gallagher.  In blatant disregard for his confidentiality obligations and applicable law, De La Torre went to great lengths to remove Gallagher's information from Gallagher.

Moreover, De La Torre refused to comply with the fourteen day notice period, wherein he was obligated to cooperate with Gallagher in transitioning the business and accounts for which De La Torre had responsibility to other employees within Gallagher, but abruptly and without notice, resigned from his position at Gallagher.

There is no doubt that Gallagher is likely to succeed on the merits of each of its claims, or that Gallagher is in need of immediate injunctive relief from this Court to protect Gallagher from any further misconduct by De La Torre and his new employer, Andreini.  For these reasons, and the reasons stated more fully below, Gallagher respectfully requests that its Application for Temporary Restraining Order be Granted.

1

## II.   STATEMENT OF FACTS

### A.   Gallagher and Its Business

Arthur J. Gallagher & Co. is the fourth largest commercial brokerage and risk management firm in the world, founded in 1927 to provide services worldwide in the area of risk management and general insurance brokerage services, managing the assets of companies, providing insurance, including managing their workers compensation, furnishes similar services in areas of risk management and general insurance brokerage. In 1999, it established Gallagher Benefit Services ("Gallagher" or the "Company") as a separate entity. Gallagher provides services to companies worldwide, establishing and managing the complete spectrum of employee benefits. In 1991, Gallagher began working in the federal marketplace with the introduction of Group Long Term Disability program into the Federal Judiciary. This program was unique and innovative in that it was designed and built especially for federal employees and designed primarily to provide supplemental benefit plans that were not provided by the federal benefit plans. These benefits were sold under the name Federal Employees Group Long Term Disability. (Complaint ("Compl.") ¶6).

In 2005, Gallagher rebranded the program as "Federal First," a trademarked brand it currently uses to provide supplemental benefits and education seminars across the country to help participants understand the full scope of federal benefits, in addition to maintaining a website for these purposes. Federal First's primary focus is to provide to federal employees supplemental benefits and programs that are not provided directly by the employers' plan. (*Id.*)

Gallagher's existing clients receiving benefits services under the Federal First program include National Counsel of Bankruptcy Clerks, the Department of Justice Recreation Association, the Treasury Department Recreation Association and the Nurses of the Veterans Association. Gallagher's prospective clients about which former employee De La Torre has confidential and proprietary information, and in which he was in negotiations to gain their business on behalf of Gallagher include the American Foreign Service Association; the American Society of Military Comptrollers; the Federal Firefighters Association; the National Association Air Traffic specialists; and the Environmental Protection Agency Employee

1    Recreation Association.  (See Decl. of David Brown in Support of TRO ("Brown Decl.") ¶ 5).

2         Federal First provides plan sponsors (e.g. National Conference of Bankruptcy Clerks) with

3    the best products based on Gallagher's experience and knowledge of the marketplace, to help

4    clients identify the best insurers, engage in competitive bidding on their behalf, communicates

5    with plan participants, and coordinates compliance activities under HIPAA and ERISA.  In

6    addition, Federal First's educational workshops provide information to integrate members' federal

7    benefit programs with their personal financial and retirement objectives.  The workshops range

8    from one to two days, and sometimes include a supplemental one-on-one session with members

9    and/or prospective members and their spouses.  (Compl. ¶7; Brown Decl., ¶ 6)

10   **B.     Gallagher's Confidential Business Information**

11        There is no known program in the federal market that combines the administration,

12   marketing, and website and member support comparable to those provided by Federal First.

13   Gallagher has spent excessive resources developed over many years, collecting and analyzing

14   data about special insurance packages that the Company negotiated with various underwriters

15   and the peculiar risks inherent in their operations.  Gallagher maintains a large database of

16   confidential information on participating underwriters, insurance carriers, current client policy

17   holders and their members and prospective clients and potential members.  (Compl., ¶ 8)

18        The confidential and proprietary data accumulated by Gallagher includes that which is

19   not known either to its competitors or within the insurance agency and brokerage business

20   generally and which has independent economic value to the Company, including but not limited

21   to, data relating to Gallagher's unique marketing and servicing programs, procedures and

22   techniques; business management and personal strategies; the criteria and formulae used by the

23   Company in pricing its insurance products and claims management, loss control and information

24   management services, the structure and pricing of special insurance packages, lists of prospects;

25   the identity, authority and responsibilities of key contacts at Company accounts; the composition

26   and organization of accounts' businesses; the peculiar risks inherent in their operations, highly

27   sensitive details concerning the structure, conditions and extent of their existing insurance

28   coverages, and other data showing the particularized insurance requirements and preferences of

---

3

1  the accounts.   In addition, Gallagher provides a national platform for carriers which is unique

2  because of its size, expertise, proven track record and accumulated goodwill.  (Compl., ¶11)

3      **C.**    **Gallagher Protects Its Confidential Business Information**

4      Gallagher's confidential and proprietary business data is only accessible to Gallagher's

5  employees on a need to know basis through Gallagher's computer network.  Gallagher's

6  employees are issued Gallagher-owned laptop computers and can also access its systems through

7  their handheld Blackberry.  Gallagher's "Goldmine" data base and computer network and

8  systems afford its employees extensive resources to assist in the solicitation, production,

9  enrollment and servicing of its nationwide existing clients and prospective clients.  All efforts

10  expended in soliciting, producing and servicing these existing and prospective client accounts are

11  for the permanent benefit of Gallagher.  (Compl., ¶12; Brown Decl., ¶9-10).

12      Gallagher requires that its information be kept strictly confidential by its current and

13  former employees and restricts access to this confidential and proprietary information.  Gallagher

14  takes specific measures to preserve the confidentiality of this information, including, but not

15  limited to, the following:

16          a.    The Executive Agreement, which recognizes the highly sensitive nature of
17                  Gallagher's confidential and proprietary information and requires its
                   employees to maintain such confidentiality, and to refrain from divulging
18                  such information for a period of two (2) years following termination on
                   any grounds;

19          b.    The Code of Business Conduct and Ethics requires Gallagher's employees
20                  to maintain the confidentiality of all information entrusted to them by the
                   Company, its clients or suppliers, or others with whom the Company does
21                  business;

22          c.    Gallagher restricts access to its offices, desks, drawers or file cabinets
                   under the Desk/Drawer Inspection Policy; and

23          d.    Gallagher restricts access to its computerized information, computer
24                  network and computers through the use of passwords.  (Brown Decl., ¶
                   11).

25      Gallagher rigorously maintains the confidentiality of its business information because it

26  provides Gallagher a competitive advantage in the marketplace from which it derives economic

27  value.  Gallagher's confidential and proprietary information is of great value to Gallagher and

28  would give any competitor who acquired that information an unfair competitive advantage.  A

1  competitor could use the information to unfairly identify clients, unfairly bid for business against

2  Gallagher, unfairly move business away from Gallagher and unfairly gain knowledge of the

3  procedures which result in the delivery of services and specialized pricing. (Brown Decl., ¶12).

4      Gallagher has spent many years and has invested substantial resources developing its

5  existing and prospective client accounts, in addition to other business information, and in

6  developing and maintaining a solid relationship with, and the goodwill of, each of its existing

7  and prospective clients. (Brown Decl., ¶ 13).

8  **D.    De La Torre's Obligations Owed to Gallagher**

9      In October 1998, as a condition of, and as consideration for his employment, and in order

10  to protect both De La Torre's and Gallagher's interests in the employment relationship, and to

11  protect Gallagher's legitimate business interest in its confidential and proprietary information

12  and customer relationships, De La Torre was required to, and did, sign Gallagher's Executive

13  Agreement. A copy of that Agreement is attached hereto at **Exhibit A**. (Compl., ¶ 21).

14      De La Torre was also required to abide by and did acknowledge Gallagher's Code of

15  Business Conduct and Ethics. A copy of Gallagher's Code of Business Conduct and Ethics is

16  attached hereto as **Exhibit B**. A copy of De La Torre's signed acknowledgement of the Code of

17  Ethics is attached hereto as **Exhibit C**. (Compl., ¶ 22).

18      De La Torre also signed and acknowledged receipt of keys to Gallagher's office space

19  and confidential files, as well as Gallagher's electronic information policy which prohibits the

20  disclosure of confidential information. A copy of each signed acknowledgment is attached

21  hereto as **Exhibit D**. (Compl., ¶ 23).

22      Specifically, Exhibit A, the Executive Agreement provides, in part:

23      **Paragraph Five:** The Executive recognized that, by virtue of his
        employment by the Company and to assist him in the solicitation,
24      production and servicing of accounts, he will be granted otherwise
        prohibited access to confidential and proprietary data of the
25      Company which is not known either to its competitors ... he will
        not, at any time during his employment by the Company, divulge
26      such Confidential Information or make use of it for his own
        purposes or the purposes of another.
27
        **Paragraph Six.** The Executive recognizes that by virtue of his
28      employment by the Company, he will be afforded numerous and

PLAINTIFF'S MEMO. OF POINTS & AUTHORITIES I/S/O EX PARTE APPLICATION FOR TRO & OSC
REGARDING PRELIMINARY INJUNCTION

1   extensive resources to assist him in the solicitation, production and
    servicing of accounts… and agrees that all efforts that he expends
2   in this regard shall be for the permanent benefit of the Company….

3   **Paragraph Thirteen. A.**   The Executive recognizes the highly
    sensitive nature of the Confidential Information … and
4   acknowledges the Company's legitimate interest in safeguarding
    same from disclosure. … the Executive agrees that, for a period of
5   two (2) years following the termination of his employment…he
    will not divulge the Company's Confidential Information or make
6   use of it for his own purpose or the purpose of another. …and
    agrees that for a period of two (2) years following the termination
7   of his employment …he will not, directly or indirectly, solicit…
    any existing Company account or any actively solicited
8   prospective account of the Company for which he performed any
    of the foregoing functions during the two-year period immediately
9   preceding such termination, ….

10  (Compl., ¶24).  Pursuant to his Executive Agreement, De La Torre was prohibited from using or

11  disclosing Gallagher's confidential and proprietary information, from soliciting any of

12  Gallagher's clients or prospective clients, and from placing or accepting their insurance

13  requirements.  (Compl., ¶ 25).

14       Pursuant to the Executive Agreement, the Employee Handbook, Code of Ethics, and

15  other agreements, De la Torre was required to maintain the confidentiality of Gallagher's

16  information and not use such information for his own purposes.  (Compl., ¶ 26).

17  **E.       James De La Torre's Employment With Gallagher**

18       Gallagher hired James De La Torre as an Account Executive on or about October 5,

19  1998.  Prior to joining Gallagher, De La Torre had never been responsible for selling insurance

20  consisting of the type and extent of the programs offered by Federal First.  (Compl., ¶ 27).

21       Pursuant to his Executive Agreement, De La Torre was prohibited from using or

22  disclosing Gallagher's confidential and proprietary information.  In addition, De La Torre was

23  required to give Gallagher fourteen (14) days written notice to terminate ("Notice Period") and

24  during this Notice Period, was required to return to Gallagher all literature, correspondence,

25  memoranda, reports, summaries, manuals, proposals, contracts and other documents of any kind

26  which relate in any way to Gallagher's business, including all materials which comprise or refer

27  to Gallagher's confidential and proprietary information.  Only as a result of his position at

28  Gallagher, De La Torre received and was given access to extensive confidential and proprietary

PLAINTIFF'S MEMO. OF POINTS & AUTHORITIES I/S/O EX PARTE APPLICATION FOR TRO & OSC
REGARDING PRELIMINARY INJUNCTION

1   information of the type described above. (Compl., ¶ 54; Brown Decl., ¶ 15).

2         For more than nine years, De La Torre was given access to Gallagher's confidential and

3   proprietary information about existing and prospective clients and their members, and the

4   management, operations and funding of employee benefit plans under the Federal First program,

5   and the strategies, criteria and formulae used by the Company in pricing its insurance products

6   and pricing of special insurance packages, among other confidential and proprietary information.

7   During the course of De La Torre's employment, Gallagher provided De La Torre a lap top

8   computer and office space and files, and Blackberry service enabling De La Torre to access

9   Gallagher's systems, networks and Goldmine database remotely. De La Torre routinely stored

10  Gallagher's confidential and proprietary information on the local hard drive of his lap top and on

11  the Blackberry's hard drive. (Compl., ¶ 29; Brown Decl., ¶ 18).

12        De La Torre serviced existing and prospective clients nationwide and developed

13  relationships on behalf of Gallagher. De La Torre learned about the needs and services that

14  Gallagher could provide to participating clients and learned confidential information about each

15  existing and prospective client and their members. In September 2007, he indicated that he had

16  several other job offers. On October 15, 2007, De La Torre abruptly resigned. In his resignation

17  letter, De La Torre acknowledged his obligations owed to Gallagher under the Executive

18  Agreement and company policies. A true and correct copy of De la Torre's resignation email is

19  attached hereto as **Exhibit E.** On October 13, 2007, De La Torre was reminded of the

20  confidentiality obligations owed to Gallagher. (Compl., ¶¶ 30-33; Brown Decl., ¶¶ 19-20).

21        Upon his resignation Gallagher attempted to work with De La Torre regarding his

22  requirement to help Gallagher transition his position to a new employee, but De La Torre did not

23  cooperate. De La Torre initially agreed to meet on October 18, to provide detail about the clients

24  and prospects, educational commitments made, the policy holders information and the identifies

25  of key decision makers on the accounts, but then reneged on his agreement. A true and correct

26  copy of the correspondence between De la Torre and Brown is attached hereto as **Exhibit F.**

27  (Compl., ¶ 34; Brown Decl., ¶20).

28

7

F.      **Events Giving Rise To This Action**

Gallagher recently learned that De La Torre has become employed by Andreini. (Compl. ¶ 36). Since leaving Gallagher, De La Torre utilized or disclosed Gallagher's confidential information about current clients and contacts in this niche market to solicit them on behalf of Andreini, and for himself, in order to terminate Gallagher's contracts with certain existing clients and to persuade prospective clients to sign contracts with Andreini. (Compl. ¶ 37).

As a result of Defendants' misappropriation of Gallagher's confidential and proprietary information, at least two existing and prospective clients serviced by De La Torre before he left Gallagher agreed to follow De La Torre to Andreini for the same services provided by Gallagher. On October 25, 2007, Gallagher received an email from Aetna stating that it received a "Broker of Record" ("BOR") letter from Gallagher's endorser, Federal Law Enforcement Officers Association ("FLEOA").[1]   FLEOA is a current endorser under Gallagher's Long Term Disability Plan, and had previously committed to signing up for Gallagher's new Life Program which was scheduled to roll out in Fall 2007. The BOR stated that, effective immediately, Andreini was the broker of record for FLEOA. This diversion is estimated to result in a loss of $750,000.00 per year in business for Gallagher. A copy of the related correspondence regarding the BOR letter is attached as hereto as **Exhibit G.** (Compl. ¶¶ 38-39). De La Torre serviced FLEOA during his employment at Gallagher, and his personal cell phone number appears as the "contact" on FLEOA's website, as opposed to a Gallagher contact number, thereby diverting any prospective business from Gallagher to Defendants. A copy of the FLEOA website is attached as hereto as **Exhibit H.** (Compl., ¶ 40).

Further, De La Torre has utilized Gallagher's confidential information to unfairly target existing clients. On October 25, 2007, the board of directors of the National Council of Bankruptcy Clerks ("NCBC") voted to move their insurance and benefits business from Gallagher to Andreini. Defendants conduct threatens to destabilize Gallagher's stable and productive relationships with its clients. (Compl. ¶ 47).

---

[1] / A Broker of Record letter or BOR authorizes the holder to negotiate—sometimes immediately with carriers on behalf of the client.

1    After leaving Gallagher, De La Torre continued to solicit Gallagher's clients by going

2    forward with informational seminars that De La Torre had planned and scheduled while working

3    for Gallagher.  De La Torre is intending to conduct an educational Retirement Financial Seminar

4    with the U.S. Bankruptcy Court ("USBC") in Delaware in an effort to divert that business from

5    Gallagher to Andreini. Gallagher is informed and believes that De La Torre intends to conduct

6    similar seminars scheduled for November and December 2007 in New Mexico, also in an effort

7    to steal Gallagher's current and potential clients away from it.[2]  (Compl., ¶ 41).

8    Gallagher is informed and believes that De La Torre has utilized Gallagher's confidential

9    and proprietary information to target and inappropriately solicit at least two existing clients who

10   he serviced before leaving Gallagher to move their business to Andreini, and has succeeded in

11   persuading them to terminate their business with Gallagher and follow him to Andreini, thereby

12   illegally diverting business from Gallagher to Defendants.  (Compl. ¶ 42).  Gallagher is not fully

13   aware of the extent of De La Torre's wrongful contact with its clients.  (Compl. ¶ 43).

14   After receiving De La Torre's resignation, Gallagher demanded that he comply with his

15   Executive Agreement, the confidentiality requirements therein and the requirement for a fourteen

16   (14) day transition period.  De La Torre initially agreed to meet with Gallagher on October 18,

17   2007, but he reneged.  A copy of the related correspondence regarding Gallagher's demand that

18   De La Torre comply with the Executive Agreement and transition period required thereunder is

19   attached as hereto as **Exhibits I and J.**  De La Torre has yet to return the electronic files and

20   information, and is not authorized to access Gallagher's information.  (Compl. ¶ 44).

21   Defendants have not spent the time and resources to cull through thousands of

22   prospective clients to determine which federal agencies or associations are amenable to the

23   services Gallagher has to offer.  Instead, Defendants utilized Gallagher's confidential

24   information to identify current and prospective clients of Gallagher and have and will steal those

25   current and prospective clients that are attractive targets to be moved to Andreini.  (Compl. ¶ 45).

26   On information and belief, current clients previously serviced by De La Torre alerted

27

28   [2] / Due to a scheduling conflict on USBC's part and Gallagher's intervention, these seminars have been
postponed until the end of the year.

9

1    Gallagher to De La Torre's solicitations.  On information and belief, De La Torre may be

2    misleading current clients regarding the services provided by Andreini as compared to Gallagher.

3    (Compl. ¶ 46).  An immediate temporary restraining order is necessary to enjoin Defendants

4    from their unlawful conduct.

5        Gallagher has invested considerable resources in the development of its confidential and

6    proprietary trade secret information which has been misappropriated by De La Torre.  If

7    Defendants are not immediately restrained as prayed for herein, Defendants will have an

8    immeasurable and unfair competitive advantage over Gallagher and will be likely to improperly

9    utilize the relationships and information about Gallagher's existing and prospective clients for

10   themselves.  In addition, if unrestrained, Defendants threaten to continue to exploit the

11   confidential and proprietary information of Gallagher and to continue to cause the unfair

12   cancellation and termination of contracts with Gallagher.  Further, unless Defendants are

13   immediately restrained, the loss of goodwill that Gallagher has engendered over the years with

14   many of its existing and prospective clients will be irreparably harmed.  De La Torre's breaches

15   of his contractual and other duties to Gallagher, if not enjoined, will cause Gallagher further

16   damage.  Gallagher does not have an adequate remedy at law.  (Compl. ¶ 48).

17   ### III.      ARGUMENT

18       Gallagher seeks a narrowly-tailored TRO and preliminary injunction to recover its

19   confidential information, to enjoin Defendants from using or disclosing any confidential

20   information obtained by De La Torre from Gallagher, to account for the whereabouts of all files,

21   data and information removed from Gallagher or e-mailed from Gallagher, to enjoin De La Torre

22   from carrying out any job function at Andreini in which he would have responsibility for or

23   access to products competitive with Gallagher's products and accounts on which De La Torre

24   worked while employed by Gallagher, and to enjoin Defendants from soliciting any of

25   Gallagher's clients or prospective clients, and from placing or accepting their insurance

26   requirements.  Gallagher further seeks an order that De La Torre be forced to return to Gallagher

27   and conduct a transition with Gallagher personnel as required by his Executive Agreement and

28   submit to an expedited deposition to fulfill his transition obligations under the agreement.

1    The traditional equitable criteria for granting preliminary or temporary injunctive relief

2   are (1) a strong likelihood of success on the merits; (2) the possibility of irreparable injury to the

3   plaintiff if the preliminary relief is not granted; (3) a balance of hardships favoring the plaintiff;

4   and (4) advancement of the public interest.  In the Ninth Circuit, the moving party may meet its

5   burden by demonstrating either: (1) a combination of probable success on the merits and the

6   possibility of irreparable injury; or (2) that serious questions are raised and the balance of

7   hardships tips sharply in its favor.  *White Mountain Apache Tribe v. State of Arizona*, 649 F.2d

8   1274, 1285 (9th Cir. 1981); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Garcia*, 127 F.

9   Supp.2d 1305 (C.D. Cal. 2000).

10    Here, the evidence is overwhelming that Gallagher is likely to succeed on each of its

11   claims and that it will be irreparably harmed if the Defendants are not enjoined, and that serious

12   questions are raised sufficient to warrant a TRO given the balance of hardships.

### A.    Gallagher Is Likely To Prevail On The Merits Of Each of Its Claims.

14    To obtain a TRO or preliminary injunction, a plaintiff must show a likelihood of

15   prevailing on the merits.  *Wilson v. Watt*, 703 F.2d 395 (9th Cir. 1983).  A plaintiff need not

16   show, however, it will positively prevail on the merits.  *Gilder v. P.G.A. Tour, Inc.*, 936 F.2d

17   417, 422 (9th Cir. 1991) (emphasis added).  A reasonable probability - "fair chance" of success -

18   is the standard for granting preliminary injunctive relief.  *Berda v. Grand Lodge of IAM*, 584

19   F.2d 308, 315 (9th Cir. 1978).  Gallagher, given the evidence, is likely to prevail.

#### 1.    Gallagher Is Likely To Succeed On Its Computer Fraud and Abuse Act Claim.

A violation of the Computer Fraud and Abuse Act ("the Act") occurs when (among other

things) any person:

- (a)    intentionally accesses a computer without authorization or exceeds authorized access and thereby obtains information from any protected computer.  18 U.S.C. § 1030(a)(2)(C); or

- (b)    knowingly and with intent to defraud, accesses a protected computer without authorization, or exceeds authorized access, and by means of such conduct furthers the intended fraud and obtains anything of value.  18 U.S.C. § 1030(a)(4); or

---

11

1          • (c)       intentionally accesses a protected database without
            authorization, and, as a result of such conduct, causes damage. 18
2          U.S.C. § 1030(a)(5)(C).

3          The Act expressly provides plaintiffs (like Gallagher) with a civil cause of action,

4    including injunction relief, against those (like De La Torre and Andreini) who illegally use

5    computers for their own commercial advantage. *See* 18 U.S.C. § 1030(g) ("any person who

6    suffers damage or loss by reason of a violation of this section may maintain a civil action against

7    the violator to obtain compensatory damages and injunctive relief or other equitable relief"). The

8    Act defines "protected computer" broadly, as any high speed data process that "is used in

9    interstate or foreign commerce or communication." *See* 18 U.S.C. § 1030(c)(2)(A)(B). Likewise,

10   the Act broadly defines "damage" to include "any impairment to the integrity or availability of

11   data, a program, a system or information 'that causes loss aggregating at least $5,000 in value

12   during any 1-year period to one or more individuals.'" *See* 18 U.S.C. § 1030(e)(8)(c).

13          Defendants plainly have violated the terms of the statute. Gallagher maintains and

14   operates a variety of protected computers and information that contain confidential, proprietary

15   and other information, and are used in interstate commerce by Gallagher. Defendants violated

16   the Act when they accessed and utilized this protected information without authorization, to

17   solicit Gallagher's clients and prospective clients, and agreed to contract with these clients to

18   provide insurance coverage. *See Ingenix, Inc. v. Lagalante,* No. 02-876 Section "N"(3), 2002

19   U.S.Dist. LEXIS 5795 (E.D. La. Mar. 28, 2002) (enjoining temporarily former employee from

20   using or disclosing any of employer's business, customer, pricing and marketing information,

21   and requiring employee to return all of employer's property, documents and business records);

22   *Shurguard Storage Centers, Inc. v. Safeguard Self Storage, Inc.,* 119 F. Supp. 2d 1121 (W.D.

23   Wash. 2000) (enjoining former employees under the Computer Fraud and Abuse Act).

24          Upon his resignation, De La Torre continued to use his Blackberry to access Gallagher's

25   confidential and proprietary information, email programs, and servers. Even though he

26   understood and acknowledged his obligation to abide by the terms of his Executive Employment.

27   *See Id.* at 1127; 18 U.S.C. § 1030(a)(5)(C). The Act expressly authorizes injunctive and other

28   equitable relief and Gallagher is entitled to such relief. *See* 18 U.S.C. § 1030(g).

1    **2.    Gallagher Is Likely To Succeed On Its Trade Secrets Claim.**

2    The laws preventing the misappropriation of trade secrets are designed to prevent

3    industrial espionage, and to encourage innovation and development.  *Kewanee Oil Co. v. Bicron*

4    *Co.*, 416 U.S. 470, 485-86 (1974).  The Uniform Trade Secret Act ("UTSA") adopted by

5    California, is similarly designed.  The UTSA defines a "trade secret" that follows:

6    > [I]nformation, including a formula, pattern, compilation, program, device,
   > method, technique, or process that:

7

8    > (1)    Derives independent economic value, actual or potential, from not being
   > generally known to the public or to the other persons who can obtain economic
   > value from its disclosure or use; and

9

10   > (2)    Is the subject of efforts that are reasonable under the circumstances to
   > maintain its secrecy.

11   Cal Civ. Code § 3426.1(d).

12    **a)    Gallagher's Information Constitutes Trade Secrets.**

13   Gallagher's information includes compilations of information, methods, techniques,

14   formulae and processes that have taken years to develop at significant time, effort, and expense.

15   Gallagher rigorously maintains the confidentiality of that information because it provides

16   Gallagher a competitive advantage in the marketplace from which Gallagher derives economic

17   value.  Moreover, Gallagher's information is provided to, developed, and utilized by Gallagher

18   for the purpose of allowing it to effectively and efficiently conduct its business.  Gallagher's

19   information is of great value to Gallagher, and would give any competitor who acquired that

20   information an unfair competitive advantage.  Among other things, Gallagher's information

21   would enable a competitor of Gallagher to produce and price competitive products and services

22   in a way that would unfairly undercut Gallagher in the marketplace, and to structure and

23   disseminate confidential information about Gallagher and its performance to the public.

24   Gallagher clearly undertook reasonable efforts to maintain the secrecy of Gallagher's

25   Information.  "Reasonable efforts to maintain secrecy have been held to include advising

26   employees of the existence of a trade secret, limiting access to a trade secret on a 'need to know

27   basis,' and controlling plant access."  *Courtesy Temporary Serv. v. Camacho*, 222 Cal. App.3d

28   1278, 1288 (2d Dist. 1990); *see also MAI Systems Corp. v. Peak Computer, Inc.*, 991 F.2d 511,

13

1   521 (9th Cir. 1993) (requiring employees to sign confidentiality agreements sufficient to

2   establish existence of trade secrets).

3          All of the information at issue here is "secret" and Gallagher has made substantial efforts

4   to keep it so. Gallagher prohibits its employees from using its electronic information and

5   resources for any purpose not directly related to Gallagher. Gallagher restricts access to its

6   offices, and to its computerized information. Gallagher prohibits the removal or borrowing of

7   Gallagher property without permission. Gallagher requires all employees to sign

8   acknowledgment forms agreeing to abide by Gallagher's Code of Business Conduct and Ethics

9   and Executive Agreements, and also agreeing not to reveal Gallagher's information. Gallagher

10  also restricts access to its computerized information through the use of passwords. As these

11  measures make clear, Gallagher takes reasonable and considerable steps to ensure that its

12  Information remains confidential, and that employees, such as De La Torre, are prevented from

13  using or disclosing any of Gallagher's Information except on behalf of the company.

14
                    **b)        Defendants Have Misappropriated or Threaten to
15                              Misappropriate Gallagher's Information And Gallagher Risks
                                Potential Disclosure Of That Information Unless Defendants
16                              Are Temporarily Enjoined.**

17        Under the UTSA, "misappropriation" of a trade secret occurs either by:

18  • (1)      Acquisition of a trade secret of another by a person who knows or has
             reason to know that the trade was acquired by improper means; or

19                              *          *          *

20  • (3)      Disclosure or use of a trade secret of another without express or implied
21            consent by a person who:

22     (A)     Used improper means to acquire knowledge of the trade secret; or

23     (B)     At the time of disclosure or use, knew or had reason to know that his or
             his knowledge of the trade secret was:

24          (i)      Derived from or through a person who had utilized improper
25                   means to acquire it;

26          (ii)     Acquired under circumstances giving rise to a duty to maintain its
                     secrecy or limit its use; or

27
            (iii)    Derived from or through a person who owed a duty to the person
28                   seeking relief to maintain its secrecy or limit its use.

PLAINTIFF'S MEMO. OF POINTS & AUTHORITIES I/S/O EX PARTE APPLICATION FOR TRO & OSC
REGARDING PRELIMINARY INJUNCTION

1  Cal. Civ. Code § 3426.1(b). "Improper means," in turn, is defined as "theft, bribery,

2  misrepresentation, breach or inducement of a breach of a duty to maintain secrecy." Cal. Civ.

3  Code § 3426.1(a).

4       Under the UTSA, "threatened" as well as "actual" misappropriation of trade secrets may

5  be enjoined. Cal. Civ. Code § 3426.2(a); *American Credit Indemnity Co. v. Sacks*, 213

6  Cal.App.3d 622 (2d Dist. 1989) (remanding to trial court to form injunctive relief required to

7  protect against future trade secret misappropriation); *Imi-Tech Co. v. Gaaliani*, 691 F.Supp. 214

8  (S.D. Cal. 1986) (granting preliminary injunction granted to prevent against threatened

9  disclosure of trade secret information obtained from the plaintiff's former employees); *Surgidev*

10  *Corp. v. Eye Technology Inc.*, 648 F.Supp. 661 (D. Minn. 1986) (granting injunction under

11  California law to prevent future disclosure of trade secrets).

12       In this case, there exists no question that Defendants misappropriated Gallagher's

13  Information, and that the confidentiality of that information is at risk unless the Court intervenes.

14  Most importantly, on information and belief, De La Torre has taken a position with Andreini

15  working on insurance coverage programs and services competitive with Gallagher's services and

16  Andreini will, directly or indirectly, benefit from De La Torre's misappropriation. Nothing more

17  is required under the UTSA to establish misappropriation. Cal. Civ. Code § 3426.1(a) and

18  (b)(1). Such blatant violation of the law should not be tolerated.

19            **3.    Gallagher Is Likely To Succeed On Its Conversion Claim.**

20       To establish conversion under California law, Gallagher must show that: (a) it had an

21  ownership or right to possession of the property at issue at the time of the conversion; (b) De La

22  Torre converted that property by a wrongful act; and (c) damages. *See Oakdale Village Group v.*

23  *Fong*, 43 Cal. App. 4th 539 (3d Dist. 1996). Gallagher will be able to establish each of these

24  elements.

25       First, Gallagher clearly had an ownership interest in its Information at the time of the

26  conversion. Gallagher's Information was developed at significant time, effort, and expense to

27  Gallagher, and Gallagher took reasonable steps to maintain its confidentiality. Moreover,

28  Gallagher derived economic value from that information. Second, De La Torre converted

1    Gallagher's Information by removing that information from Gallagher without its authorization.

2    Finally, Gallagher has suffered (and continues to suffer) damages from De La Torre's removal of

3    Gallagher's Information. Unless De La Torre is enjoined as requested, the value of Gallagher's

4    Information will be destroyed and Gallagher's time, effort, and expense in developing that

5    information will be wasted.

6        Although the real value of the converted property is the proprietary information itself,

7    because the information has taken a tangible form, it is susceptible to a cause of action for

8    conversion. *See, e.g., A&M Records, Inc. v. Heilman*, 75 Cal.App.3d 554, 570, 142 Cal.Rptr.

9    390 (1978) (holding that defendant's rerecording and disseminating performances owned by

10   plaintiff was conversion); *see also Thrifty-Tel, Inc. v. Bezenek,* 46 Cal.App.4th 1559, 1565, 54

11   Cal.Rptr.2d 468 (1996) (holding "an individual who misappropriates a floppy disk which

12   contains valuable trade secrets, protected formulas, or customer lists can be liable for

13   conversion.") Consistent with Gallagher's request, a proper remedy for conversion of property is

14   the return of the property to the plaintiff. See California Civil Code § 1712.

15       **4.    Gallagher Is Likely To Succeed On Its Breach Of Contract Claims.**

16       There is no question that De La Torre breached his agreements with Gallagher by

17   utilizing Gallagher's Information for his personal use and the use of Andreini without

18   Gallagher's authorization. *See Merrill Lynch, Pierce, Fenner & Smith Inc. v. Chung,* No. CV

19   01-659 CBM, 2001 U.S.Dist. LEXIS 3248 (Feb. 2, 2001)(granting preliminary injunction based,

20   in part, on likelihood of success of breach of confidentiality agreement).

21       De La Torre's agreements with Gallagher required him to maintain the confidentiality of

22   Gallagher's Information, to not use Gallagher's property for any unauthorized purpose, to not

23   use Gallagher's property without authorization, and to return Gallagher's property upon

24   termination of his employment. Under the express terms of each of these agreements, De La

25   Torre understood that all Gallagher's confidential and proprietary information was to remain at

26   all times the property of Gallagher, that such information was not to be accessed without the

27   authority of Gallagher, and that De La Torre was to return that information to Gallagher.

28

1    **5.    Gallagher Will Succeed on its Breach of Loyalty Claim.**

2    Under California law, an employee owes a duty of loyalty toward his employer during

3    the term of employment.  Labor Code §§ 2854, 2859;  *Fowler v. Varian Assoc., Inc.* 196

4    Cal.App.3d 34, 41 (1987) (finding "during term of employment, an employer is entitled to its

5    employees' 'undivided loyalty.'"); *Stokes v. Dole Nut Co.,* 41 Cal.App.4th 285, 295 (1995)

6    (stating "[a]n employer has the right to expect the undivided loyalty of its employees").  The

7    "duty of loyalty is breached . . . when the employee takes action which is inimical to the best

8    interests of the employer." *Stokes,* 41 Cal.App.4th at 285.  Injunctive relief is also an available

9    remedy.  Section 399(f) of the Restatement (Second) of Agency.  Here, the evidence establishes

10    that De La Torre breached his duty of loyalty to Gallagher by intentionally misappropriating

11    Gallagher's confidential, proprietary and trade secret information.

12    **6.    Gallagher Will Succeed on its Tortious Interference With Contractual**
**Relations Claim.**

13

14    A successful claim for tortious interference with contractual relations requires the

15    plaintiff to show that: (1) a valid contract between the plaintiff and a third party; (2) the

16    defendant's knowledge of this contract; (3) intentional acts designed to induce a breach or

17    disruption of the contractual relationship; (4) actual breach or disruption of the relationship; and

18    (5) resulting damage.  *See Quelimane Co. v. Stewart Title Guar. Co.*, 19 Cal.4th 26, 77 (1998);

19    *Limandri v. Jenkins*, 52 Cal.App.4th 326, 343-44 (1997); *Reeves v. Hanlon*, 33 Cal.4th 1140,

20    1148 (2004); *Robi v. Five Platters, Inc.*, 918 F.2d 1439, 1442 (9th Cir. 1990).

21    De La Torre had knowledge of Gallagher's contracts with its clients and prospective

22    clients or Gallagher's expectancy that these clients would continue to remain as clients.

23    Gallagher has reasonably come to expect that its clients will remain as such and Gallagher has

24    invested substantial resources in maintaining the relationships.  Despite this knowledge, De La

25    Defendants interfered with Gallagher's contracts or its business expectancies by utilizing or

26    disclosing Gallagher's confidential information and by taking steps to move Gallagher's clients

27    to Andreini.  Gallagher has been injured and faces irreparable injury.  Gallagher is threatened

28    with losing or has lost clients, income, value of proprietary information and/or goodwill.

17

1   Because the Defendants' actions threaten to cause Gallagher to suffer significant business losses,

2   this Court should grant immediate injunctive relief to prevent such losses.

3          **7.     Gallagher Will Succeed on its Unfair Competition Claim.**

4         Gallagher alleges a claim for violation of California's unfair competition law, Business &

5   Professions Code Section 17200, et seq. ("UCL"). Any business practice that is "unlawful" in

6   that it violates a specific statute or regulation may be enjoined under the UCL. *Committee on*

7   *Children's Television, Inc. v. General Foods Corp.,* 35 Cal.3d 197, 209-10 (1983). Thus, the

8   UCL "borrows" violations from other laws by making them independently actionable as unfair

9   competitive practices. *Paulus v. Bob Lynch Ford, Inc.,* 139 Cal.App.4th 659, 677 (2006).

10        Further, a former employee may not use or exploit information which his employer

11  compiled at great expense and which represents a valuable business asset. *Klamath-Orleans*

12  *Lumber, Inc. v. Miller,* 87 Cal.App.3d 458, 464 (1978). Where the employee uses the former

13  employer's confidential information to solicit customers more selectively and more effectively,

14  the employee and its new employer are engaging in "a patent act of unfair competition" which

15  can be enjoined. *Id.* at 466.

16        The Court in *Klamath-Orleans Lumber, Inc.* rejected defendants' contentions that since

17  the identities of the customers solicited were common knowledge in the trade, no unfair

18  competition occurred. Id. at 464. *See also Greenly v. Cooper,* 77 Cal.App.3d 382. 391-92 (1978)

19  (holding that a former employee's use of confidential information obtained from his employer to

20  compete with it and to solicit the business of his former employer's customers is regarded as

21  unfair competition); *Empire Steam Laundry v. Lozier,* 165 Cal. 95, 100 (1913) (finding "an agent

22  has no right to employ as against his principal materials which that agent has obtained only for

23  his principal and in the course of his agency. They are the property of the principal.")

24        Here as in *Klamath-Orleans Lumber* and *Courtesy Temporary,* the Defendants are not

25  acquiring customers "by fruit of their own labor," but are relying unfairly upon efforts expended

26  by Gallagher in compiling its commercially valuable information.

27        Defendants are unfairly competing by utilizing Gallagher's confidential information in

28  the marketplace in an attempt to lure clients away and injure Gallagher's business. As a result of

                                    18

1  Defendants' actions, Gallagher has been injured and faces irreparable injury.  Gallagher is

2  threatened with losing goodwill, customers and income in amounts which may be impossible to

3  determine unless Defendants are enjoined and restrained by order of this Court.

**B.    Gallagher Will Suffer Irreparable Harm If No Injunction Is Granted.**

5  Irreparable harm is shown by:

> the evidence of [plaintiff's] investment of time and money in the
> development of the secret processes misappropriated by defendants
> ...since harm to [plaintiff's] competitive position lacks any
> adequate remedy at law.

*IMI-Tech, supra,* 691 F. Supp. at 231.  If Gallagher does not obtain injunctive relief in this case,

it will suffer devastating and irreparable harm because Gallagher will be prevented from using

the Gallagher confidential and proprietary information on which it has invested many years of

effort and significant sums of money.  Damages would not be an adequate remedy for actual or

threatened disclosure of trade secret information.

Moreover, unless Defendants are enjoined as requested, there is a significant threat that

Gallagher's information will be disclosed to others, significantly impairing Gallagher's ability to

protect that information.  Once these secrets are in the hands of Defendants, there will be no way

for Gallagher to "unring the bell" giving any of these competitors an unfair short-cut advantage,

leading to lost sales and market share for Gallagher, as well as damage to Gallagher's reputation

as an industry leader and goodwill.  Only through an immediate injunction will further injury be

prevented.  *See American Credit Indemnity Co.*, 213 Cal.App.3d 622 (remanding case to trial

court to form injunctive relief required to protect against future trade secret misappropriation);

*Imi-Tech Co.,* 691 F.Supp. 214 (granting preliminary injunction to prevent against threatened

disclosure of trade secret information obtained from the plaintiff's former employees).

**C.    On Balance, The Equities Weigh Heavily In Favor Of Granting Gallagher
        The Requested TRO.**

In considering the appropriateness of injunctive relief, the court should balance the

possible harm to plaintiff from denying the TRO against the possible harm to the defendant from

granting it.  *E.g., Amoco Production Co. v. Village of Gambell, Alaska,* 480 U.S. 531 (1987).

Here, De La Torre will suffer no undue hardship if a TRO is granted.  The requested TRO

19

1  merely seeks to order Defendants to refrain from utilizing or disclosing Gallagher's trade secrets

2  and other information and to account for the whereabouts such information; to order Defendants

3  to not solicit Gallagher's employees to obtain additional confidential information; to require De

4  La Torre to submit to a deposition to assist in the transition of his position to a new Gallagher

5  employee, and to determine the full extent of his misappropriation and disclosure of Gallagher's

6  confidential information, and to require De La Torre to refrain from any job function at Andreini

7  in which he would have responsibility for or access to products and services competitive with

8  Gallagher's, and on which De La Torre worked while at Gallagher. When the certain irreparable

9  harm to Gallagher in the absence of a TRO is weighed against the hardship that would be

10 imposed on the Defendants if a TRO is entered, the equities weigh heavily in favor of Gallagher.

### IV.    A NOMINAL TRO BOND SHOULD BE REQUIRED

Federal Rule of Civil Procedure, Rule 65(c) provides that a temporary restraining order or preliminary injunction shall issue "upon the giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained." Here, Gallagher is asking that Defendants be restrained from further violating the Computer Fraud and Abuse Act and the UTSA. Consequently, Defendants will have no costs or damages as a result of the relief requested. Therefore, a bond in the nominal amount of $3,000 would provide more than adequate security.

### V.    CONCLUSION

For all of the foregoing reasons, Gallagher Benefit Services, Inc. respectfully requests that its Application be granted.

DATED: October 29, 2007

SEYFARTH SHAW LLP

By _____
Robert S. Niemann
Althea V. Bovell
Krista L. Mitzel

Attorneys for Plaintiff
GALLAGHER BENEFIT SERVICES, INC.

PLAINTIFF'S MEMO. OF POINTS & AUTHORITIES I/S/O EX PARTE APPLICATION FOR TRO & OSC REGARDING PRELIMINARY INJUNCTION

Exhibit A

# EXECUTIVE AGREEMENT

This AGREEMENT is made and entered into as of the 5th day of OCTOBER , 1998 , by and between   Jim De La Torre   (hereinafter referred to as the "Executive") and ARTHUR J. GALLAGHER & CO. ("Corporation"), its subsidiaries, divisions and affiliated and related companies (hereinafter collectively referred to as the "Company").

IN CONSIDERATION of the mutual covenants hereinafter made by each party to the other, the Executive and the Company agree as follows:

## EMPLOYMENT AND REMUNERATION

**Paragraph One.** The Company agrees to employ and to continue to employ the Executive in accordance with the terms of this Agreement. Such employment shall include the sales and servicing of accounts and prospective accounts of Company. Company shall provide Executive with access to the resources and data of the Company to assist Executive in such sales and servicing activities.

**Paragraph Two.** The Company agrees that the Executive shall be entitled to the semi-monthly payment of compensation, an annual paid vacation, and various employee benefit plans. It is understood and agreed that the Company may from time to time modify the specific terms and conditions of these entitlements.

**Paragraph Three.** The Company agrees that the Executive shall be entitled to reimbursement for traveling, entertainment and other expenses reasonably incurred by the Executive in the performance of his employment obligations and responsibilities. It is understood and agreed that the Company's liability in this regard shall be limited by the terms and conditions of the Company policy in effect on the date that the expense is incurred.

## FIDUCIARY OBLIGATIONS
## OF THE EXECUTIVE

**Paragraph Four.** The Executive agrees to devote his full energies, abilities, attention and business time to the performance of his employment obligations and responsibilities. The Executive further agrees that he will not engage in any activity which conflicts or interferes with, or in any way compromises, his performance of those obligations and responsibilities.

**Paragraph Five.** The Executive recognizes that, by virtue of his employment by the Company and to assist him in the solicitation, production and servicing of accounts, he will be granted otherwise prohibited access to confidential and proprietary data of the Company which is not known either to its competitors or within the insurance agency and brokerage business generally and which has independent economic value to the Company. This information (hereinafter referred to as "Confidential Information") includes, but is not limited to: data relating to the Company's unique marketing and servicing programs, procedures and techniques; business, management and personnel strategies; the criteria and formulae used by the Company in pricing its insurance products and claims management, loss control and information management services;

the structure and pricing of special insurance packages that the Company has negotiated with various underwriters; lists of prospects; the identity, authority and responsibilities of key contacts at Company accounts; the composition and organization of accounts' businesses; the peculiar risks inherent in their operations; highly sensitive details concerning the structure, conditions and extent of their existing insurance coverages; policy expiration dates; premium amounts; commission rates; risk management service arrangements; loss histories; and other data showing the particularized insurance requirements and preferences of the accounts. The Executive recognizes that this Confidential Information constitutes a valuable property of the Company, developed over a long period of time and at substantial expense. Accordingly, the Executive agrees that he will not, at any time during his employment by the Company, divulge such Confidential Information or make use of it for his own purposes or the purposes of another.

**Paragraph Six.** The Executive recognizes that by virtue of his employment by the Company, he will be afforded numerous and extensive resources to assist him in the solicitation, production and servicing of accounts. The Executive understands and agrees that all efforts that he expends in this regard shall be for the permanent benefit of the Company, that the Company shall secure and retain indefinitely the proprietary interest in all such accounts, and that the Executive will not undertake any action which could in any way disturb the Company's relationship with said accounts.

## TERMINATION OF
## EMPLOYMENT RELATIONSHIP

**Paragraph Seven.** The Executive and the Company understand and agree that each has the right, upon fourteen (14) days' written notice (hereinafter referred to as the "Notice Period"), to terminate the employment relationship for any reason whatsoever. The Company may, at its option, pay the Executive for the Notice Period in lieu of active employment during the Notice Period. It is further agreed that Company may terminate such employment without any notice in the event Executive breaches this Agreement, commits any dishonest or fraudulent act or is unable to lawfully perform his duties hereunder.

**Paragraph Eight.** The Company agrees to continue in effect during the Notice Period the compensation and benefits to which the Executive may be entitled under Paragraphs One, Two and Three of this Agreement. It is understood and agreed that at the expiration of the Notice Period, the Executive's entitlement to the remuneration described in the aforementioned three (3) paragraphs shall cease.

**Paragraph Nine.** The Executive agrees that during the Notice Period, he will cooperate fully with the Company in all matters relating to the winding up of any pending work and the orderly transfer to other Company employees of the accounts and prospective accounts for which he has most recently been responsible. The Executive further agrees that, during the Notice Period (whether or not active employment continues during the Notice Period), Executive's fiduciary duties to Company shall remain in effect.

**Paragraph Ten.** The Executive agrees that, prior to the expiration of the Notice Period, he will return to the Company all literature, correspondence, memoranda, reports, summaries,

manuals, proposals, contracts and other documents of any kind which relate in any way to the business of the Company, including specifically all materials which comprise or refer to the Company's Confidential Information. It is understood and agreed that the Executive will not retain any copy, facsimile or note intended to memorialize any such data.

**Paragraph Eleven.** The Executive understands and agrees that, during or at the expiration of the Notice Period, he will attend any meeting the Company may convene to: (i) review the status of accounts for which the Executive has most recently been responsible; (ii) ensure that the Executive has fully obtained his entitlements under this Agreement; and/or (iii) confirm that the Executive clearly understands the nature and scope of his post-employment obligations.

## POST-EMPLOYMENT OBLIGATIONS
## OF THE PARTIES

**Paragraph Twelve.** The Company agrees that the Executive, upon the termination of his employment, shall be entitled to such severance pay, if any, as may then be provided for under the Company's personnel policies. It is understood and agreed that the Company may, in its discretion, increase both the amount of severance pay due the Executive, and the time period for distributing same.

**Paragraph Thirteen.**

A. The Executive recognizes the highly sensitive nature of the Confidential Information to which he will have access during his employment, and acknowledges the Company's legitimate interest in safeguarding same from disclosure. Accordingly, the Executive agrees that, for a period of two (2) years following the termination of his employment for any reason whatsoever, he will not divulge the Company's Confidential Information or make use of it for his own purpose or the purpose of another. In addition, the Executive understands and agrees that for a period of two (2) years following the termination of his employment for any reason whatsoever, he will not, directly or indirectly, solicit, place, accept, aid, counsel or consult in the renewal, discontinuance or replacement of any insurance by, or handle self-insurance programs, insurance claims or other insurance administrative functions for, any existing Company account or any actively solicited prospective account of the Company for which he performed any of the foregoing functions during the two-year period immediately preceding such termination, if the loyal and complete fulfillment of his duties in connection with the performance of any of the foregoing functions would likely call upon the Executive to reveal, make judgments upon, or to otherwise use or divulge any of the Confidential Information or to otherwise violate any provision of this Agreement.

B. The Executive recognizes that employees of the Company are a valuable resource of the Company. Accordingly, the Executive agrees that, for a period of two (2) years following the termination of his employment for any reason whatsoever, he will not, directly or indirectly, solicit, induce or recruit any employee of the Company to leave the employ of the Company.

**Paragraph Fourteen.** Notwithstanding anything contained herein to the contrary, the Post-Employment obligations of the Executive contained in Paragraph Thirteen shall become null and void and have no further effect immediately upon a Hostile Change in Control of the Corporation as defined herein. The Company shall send written notice to the Executive within ten (10) days of a Hostile Change in Control of the Corporation, notifying the Executive that such event has taken place. Failure of the Company to send such notice shall not preclude the release of the Executive from the Post-Employment Obligations contained in Paragraph Thirteen. For the purposes of this Paragraph Fourteen, the following definitions apply:

A.    The term "Hostile Change in Control" means a transaction, event or election constituting a Change in Control, which was not approved by, or, in an election, the directors elected were not nominated by, at least two-thirds of the members of the Board of Directors of the Corporation in office immediately prior to the Change in Control who have not died or become permanently disabled.

B.    The term "Change in Control" of the Corporation means and includes each and all of the following occurrences:

1.    A Business Combination, unless:

(a)    the Business Combination is approved or authorized by the affirmative vote of the holders of not less than 80% of the outstanding shares of voting stock of the Corporation and the affirmative vote of the holders of not less than 67% of the outstanding shares of the voting stock held by shareholders other than Related Persons; or

(b)    the Continuing Directors of the Corporation by a two-thirds vote (i) have expressly approved in advance the acquisition of outstanding shares of voting stock of the corporation that caused the Related Person to become a Related Person, or (ii) have approved the Business Combination prior to the Related Person involved in the Business Combination having become a Related Person; or

(c)    the Business Combination is solely between this corporation and another corporation, 50% or more of the voting stock of which is owned by the Corporation and none of which is owned by the Related Person; or

(d)    all of the following conditions are satisfied:

(i)    The cash or fair market value of the property, securities or "other consideration to be received" per share by holders of common stock in the Corporation in the Business Combination is not less than the higher of:

(A)    the highest per share price (including brokerage commissions, transfer taxes and soliciting dealers' fees) paid by the Related Person in acquiring any of its holdings of the Corporation's common stock, or

(B)    an amount that bears that same percentage relationship to the market price of the Corporation's common stock immediately prior to the announcement of such Business Combination as the highest per share price determined in (A) above bears to the market price of the Corporation's common stock immediately prior to the commencement of the acquisition of the Corporation's voting stock that caused such Related Person to become a Related Person, or

(C)    an amount calculated by multiplying the earnings per share of the Corporation's common stock for the four fiscal quarters immediately preceding the record date for determination of stockholders entitled to vote on such Business Combination by the price/earnings multiple of the Related Person as of the record date as customarily computed and reported in the financial press.

Appropriate adjustments shall be made with respect to (A), (B) and (C) above for recapitalizations and for stock splits, stock dividends, and like distributions; and

(ii)    A timely mailing shall have been made to the stockholders of the Corporation containing in a prominent place (x) any recommendations as to the advisability (or inadvisability) of the Business Combination that the Continuing Directors or Outside Directors may choose to state, if there are at the time any such directors, and (y) the opinion of a reputable nationally recognized investment banking or financial services firm as to the fairness from the financial point of view of the terms of the Business Combination to the stockholders of the Corporation other than the Related Person (such firm to be engaged solely on behalf of such other stockholders, to be paid a reasonable fee for its services by the Corporation upon receipt of such opinion, to be a firm that has not previously been significantly associated with the Related Person and, if there are at the time any such directors, to be selected by a majority of the Continuing Directors and Outside Directors).

2.    The acquisition of outstanding shares of the Corporation's voting stock that causes an individual, a corporation, partnership or other person or entity to become a Related Person.

3.    Individuals who at the beginning of any period of three consecutive years constitute the entire Board of Directors of the Corporation shall for any

reason other than death or permanent disability during such period cease to constitute a majority thereof.

        4.     A change in control of a nature that would be required to be reported in response to Item 6(e) of Schedule 14A of Regulation 14A promulgated under the Securities Act of 1934, as amended.

C.     The term "Business Combination" shall mean (i) any merger or consolidation of the Corporation or a subsidiary of the Corporation with or into a Related Person, (ii) any sale, lease, exchange, transfer or other disposition, including without limitation a mortgage or any other security device, of all or any Substantial Part of the assets either of the Corporation (including without limitation any voting securities of a subsidiary) or of a subsidiary, to a Related Person, (iii) any merger or consolidation of a Related Person with or into the Corporation or a subsidiary of the Corporation, (iv) any sale, lease, exchange, transfer or other disposition of all or any Substantial Part of the assets of a Related Person to the Corporation or a subsidiary of the Corporation, (v) the issuance of any securities of the Corporation or a subsidiary of the Corporation to a Related person, (vi) the acquisition by the Corporation or a subsidiary of the Corporation of any securities issued by a Related Person, (vii) any reclassification of securities, recapitalization or other transaction designed to decrease the number of holders of the Corporation's voting securities remaining, if there is a Related Person, and (viii) any agreement, contract or other arrangement providing for any of the transactions described in this definition of Business Combination.

D.     The term "Related Person" shall mean and include any individual, corporation, partnership or other person or entity which, together with their "Affiliates" and "Associates" (as defined as of November 1, 1983, in Rule 12b-2 under the Securities Exchange Act of 1934), "Beneficially Owns" (as defined as of November 1, 1983, in Rule 13d-3 under the Securities Exchange Act of 1934) in the aggregate 20% or more of the outstanding shares of the voting stock of the Corporation, and any Affiliate or Associate of any such individual, corporation, partnership or other person or entity; provided that Related Person shall not include any person who beneficially owned 20% or more of the outstanding shares of the voting stock of the Corporation on November 1, 1983. Without limitation, any shares of voting stock of the Corporation that any Related Person has the right to acquire pursuant to any agreement, or upon exercise of conversion rights, warrants or options, or otherwise, shall be deemed beneficially owned by the Related Person.

E.     The term "Substantial Part" shall mean more than 30% of the fair market value of the total assets of the corporation in question, as of the end of its most recent fiscal year ending prior to the time the determination is being made.

F.     The term "other consideration to be received" shall include, without limitation, capital stock of the Corporation retained by its existing public stockholders in the event of a Business Combination in which the Corporation is the surviving corporation.

G.     The term "Continuing Director" shall mean a director who was a member of the board of directors of the Corporation immediately prior to the time that the Related Person

involved in a Business Combination became a Related Person, and the term "Outside Director" shall mean a director who is not (a) an officer or employee of the Corporation or any relative of an officer or employee or (b) a Related Person or an officer, director, employee, Associate or Affiliate of a Related Person, or a relative of any of the foregoing.

## ENFORCEMENT

**Paragraph Fifteen.** The Executive and the Company understand and agree that any breach or evasion of any term of this Agreement will give rise to an action for breach of contract, which may be brought in any court of competent jurisdiction.

**Paragraph Sixteen.** The Executive recognizes that the services provided by him pursuant to this Agreement are of a special, unique and extraordinary character. The Executive further recognizes that a breach of the covenants of Executive set forth in Paragraph Thirteen (A) hereof will result in losses that cannot be reasonably estimated or easily calculated by either Executive or Company and may further result in future losses which cannot be adequately compensated for by damages. In recognition of the foregoing, the Executive agrees that:

A. In the event of a breach of the covenants of Executive referred to above which results in the loss of a customer or account that produced commission or fee revenues to the Company, Executive shall pay Company, as liquidated damages for, and as a reasonable forecast of, such loss, an amount equal to one hundred thirty-five percent (135%) of such revenues derived by Company attributable to such lost customer or account in the one year immediately preceding the date of breach, payable upon demand by Company;

B. In the event of a breach of the covenants of Executive referred to above which results in Executive or any person, corporation or other entity affiliated with Executive ("Executive's Affiliates") receiving commission or fee revenues attributable to an actively solicited prospective account of the Company, Executive shall pay Company, as liquidated damages and as received, forty-five percent (45%) of such revenues received by Executive or by Executive's Affiliates during the three (3) year period following the date of the first receipt of such revenues attributable to such prospective account of the Company; and

C. In the event of a breach or threatened breach of the covenants of Executive referred to above, the Company shall be entitled to equitable relief, including a temporary restraining order and preliminary and permanent injunctive relief to prevent a future breach of such covenants.

**Paragraph Seventeen.** This Agreement shall be governed by and construed in accordance with the laws of the State of California.

**Paragraph Eighteen.** The provisions of this Agreement are intended to be interpreted and construed in a manner which makes such provisions valid, legal and enforceable. In the event any provision of this Agreement is found to be partially or wholly invalid, illegal or unenforceable, such provision shall be modified or restricted to the extent and in the manner necessary to render

such provision valid, legal and enforceable. It is expressly understood and agreed between the parties that this modification or restriction may be accomplished by mutual accord between the parties or, alternatively, by disposition of a court of law. If such provision cannot under any circumstances be so modified or restricted, it shall be excised from this Agreement without affecting the validity, legality or enforceability of any remaining provisions.

**Paragraph Nineteen.** The Executive understands and agrees that, in the event of his breach of this Agreement, he shall be liable for any attorneys' fees and costs incurred by the Company in enforcing its rights hereunder. The Executive further agrees that, in the event of a breach of the provisions of Paragraph Thirteen, the time period specified in such paragraph shall be extended by the number of days between the date of such breach and the date such breach is enjoined or other relief is granted the Company by a court of competent jurisdiction. It is the intention of the parties that the Company shall enjoy the faithful performance by Executive of the covenants specified in said paragraph for the full time period specified therein.

## MISCELLANEOUS

**Paragraph Twenty.** Except as hereinafter provided, this Agreement supersedes all existing Company policies, and all previous agreements between the parties, to the extent that such policies and agreements consider subject matters herein addressed. Any and all prior covenants entered into by Executive for the benefit of Company and relating to restrictions on Executive's business activities after termination of employment with Company remain in full force and effect. Company, however, agrees that the contingent release of Post-Employment obligations contemplated by Paragraph Fourteen shall apply with like force and effect to any such prior covenants.

**Paragraph Twenty-One.** This Agreement shall inure to the benefit of and shall be binding upon the successors and assigns of the Company and may be enforced by any subsidiary of the Company for whom Executive has provided services hereunder.

**Paragraph Twenty-Two.** As used in this Agreement, all terms of masculine gender shall be construed, where appropriate, to be of the feminine gender.

## ACKNOWLEDGEMENT

The Executive and the Company, by its designated representative, hereby acknowledge that they have read and understand each of the provisions of this Agreement, that they have executed

8

his Agreement voluntarily and with full knowledge of its significance, and that they intend to be fully bound by the same.

THE EXECUTIVE                                ARTHUR J. GALLAGHER & CO.

_____                      _____
                                             Vice President

Witness:                                     Attest:

_____                      _____
                                             Carl E. Fasig
                                             Secretary

**9**

Exhibit B

# CODE OF BUSINESS CONDUCT AND ETHICS

## ARTHUR J. GALLAGHER & CO.

This Code of Business Conduct and Ethics applies to all of the employees, officers and directors of Arthur J. Gallagher & Co. and its subsidiaries. Any employee or officer who violates the letter or spirit of these policies is subject to disciplinary action, up to and including termination of employment.

Every employee, officer and director has the responsibility to obey the law and act honestly and ethically. To that end, this Code of Business Conduct and Ethics is a guide that is intended to sensitize employees, officers and directors to significant legal and ethical issues that arise frequently and to the mechanisms available to report illegal or unethical conduct. It is not, however, a comprehensive document that addresses every legal or ethical issue that an employee, officer or director may confront, nor is it a summary of all laws and policies that apply to Gallagher's business. Ultimately, no code of business conduct and ethics can replace the thoughtful behavior of an ethical employee, officer or director.

Please read this Code of Business Conduct and Ethics carefully and consider how the provisions relate to your daily business interactions. Each employee, officer and director should also read and be familiar with the portions of our other company policies applicable to such employee, officer and director, none of which are a part of this Code of Business Conduct and Ethics.

Any questions you may have on this Code of Business Conduct and Ethics or its administration should be referred to your immediate supervisor or a member of the Legal Department. No one at Arthur J. Gallagher & Co. has the authority to make exceptions to these policies, other than our Board of Directors.

## I.    COMPLIANCE WITH LAWS, RULES AND REGULATIONS

All employees, officers and directors must comply fully with all applicable foreign, federal, state and local laws, rules and regulations that govern Gallagher's business activities and conduct, including, without limitation, antitrust laws, employee health and safety laws, insider trading laws, the Foreign Corrupt Practices Act and any applicable trade restrictions, export controls, or antiboycott laws and regulations. All governmental inquiries or investigations must be referred to our Legal Department. It is our policy to fully cooperate with any governmental or regulatory investigation, and all employees, officers and directors are expected to fully cooperate with any internal or external investigations. Since the laws governing our activities are often complex, any questions that you may have regarding their applicability and interpretation, should, after review with your supervisor, be referred to our Legal Department.

In general, employees, officers and directors who have access to, or knowledge of, material nonpublic information from or about our company are prohibited from buying, selling or otherwise trading in our company's stock or other securities. "Material nonpublic" information includes any information, positive or negative, that has not yet been made available or disclosed

to the public and that might be of significance to an investor, as part of the total mix of information, in deciding whether to buy or sell stock or other securities.

Such insiders also are prohibited from giving "tips" on material nonpublic information, that is directly or indirectly disclosing such information to any other person, including family members, relatives and friends, so that they may trade in our stock or other securities. Furthermore, if, during the course of your service with our company, you acquire material nonpublic information about another company, such as one of our customers or suppliers, or you learn that we are planning a major transaction with another company (such as an acquisition), you are restricted from trading in the securities of the other company as well as ours.

Such "insider trading" is both unethical and illegal, with criminal penalties of up to $5 million and a jail term of up to 20 years and civil penalties of up to three times the illegal profit gained or loss avoided.

Please refer to our Insider Trading Policy for a more complete description of our company's policies on insider trading which can be found on our web portal.

## II.    CONFLICTS OF INTEREST

Business decisions must be made in the best interest of our company, not motivated by personal interest or gain. Therefore, as a matter of Gallagher policy, all employees, officers and directors must avoid any actual or perceived conflict of interest.

A "conflict of interest" occurs when an individual's personal interests interfere or conflict in any way (or even appear to interfere or conflict) with the interests of our company. A conflict of interest situation can arise when an employee, officer or director takes actions or has interests (financial or other) that may make it difficult to perform his or her company work objectively and effectively. Conflicts of interest also may arise when an employee, officer or director, or a member of his or her family, receives improper personal benefits as a result of his or her position in Gallagher, regardless of whether such benefits are received from us or a third party. Loans to, or guarantees of obligations of, employees, officers and directors and their respective family members are of special concern. Federal law currently prohibits Gallagher from making loans to directors and executive officers.

It is difficult to identify exhaustively what constitutes a conflict of interest. For this reason, employees, officers and directors must avoid any situation in which their independent business judgment might appear to be compromised. Questions about potential conflicts of interest situations, and disclosure of these situations as they arise, should be addressed and reported to the Legal Department.

## III.    ACCURATE ACCOUNTING AND PUBLIC DISCLOSURE

The accurate and full recording of company business activities is essential to our ability to fulfill our financial and legal obligations. Under no circumstances should you alter any business record or destroy any records except in conformity with our policy on records retention.

Financial transactions are to be recorded in accordance with generally accepted accounting principles and applicable governmental rules and regulations. You are expected to comply fully with internal accounting and audit policies and procedures designed to protect the integrity of our corporate records and are also to cooperate with the Accounting Department and internal and external auditors.

All employees, officers and directors are encouraged to report any concerns that they may have regarding the accounting, internal accounting controls, or auditing matters of the company directly to the Audit Committee. All submissions by employees of concerns regarding questionable accounting or auditing matters will be received by the Audit Committee on a confidential and anonymous basis. We want to assure all of our employees, officers and directors that they have no need to fear retaliation or retribution for having acted in good faith in reporting their concerns.

As a result of our status as a public company, Gallagher is required to file periodic and other reports with the Securities and Exchange Commission. Gallagher takes its public disclosure responsibility seriously to ensure that these reports and other public communications furnish the marketplace with full, fair, accurate, timely and understandable disclosure regarding the financial and business condition of the company.

## IV.    CONFIDENTIALITY

Employees, officers and directors must maintain the confidentiality of all information entrusted to them by us, our clients or suppliers, or others with whom we may conduct business, except when disclosure of such information is specifically authorized by our Legal Department or required as a matter of law. Confidential information includes all non-public information that might be of use to competitors, or harmful to us or our clients, if disclosed.

## V.    PROTECTION AND PROPER USE OF COMPANY ASSETS

All employees, officers and directors must protect our assets and ensure their efficient use. Such assets include, without limitation, intellectual property such as the Gallagher name, logos, trademarks, patents, copyrights, confidential information, ideas, plans and strategies. Theft, carelessness and waste have a direct impact on our profitability. All company assets must be used for legitimate business purposes. Any misuse or infringement of our assets should be reported to the Legal Department.

## VI.    CORPORATE OPPORTUNITIES

Employees, officers and directors are prohibited from: (a) taking for themselves personally opportunities that properly belong to the company or are discovered through the use of corporate property, information or position; (b) using corporate property, information or position for personal gain; and (c) competing with the company. Employees, officers and directors owe a duty to the company to advance its legitimate interests when the opportunity to do so arises. Any questions as to the appropriateness of the conduct of any employee, officer or director should be brought to the attention of the Legal Department immediately.

3

## VII.   FAIR DEALING

Each employee, officer and director must endeavor to deal fairly and in good faith with our customers, suppliers, competitors, stakeholders and employees. No employee, officer or director shall take unfair advantage of anyone through manipulation, concealment, abuse of privileged information, misrepresentation of material facts or any other unfair dealing practices.

## VIII.   EQUAL EMPLOYMENT OPPORTUNITY AND HARASSMENT

Through specific policies issued by our Human Resource Department, we strive to select, place and work with all our employees and officers without discrimination based on race, color, national origin, gender, age, religion, disability, veteran's status, or actual or perceived sexual orientation. Equal opportunity is one of our firmest and most basic beliefs. Please see the Company's Human Resources Manual for a fuller description of the Company's Equal Employment Opportunities, Anti-Discrimination and Americans With Disabilities Act policies.

Further, it is the responsibility of each of us to help the company provide a work atmosphere free of harassing, abusive, disrespectful, disorderly, disruptive or other nonprofessional conduct. Sexual harassment in any form, verbal or physical, by any employee, officer or director will not be tolerated. It is also a violation of our policy to retaliate against anyone who in good faith complains about harassing behavior or participates in an investigation. A violation of the Company's harassment policy will be treated with appropriate discipline, up to and including termination of employment. Please see the Company's Sexual Harassment policy found in the Company's Human Resources Manual for further details.

## IX.   REPORTING VIOLATIONS AND COMPLIANCE

All of our employees, officers and directors have a duty to adhere to this Code of Business Conduct and Ethics. It is our intention to enforce the policies expressed in this Code of Business Conduct and Ethics. If confronted with an ethical question, employees are strongly urged to discuss this matter either with their supervisor or the Human Resources Department. As discussed in Section III of this Code of Business Conduct and Ethics, concerns regarding questionable accounting or auditing matters should be brought to the attention of the Audit Committee. We will respect the confidentiality of all such discussions, and we further want to assure all of our employees, officers and directors that they need have no fear of retaliation or retribution for having acted in good faith in calling unethical conduct to the attention of our management.

All allegations will be investigated by the proper corporate, business unit or department personnel, and, upon the advice and approval of the Legal Department, will be reported to the appropriate authorities. In order to facilitate implementation of this Code of Business Conduct and Ethics, employees, officers and directors have a duty to cooperate fully with the investigation process and to maintain the confidentiality of investigative information unless specifically authorized to disclose such information.

4

Employees, officers and directors who provide information to or assist in any investigation or proceeding by the Company, federal governmental or law enforcement agency regarding any alleged violation of fraud laws or SEC rules and regulations will not be subject to retaliatory action for their cooperation in such matters. It is a violation of this policy and federal law for any employee, officer or director to retaliate against an employee because the employee provides such cooperation. Any employee who believes he or she has been the subject of retaliation should report the matter to his or her supervisor or the Human Resources Department. If the employee's manager is involved in the alleged retaliation, the employee should contact the Human Resources Department directly.

Employees, officers or directors who fail to comply with the standards of behavior that we have described in this booklet are subject to disciplinary action that may include termination of service, referral for criminal prosecution, and reimbursement to Arthur J. Gallagher & Co. for any losses or damages resulting from the violation. Discipline may also be imposed for conduct that is considered unethical or improper even if the conduct is not specifically covered by our Code of Business Conduct and Ethics.

No code or set of values can address every ethical choice we face in business; no communication system or oversight group can ensure complete compliance. Each of us must use good common sense and judgment in our personal conduct.

## X.    AMENDMENT, MODIFICATION AND WAIVER

This Code of Business Conduct and Ethics may be amended, modified or waived by the Board of Directors of the Company. Any change to, or waiver of, this Code of Business Conduct and Ethics for executive officers or directors must be disclosed promptly to our stockholders either by a Form 8-K filing or by publishing a statement on our website.

6

Exhibit C

꣑꣑꣑꣑꣑꣑꣑꣑꣑꣑꣑꣑꣑꣑꣑꣑꣑꣑꣑꣑꣑꣑꣑꣑꣑꣑꣑꣑꣑꣑

# CODE OF ETHICS SIGNATURE CARD

I hereby acknowledge that I have read the Arthur J. Gallagher & Co.
Code of Ethics, have become familiar with its contents, am presently
in compliance with the Code and will comply with it in the future,
subject to any exceptions noted below.

(Use Only Ballpoint Pen)

*James De La Torre*

Name (please print)

*[signature]*

Your Signature

*Gallagher - Heffernan*

Organization (AJGCo, GB, GBS, etc.)

*San Francisco*

Location

*10/9/98*

Date

Exceptions:

_____

_____

_____

_____

_____

_____

_____

**Return to the Home Office Human Resource Department**

꣑꣑꣑꣑꣑꣑꣑꣑꣑꣑꣑꣑꣑꣑꣑꣑꣑꣑꣑꣑꣑꣑꣑꣑꣑꣑꣑꣑꣑꣑



# CODE OF BUSINESS CONDUCT AND ETHICS
## SIGNATURE CARD

I hereby acknowledge that I have read the Arthur J. Gallagher & Co. Code of Business Conduct and Ethics, have become familiar with its contents, and agree not to violate the spirit or letter of the Code.

(Use Only Ballpoint Pen)

Name (please print)

*JAMES DE LA TORRE*

Your Signature

*[signature]*

Organization (AJGCO, GB, GBS, etc.)

*GBS*

Location

*SAN FRANCISCO*

Date

*12-29-03*

PRINT:

# CODE OF BUSINESS CONDUCT AND ETHICS

## SIGNATURE CARD .

I hereby acknowledge that I have read the Arthur J. Gallagher & Co. Code of Business Conduct and Ethics, have become familiar with its contents, and agree not to violate the spirit or letter of the Code.

(Use Only Ballpoint Pen)

Name (please print)    *JAMES DE LA TORRE*

Your Signature    *[signature]*

Organization (AJGCO, GB, GBS, etc.)    *GBS*

Location    *SAN FRANCISCO*

Date    *2/21/05*

Exhibit D

## LOCK REGISTRATION / CONSENT FORM

I hereby request that the company provide me with a key to the office door, desk, drawer or file cabinet listed below for my convenience. I understand that the company provides desks, drawers and file cabinets for the convenience of its employees during work. I also understand that I must not place any lock on desks, drawers or file cabinets other than the lock furnished by the company. Further, I understand that the desks, drawers and file cabinets are and shall remain the sole property of the company and that the company reserves the right to open and inspect the desks, drawers and file cabinets; as well as any contents, effects or articles in the desk, drawer or file cabinet, at any time with or without advance notice of my further consent. Such an inspection may be conducted during or after my working hours by a supervisor, manager or any security personnel designated by the company. I understand that I must, if asked, cooperate with the company or its designated representative in connection with any such inspection and hereby consent to such inspections.

I certify I have read the Desk/Drawer Inspection Policy and the consent form, understand it, and voluntarily agree to its provisions.

**KEY NUMBER:**          SBA 3 & SCA 28

**EMPLOYEE NAME (PRINT):**    JIM DE LA TORRE

**SIGNATURE:**

**DATE:**          OCTOBER 24, 2005

Restroom
Key ⟶

Office Suite
Key ⟶

Returned to Garcia
10/5/07

REVISED 3/18/96

# Gallagher Benefit Services, Inc.
## PRIVACY POLICY ACKNOWLEDGEMENT

Certain privacy laws and related regulations require records, documents and other materials pertaining to services rendered by Gallagher Benefit Services, Inc. (GBS) be held in strict confidence. Therefore, GBS requires its employees to acknowledge and agree that:

- You have read and understand the privacy policies and procedures established by GBS;
- You acknowledge and agree that you have access to certain information in the form of confidential financial information, Protected Health Information, and other information, including but not limited to information such as addresses, phone numbers, and group health plan enrollment status ("Information"), provided by clients and vendors that should be treated in a confidential manner;
- You shall not during your employment or at any time thereafter, disclose any confidential or Protected Information to any person, firm, corporation, or other business association unless such disclosure is necessary to perform my duties as a GBS employee;
- You will maintain Information in a confidential manner by exercising a reasonable degree of care over the control and dissemination of such information; and
- You will use any and all information accessed as a result of your employment with GBS only for internal business purposes, unless otherwise directed to do so in writing by GBS. Such Information may not be disclosed except (i) as provided in a written authorization from the individual subject to said records; (ii) to the extent permitted or required by law; (iii) to the extent permitted or required by administrative or judicial order.

This acknowledgement does not evidence any contractual term of employment and it does not in any way limit your employment at will status, and is effective as of the date it is executed by you under the laws of the State of Illinois.

Executed this _2_ day of _April_, 20_03_

BY: _____

_James De La Torre_
(Print Name)

1-3/17/03

### ONE MARKET
### ACCESS CARD RECEIPT
### GALLAGHER HEFFERNAN INSURANCE BROKERS

Here is your new access card. Please carry it with you for entry into the building, elevators and offices during the following times:

**MONDAY THROUGH FRIDAY:**  6:30 PM – 7:00 AM
(Building & Elevators)

**MONDAY THROUGH FRIDAY:  BEFORE 8:00AM**
(Office Access)

**SATURDAY & SUNDAY:**   24 HOURS

**HOLIDAYS:**    24 HOURS

If your card is lost or stolen, please report it to Human Resources immediately.  There is a $10.00 charge for lost or stolen cards.

I acknowledge receipt of the following card.  I am aware of the fee for a lost or stolen card.

SIGNATURE: _____

PRINT NAME:     JIM DE LA TORRE

CARD NUMBER:    809222

DATE:           June 29, 2001



Human Resource
Administrative and Policy Guide

| Chapter: | Other Policies/Procedures | |
|---|---|---|
| Title: | Electronic Information Policy | |
| Original Issue Date: 12/18/97 | Date of this Revision: 05/29/2005 | Next Review Date: |
| Revision #: 1.0 | Authorized Readers: All Employees | |

# Electronic Information Policy

**PURPOSE**

To inform employees of the Company's expectations concerning use of the Company's electronic information resources.

**1.0    Employee Responsibilities**

The Company's electronic information resources shall be used primarily for the Company's business. Each employee is expected to : (i) adhere to the Gallagher Code of Business Conduct and Ethics Policy, (ii) communicate in a professional and appropriate manner, (iii) protect access to the Company's electronic information resources and (iv) protect the confidentiality of the Company's material.

**2.0    Use of Company's Intellectual Property**

Use of any Company name, trademark or service mark in electronic media must adhere to relevant Company standards, be approved by the employee's manager, and is subject to the approval of the Vice President - CIS, before release.

**3.0    Right to Monitor**

The Company reserves the right to monitor any electronic communication which utilizes any of the Company's resources, in accordance with applicable law. Even though you may use a private password to access the Company's electronic resources, monitoring by authorized personnel may occur at any time without additional notice.

**4.0    Internet Posting of Employee Information**

Employees' personal information, including photos, may <u>not</u> be posted on public, unsecured Web pages, but may be posted on appropriately secured Web pages, such as password-protected pages for the benefit of clients. Also permitted is the posting of information/photos related to a timely news article or an award announcement.

Please note it is also prohibited to post a branch contact list on public, unsecured Web pages.

**5.0    Violation of Policy**

Employees who fail to comply with this policy shall be subject to disciplinary action including possible termination.

Exhibit E

Dear Dave,

This e-mail is to inform you that I am concluding my employment with Arthur J. Gallagher effective immediately, today October 15, 2007.

The time I have spent here has been rewarding and helpful in my career development. My contributions to the company have been constructive and our relationship has been mutually rewarding and professional. I am grateful for having the opportunity to work with you.

I have accepted a position that will enhance my career growth and expose me to challenges and opportunities that are in my and my family's best interest.

You will find my desk, files and all materials in order. I am leaving by honoring all terms and conditions of my executive agreement with Gallagher.

Dave, I have the utmost respect for you and wish nothing but the best for you and Gallagher.

Sincerely,

James De La Torre

James De La Torre, CRPC
Area Vice President
Gallagher Benefit Services of California
One Market, Spear Tower, Suite 200
San Francisco, CA 94105

10/26/2007

(650) 224-3993 - Cell
(415) 536-8402 – Office
(415) 536-8499
License #0D36879

"Jim De LaTorre" <jdelatorre@andreini.com>

To <David_Brown@AJG.com>

10/19/2007 11:00 AM

CC <Norbert_Chung@ajg.com>, <Joe_Tixier@ajg.com>

Subject RE: Our meeting today and another item

Dave,

As I mentioned before, all the information you are requesting is in your office, not mine. I have nothing.

I am no longer an employee of Gallagher, and therefore, not able to access Gallagher proprietary software, I expect me expense reports to be re-imbursed to me. If I am not in receipt of my expenses in a reasonable time period you will be hearing from my legal council.

Also, I expect that you will pack up my personal belongs and I will arrange to have them removed from your office.

James A. De La Torre, CRPC
Andreini & Company
220 West Twentieth Avenue
San Mateo, CA 94403-1339
650.378.4384 - Direct
650.573.1111 - Main
650.378.4361 - Fax
jdelatorre@andreini.com
License 0208825

_____

**From:** David_Brown@AJG.com [mailto:David_Brown@AJG.com]
**Sent:** Thursday, October 18, 2007 3:02 PM
**To:** Jim De LaTorre
**Cc:** Norbert_Chung@ajg.com; Joe_Tixier@ajg.com
**Subject:** Our meeting today and another item

Jim we need to talk in person asap. When we spoke on Monday, you agreed to meet this afternoon -- a representation that I trusted.

You possess a great deal of GBS' intellectual property that needs to be shared with us per the Executive Agreement that you signed. This cannot be adequately shared in the method you suggest. For example, we have many questions regarding the educational seminars that you arranged on GBS' behalf. Unless you left us complete sets of materials and scripts -- and anticipated and left us answers for every question we may have, then you haven't fulfilled that obligation -- as you stated you would in your termination email.

It's in the best interests of the clients that you served to have this meeting today (tomorrow at the latest).  Please reconsider.

Thank you.

DB

PS.   If you want your expenses reimbursed, you will need to talk to us about the current method for doing so -- that is being used by all employees, regardless of the incurred date for the expenses.  Long story short, you'll have to use the Concur system.

David W. Brown
Area President, San Francisco Branch
Gallagher Benefit Services
One Market Plaza, Spear St. Tower, Suite 200
San Francisco, CA 94105
(415) 536-8405
david_brown@ajg.com
CA Corp. Lic. #0D36879

"Thinking Ahead"

Exhibit G

**David Brown/GBS/AJG**

10/25/2007 09:10 AM

To  "Boettger, Peg" <BoettgerP@AETNA.com>

cc  "Bahlo, Tracey L" <BahloT@aetna.com>, MillerSL@aetna.com, Norbert
     Chung/GBS/AJG@AJG, John Evans/GBS/AJG, Joe Tixier/CORP/AJG@AJG

Subject  Re: FLEOA Life Plan Link

Peg,

We should talk asap.  Please recall that Aetna executed a non-disclosure agreement with GBS prior to the bid process.  We should review those implications before you have any conversations about anything with Andreini.

DB

David W. Brown
Area President, San Francisco Branch
Gallagher Benefit Services
One Market Plaza, Spear St. Tower, Suite 200
San Francisco, CA 94105
(415) 536-8405
david_brown@ajg.com
CA Corp. Lic. #0D36879

"Thinking Ahead"

**"Boettger, Peg" <BoettgerP@AETNA.com>**

10/24/2007 07:45 PM

To  <David_Brown@AJG.com>

cc  "Bahlo, Tracey L" <BahloT@aetna.com>

Subject  FLEOA Life Plan

Dave- we have rec'd a properly executed Broker of Record letter from FLEOA naming Andreini as the broker of record effective immediately.  It is signed by John Bottone who is the V.P. of Benefit programs.  We will be honoring this letter as requested.  Please feel free to call me if you have any concerns.  Thanks!

Peg Boettger
Vice President- National Account Sales
Group Insurance
Aetna, Inc.
1 Front Street, Suite 600
San Francisco, CA 94111
p 415 645 8216
f 415 645 8276
boettgerp@aetna.com

This e-mail may contain confidential or privileged information. If you think you have received this e-mail in error, please advise the sender by reply e-mail and then delete this e-mail immediately. Thank you. Aetna

Exhibit H



**F.L.E.O.A.**
FEDERAL LAW ENFORCEMENT OFFICERS ASSOCIATION

HOME    OFFICERS    GIFTS    JOIN FLEOA NOW!    CONTACT US        Search This Site

PROTECTING AND SERVING THOSE WHO PROTECT AND SERVE



**MEMBERS LOGIN**

**Members Only**
Use your 2007 password.
Click Here for Info

**LINKS**

- NATIONAL OFFICERS
- CALENDAR OF EVENTS
- NATIONAL POLICE WEEK
- FLEOA STORE
- MEMBERSHIP INFO
- MEMBER INFORMATION UPDATE FORM
- MEMBER NEWS
- CHAPLAINS
- FLEOA FOUNDATION
- LEGAL
- LEGISLATIVE
- PRESS PASS
- LINKS





## Corporate Sponsors



The following are official FLEOA Corporate Sponsors. These companies fully support FLEOA in all our events. They have programs specially designed for our members. Please visit their websites for more information.

| | | |
|---|---|---|
|  DEFENSE SHIELD ASSOCIATION | Professional liability insurance, government co-pay 50% and $10,000 LOD life coverage, 24-hour payout | Rod Ayer, President (732) 530-5757 |
|  HIP WEAR U*S*A | Online logo store | Office: 212-393-1002 Email: HipWearUSA@aol.com Contact: Wendy, President Jenny, Manager Nancy, Manager |
|  FEDERAL FIRST Peace-of-mind protection for you and your family | Dental/medical professional insurance | Jim Delatore (650) 224-3993 |
|  Grantham UNIVERSITY | Online university, 4 full scholarships ear year to members | Valerie Beal (703) 538-6713 |
|  WELLS FARGO HOME MORTGAGE | Full service home mortgage, discounted rates, % back at closing | Michael Lanning (212) 805-1023 |

Exhibit I

**Joe Tixier/CORP/AJG**

10/19/2007 01:23 PM

To "Jim De LaTorre" <jdelatorre@andreini.com>

cc David_Brown@AJG.com, Norbert_Chung@ajg.com

Subject RE: Our meeting today and another item Link

Jim--
You have a great deal of information that Gallagher does not. I have sent you a copy of your Executive Agreement, which I expect that you had previously. It very clearly calls for a two week notice period during which you are required to work with us on transition issues. We require your assistance. This must be real assistance as contemplated by the agreement. You have not fulfilled your obligation. I believe Gallagher would be successful in obtaining a court order requiring that you follow the terms of the agreement. We would seek an order that, among other things, requires that you provide us the two week transitional period that was agreed upon (and of course that you not work for your new employer during this two week period), and that you pay our attorneys' fees. We have legitimate and pressing concerns that need to be addressed. To the extent that Gallagher is adversely impacted by your breach, we intend to hold you accountable. We reserve all rights.

As for your expenses, all Gallagher expenses are now paid through the Concur system, and yours are no exception. Gallagher will pay your legitimate expenses as long as they are in line with our policies and procedures, including submission procedures. Simply handing over receipts is insufficient. As your expenses have been submitted currently, they do not meet with our procedures and you should consider them rejected in their entirety. We will be happy to work with you to submit them properly, and encourage you to do so.

We will be happy to pack your personal items for you since that is your wish. We will alert you when they are ready for you to pick up.

Jim, I hope we are able to work these things out. However, we have important business needs that must be met. We suggest that you come into the office tomorrow to meet Dave and answer his questions. As you know, he will be out of the country next week. Please have your attorney let me know your position. Thank you.

Joe Tixier
Senior Counsel

Arthur J. Gallagher & Co.
(630) 285-3452
(630) 285-3483 (fax)
joe_tixier@ajg.com

====================
This email and any attachments are confidential, solely for the use of the intended recipient and may contain privileged material.  If you are not the intended recipient, please return or destroy it immediately.  Thank you.
====================

"Jim De LaTorre" <jdelatorre@andreini.com>

To <David_Brown@AJG.com>

10/19/2007 11:00 AM

CC <Norbert_Chung@ajg.com>, <Joe_Tixier@ajg.com>

Subject RE: Our meeting today and another item

Dave,

As I mentioned before, all the information you are requesting is in your office, not mine.  I have nothing.

I am no longer an employee of Gallagher, and therefore, not able to access Gallagher proprietary software, I expect me expense reports to be re-imbursed to me.  If I am not in receipt of my expenses in a reasonable time period you will be hearing from my legal council.

Also, I expect that you will pack up my personal belongs and I will arrange to have them removed from your office.

James A. De La Torre, CRPC
Andreini & Company
220 West Twentieth Avenue
San Mateo, CA  94403-1339
650.378.4384 - Direct
650.573.1111 - Main
650.378.4361 - Fax
jdelatorre@andreini.com
License 0208825

---

**From:** David_Brown@AJG.com [mailto:David_Brown@AJG.com]
**Sent:** Thursday, October 18, 2007 3:02 PM
**To:** Jim De LaTorre
**Cc:** Norbert_Chung@ajg.com; Joe_Tixier@ajg.com
**Subject:** Our meeting today and another item

Jim we need to talk in person asap.  When we spoke on Monday, you agreed to meet this afternoon -- a representation that I trusted.

You possess a great deal of GBS' intellectual property that needs to be shared with us per the Executive Agreement that you signed. This cannot be adequately shared in the method you suggest. For example, we have many questions regarding the educational seminars that you arranged on GBS' behalf. Unless you left us complete sets of materials and scripts -- and anticipated and left us answers for every question we may have, then you haven't fulfilled that obligation -- as you stated you would in your termination email.

It's in the best interests of the clients that you served to have this meeting today (tomorrow at the latest). Please reconsider.

Thank you.

DB

PS.   If you want your expenses reimbursed, you will need to talk to us about the current method for doing so -- that is being used by all employees, regardless of the incurred date for the expenses.  Long story short, you'll have to use the Concur system.

David W. Brown
Area President, San Francisco Branch
Gallagher Benefit Services
One Market Plaza, Spear St. Tower, Suite 200
San Francisco, CA 94105
(415) 536-8405
david_brown@ajg.com
CA Corp. Lic. #0D36879

"Thinking Ahead"

Exhibit J

**Joe Tixier/CORP/AJG**

10/21/2007 12:32 PM

To jdelatorre@andreini.com

cc David Brown/GBS/AJG@AJG, Norbert Chung/GBS/AJG@AJG

Subject Contractual obligations

Jim,

Below please see our initial minimum requirements for cooperation, based on what we know thus far.  After you have answered these inquiries in detail, we will determine whether the scope will expand and if so, whether we require additional assistance.  We reserve the right to do so.  Remember, you have a contractual obligation to provide us with two weeks worth of transitional assistance.  We are providing this list as you requested in a good faith gesture to work this matter out with you.  We expect good faith cooperation in return.  Please review this list and provide your detailed responses directly to Dave.

- Updates to include, but not be limited to -- dates, descriptions, and status of past, current and future intended discussions for each of the following groups:
    - All clients
    - All prospects
    - All locations -- including but not limited to historical records regarding past, current and future education seminar activities and expectations
    - Identified location for all client governance, vendor contract and general correspondence documents
    - Updates on all activities with all current and prospective vendors serving Federal First, including but not limited to Aetna, marketing consultants, education material vendors, seminar coordinators, etc.
    - Copies of all presentations, scripts, and any other adaptation or training materials developed for client education programs of any type, focusing on those used in the past year and intended for

future use with client locations where activities are scheduled or pending. We will also need a 5-year history of seminar locations, dates and general content description.
- o Any other information related to the FederalFirst program that may become visible during the exchange of information.
- o All compliance activities related to FederalFirst, it's policyholders, members or vendors

As for your personal items and expense reimbursement:
- o Your personal items will be neatly packed and available for you to pick up at the time we meet to review all the information above.
- o This re-affirms that you must comply with the requirement to submit your expenses via Concur, as do all other GBS employees subsequent to Fred Figge's announcement on September 25, 2007, and the training conducted on several dates in the branch in September. I suggest you log on to the following link:

https://c000100.concursolutions.com/ces00186pibp/expense/?
entity=p0001397jx2s&ORIG=V1:Ddir:T2:W0150151192903078848
If the link doesn't work, please advise immediately and we'll get it fixed so you can use it. We are returning your receipts to you via express delivery on Monday. For your future reference, you may want to keep the Concur Help Line available -- it is 800-232-6909 -- in case you need help completing the report.

Jim, to sum it up, we need to have a thorough understanding of current program operations from you in order to fulfill your contractual obligations. We expect your immediate response.

Joe Tixier
Senior Counsel
Arthur J. Gallagher & Co.
(630) 285-3452
(630) 285-3483 (fax)
joe_tixier@ajg.com

====================
This email and any attachments are confidential, solely for the use of the intended recipient and may contain privileged material. If you are not the intended recipient, please return or destroy it immediately. Thank you.
====================