**DAVID JAY MORGAN, ESQ.**
**STATE BAR NUMBER 028994**
**DAVID JAY MORGAN, INC.**
**A PROFESSIONAL CORPORATION**
**1900 O'FARRELL STREET, SUITE 190**
**SAN MATEO, CALIFORNIA   94403**
**TELEPHONE:      (650) 286-1212**
**FAX:            (650) 286-1216**

**Attorney for Defendants**
**JAMES DE LA TORRE and ANDREINI & COMPANY**

**UNITED STATES DISTRICT COURT**

**IN AND FOR THE NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| GALLAGHER BENEFITS SERVICES, INC., a Delaware Corporation, | CASE NO: C 07 5495 VRW |
| Plaintiff, | DECLARATION OF JAMES DE LA TORRE IN OPPOSITION TO REQUEST FOR RESTRAINING ORDERS |
| v. | |
| JAMES DE LA TORRE, an individual, ANDREINI & COMPANY, a California Corporation, | |
| Defendants. | |

I, James De La Torre, declare as follows:

I am one of the named Defendants in the above-entitled action. All of the statements contained in this declaration are made from my personal knowledge and, if sworn at a hearing, I would competently testify in accordance herewith.

On the 5th day of November 2007, I appeared before the Honorable Vaughn R. Walker at a hearing regarding the issuance of an injunction. At that time, my attorney stipulated that an injunction could issue:

1. Precluding me and my new employer, Andreini & Company, from using or disclosing confidential information obtained during my employment with Gallagher Benefit Services, Inc.;

2. Requiring me to return to Gallagher any confidential proprietary and trade secret information obtained during my employment with Gallagher;

3. Requiring me to return to Gallagher all originals and all copies of files, data and information removed by me from Gallagher; and

4. Requiring me to preserve without change all disc and electronic storage devices to which I had access during my employment with Andreini & Company.

Andreini and I refused to stipulate that Andreini would not solicit clients of Gallagher whose business I handled while working at Gallagher and that we would not place or accept insurance business from such clients.

I began my career as an insurance broker in 1987. I worked for Penn Mutual Life Insurance Company as a salesman. It was a part of my duties in that job to sell insurance, and much of my production was based on the sale of life and disability insurance and was related to financial planning.

In 1988 I went to Acacia Mutual Insurance Company and, during this employment, the emphasis of my production was based on financial planning.

In 1991, I became self-employed and did business under the name De La Torre Insurance Services. In my capacity of doing business as De La Torre Insurance Services, I sold life and disability insurance, and employee benefits including retirement plans.

While so employed, I began working with Federal employees, selling life and disability insurance to them.

I developed numerous seminars, the purpose of which was to explain the coverages that they were provided through the Federal government as an employee and the methods by which those benefits could be supplemented in the open market.

I was aware of the fact that it is forbidden to solicit the sale of insurance products on government facilities and on government time. Therefore, it became apparent to me that, through educating the employees, if they were interested, they would seek me out to purchase insurance and that this would be consistent with Federal law.

I attach herewith three copies of letters, dated February 8, 1996, Exhibit A; dated October 15, 1996, Exhibit B; dated June 4, 1997, Exhibit C; all of which substantially pre-date my employment with Gallagher. These letters will show that, in fact, I was presenting educational seminars to Federal employees long before my employment commenced with Gallagher.

This concept was not original with me. There were, and still are, other companies and brokerage firms that regularly provided educational programs to Federal employees as a means of attempting to obtain insurance sales.

I was intimately familiar with Gallagher between 1995 and the time I commenced employment with them on October 5, 1998. Gallagher attempted to penetrate the Federal employee market by sending brochures to Federal facilities. This is not consistent with acceptable standards of the Federal government. As a result, I know of my own knowledge, that on several occasions brochures that were shipped were refused to be off-loaded at Federal facilities and that, because of the serious error in marketing, The Hartford Insurance

Company shut down the marketing of the program that Gallagher was attempting to market.

What I had done before I ever became employed at Gallagher was, in part, the following:

1.  I developed seminars and lectures that could be given to Federal employees to explain their benefits.

2.  I wrote material that would be handed to the employees to make it easier to follow along with the lectures.

3.  I developed slides and other demonstrative means of explaining the subject of my lecture.

4.  I developed contacts among Federal agencies and associations because I developed a substantial reputation in my ability to deliver these seminars and educational programs.

In 1998, after Gallagher's program was frozen, they contacted me because, as they explained to me, they had heard about the success I had in my educational programs.

I commenced my employment with Gallagher on October 5, 1998. They never paid me any money for using the intellectual property and marketing tools that I had developed long before I became an employee. They immediately sent me out to do seminars all around the country to try and sell insurance for them using the methods that I personally developed.

I remained at Gallagher until October 15, 2007. During the time that I was employed at Gallagher, there was no other Gallagher employee doing the work the way that I did it. No one ever assisted me in composing the seminars, in how these seminars would be delivered, including the content of the seminars and the methods or

1  presentation of these seminars.

2      Approximately 30 to 45 days before I terminated my employment at
3  Gallagher, I spoke with David Brown, who was my immediate superior.  I
4  told him that the seminars were obsolete and had to be redone.  The
5  hand-out material that was given attendees no longer matched the
6  subject of the lecture I was preparing.  I advise them that we should
7  contact Emerald Publications, a company that specializes in the
8  development of written financial planning seminars.  I gave them
9  samples of Emerald's material and contact information.  I had done
10 business with Emerald long prior to my employment with Gallagher.

11     David Brown informed me that he had submitted the materials from
12 Emerald to our compliance department and that they would get back to
13 me later.

14     On or about the same time, I informed David Brown that I was
15 considering resigning from Gallagher and to seek employment elsewhere.
16 I advised David Brown that it was my preference to remain with
17 Gallagher on the condition that financial and career incentives I was
18 seeking would be realized, and that I wanted that commitment to be in
19 writing.

20     Gallagher stalled making a commitment to me and, on the 15th day
21 of October 2007, I resigned my position to David Brown.  I took no
22 material from Gallagher.  In particular, the Power Point presentations
23 were, and still are, with Gallagher.  All the hand-out material was,
24 and still is, with Gallagher.  Not only did I not take any information
25 belonging to Gallagher, but I even left my own personal effects,
26 including family photographs, etc.

27     When David Brown received notice of my resignation, he ordered me

28

to leave the premises immediately. By ordering me to leave the premises immediately, I understood that he was waiving the requirement found in my Executive Agreement signed on the 5th of October 1998 and, in particular, the requirement that I give 14 days' written notice prior to termination of my employment. In fact, I had given him substantially longer than 14 days to come up with a written commitment to me, and he was well aware that, in the absence of that commitment, it was my intention to resign.

All of the content of the educational seminars that I have presented for the last 15 years or more is readily available on the Internet and in government publications. There are any number of companies doing business with Federal employees using the same approach that I adopted.

After I departed Gallagher, they advised one or more of the associations that, because of my departure and because no other employee of Gallagher was familiar with want I was doing, there would be a several month delay in Gallagher picking up where I left off. They have sent correspondence to accounts, a copy of one being attached herewith as Exhibit D.

Gallagher is attempting to compete with Andreini and that is their right. It is likewise Andreini's right to compete with Gallagher because Andreini's competition is not taking advantage of any trade secrets or other proprietary information prepared or owned by Gallagher. The competition with Gallagher is fair and lawful.

The insurance that is involved with these programs is known as employees benefits insurance and is covered under the requirements of ERISA. The insured is the Federal association which has members who

attend the seminars.

Aetna Insurance Company is the carrier currently underwriting these programs. The pricing for the insurance products is negotiated between the association and Aetna. Gallagher had nothing to do with establishing the pricing that Aetna would charge Federal employees for the coverage being offered.

Likewise, the benefits that are offered by Aetna are consistent with their standard disability insurance programs and are determined by Aetna without participation or interference by Gallagher. Once the program is adopted and the seminars begin, a Federal employee completes an application for coverage that is submitted to a plan administrator. The plan administrator is an independent company not related to Aetna, Gallagher or the association.

The premiums are paid directly to Aetna and are reconciled by the plan administrator. Aetna sends the commission to the originating broker and keeps the balance of the premium collected. Records of commission income received are maintained at three levels: Aetna, plan administrator and the broker. The amount of commissions that Andreini will receive as a result of these premiums can be ascertained to the penny and confirmed from two other independent sources.

The collateral materials used to sell this insurance were designed and paid for by Aetna, and Aetna considers this to be their "intellectual property".

By changing brokers from Gallagher to Andreini, what is affected are insurance sales going forward. Any commissions that were received by Gallagher prior to the broker of record letter change belong to

1  Gallagher.
2      It is customary in the insurance brokerage business that the
3  insured be permitted to designate a broker of the insured's choice.
4  If there is an existing broker, then the insured carries out the
5  change by issuing a broker record letter which is sent to the carrier
6  notifying the carrier that the insured wishes to change brokers.  That
7  has been done in two instances.
8      If Andreini is appointed the broker of record, their tenure as
9  such will be completely within the discretion of the insured.
10     The foregoing is executed at San Mateo, California, this 9th day
11 of November 2007, under the penalty of perjury.

                                        /s/
                                  James De La Torre