1  SEYFARTH SHAW LLP
   Robert S. Niemann (SBN 087973)
2  E-mail: rniemann@seyfarth.com
   Althea V. Bovell (SBN 200240)
3  E-mail: abovell@seyfarth.com
   Krista L. Mitzel (SBN 221002)
4  E-mail: kmitzel@seyfarth.com
   560 Mission Street, Suite 3100
5  San Francisco, California 94105
   Telephone: (415) 397-2823
6  Facsimile: (415) 397-8549

7  Attorneys for Plaintiff
   GALLAGHER BENEFIT SERVICES, INC.
8
                    UNITED STATES DISTRICT COURT
9
           IN AND FOR THE NORTHERN DISTRICT OF CALIFORNIA
10

11 | GALLAGHER BENEFIT SERVICES, INC., a  )  Case No. 07 05495 VRW
   | Delaware Corporation,                )
12 |                                      )  **PLAINTIFF GALLAGHER BUSINESS**
   |           Plaintiff,                 )  **SERVICES, INC.'S REPLY TO**
13 |                                      )  **DEFENDANTS' OPPOSITION TO**
   |     v.                               )  **PRELIMINARY INJUNCTION**
14 |                                      )
   |                                      )  Date: November 15, 2007
15 | JAMES DE LA TORRE, an individual, and )  Time: 2:30 p.m.
   | ANDREINI & COMPANY, a California     )  Dept: 6
16 | corporation,                         )
   |                                      )  Judge: Honorable Vaughn R. Walker
17 |           Defendants.                )
   |_____)

---

Plaintiff's Reply to Defendants' Opposition to Motion for Preliminary Injunction;
Case No. 07 05495 VRW

# TABLE OF CONTENTS

Page

I. INTRODUCTION .................................................................................................................. 1

II. PERTINENT FACTS ............................................................................................................ 1

    A. Gallagher's Federal First Program ........................................................................... 1

    B. Gallagher's Modest Market Share And Clients ....................................................... 2

    C. De La Torre's Employment with Gallagher and Post-Employment Restrictions .................................................................................................................. 4

        1. The Executive Agreements' Confidentiality and Non-Solicitation Provisions .......................................................................................................... 4

        2. The Fourteen Day Notice Period Provision In The Executive Agreement ........................................................................................................... 5

    D. Gallagher Took Significant Steps to Protect Its Proprietary and Confidential Information ............................................................................................. 6

    E. De La Torre's Misappropriation of Gallagher's Confidential and Proprietary Information and Questionable (or False) Statements To The Court Regarding His Conduct ................................................................................... 6

    F. De La Torre's Subsequent Use of Gallagher's Confidential and Proprietary Information .............................................................................................. 7

III. LEGAL ARGUMENT ........................................................................................................... 7

    A. Gallagher's Client and Prospect Lists/Information Constitute Trade Secrets ........................................................................................................................ 8

    B. Defendants Unlawfully Misappropriated And Used Gallagher's Confidential and Proprietary Information ................................................................ 10

    C. The Non-Solicitation Provision In The Executive Agreement Is Enforceable, and Does Not Violate B&P Code 16600 Because It Applies Only To A Limited, Narrow Segment Of The Market ........................................... 11

    D. The Extent Of Gallagher's Damages Are Unascertainable, Hence An Injunction Is Proper ................................................................................................ 12

IV. CONCLUSION .................................................................................................................... 14

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Campbell Soup Co. v. ConAgra, Inc.*,
    977 F.2d 86 (3rd Cir. 1992) ..................................................................................... 14

*Campbell v. Board of Trustees*,
    817 F.2d 499 (9th Cir. 1987) .................................................................................... 12

*Caribbean Marine Serv. Co., Inc. v. Baldridge*,
    844 F.2d 668 (9th Cir. 1988) .................................................................................... 13

*Corporate Express Office Products, Inc. v. Guelpen, et al.*,
    2002 U.S. Dist. LEXIS 27642 (N. Dist. Cal.) ........................................................... 12

*Doran v. Salem Inn, Inc.*,
    422 U.S. 922 (1975) .................................................................................................. 14

*Forro Precision, Inc. v. International Business Machines*,
    673 F.2d 1045 (9th Cir. 1982) .................................................................................. 10

*General Commercial Packaging, Inc. v. TPS Package Engineering, Inc.*,
    126 F.3d 1131 (9th Cir. 1997) .................................................................................. 12

*Hollingsworth Solderless Terminal Co. v. Turley*,
    622 F.2d 1324 (9th Cir. 1980.) ................................................................................. 10

*IBM v. Bajorek*,
    191 F.3d 1033 (9th Cir. 1999) [Emphasis added.] ............................................... 12, 13

*MAI Systems Corp. v. Peak Computer, Inc.*,
    991 F.2d 511 (9th Cir. 1993) ............................................................................ 9, 11, 13

*Rent-A-Center, Inc. v. Canyon Television & Appliance*,
    944 F.2d 597 (9th Cir. 1991) .................................................................................... 14

*Simula, Inc. v. Autoliv, Inc.*,
    175 F.3d 716 (9th Cir. 1999) .................................................................................... 13

*Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co., Inc.*,
    240 F.3d 832 (9th Cir. 2001) .................................................................................... 14

### STATE CASES

*American Credit Indemnity Co. v. Sacks*,
    213 Cal. App. 3d 622 (1989) ...................................................................................... 9

*Courtesy Temporary Serv. v. Camacho*,
    222 Cal. App. 3d 1278 (2d Dist. 1990) ................................................................. 9, 11

*Declaration of David Brown, In Support Of Preliminary Injunction, ¶ 11, Ex.,
    A.D. -* ......................................................................................................................... 7

*Edwards v. Arthur Anderson LLP*,
    142 Cal. App. 4th 603 (2006) ................................................................................... 12

# TABLE OF AUTHORITIES

*Metro Traffic Control Inc. v. Shadow Traffic Network*,
   22 Cal. App. 4th 853 (1994) ..................................................................................9

**STATUTUES**

Business & Professions Code § 16600 ........................................................................12

## I. INTRODUCTION

Defendants' Opposition to Gallagher Benefit Services, Inc. ("Gallagher") wholly ignores the majority of the issues which remain before the Court. Defendants failed to analyze whether Gallagher's client and prospect information are trade secrets. Defendants failed to address whether the non-solicitation provision in James De La Torre's ("De La Torre") Executive Agreement is enforceable under applicable law. And finally, Defendants failed to address whether the Court should enjoin Defendants from soliciting Gallagher's clients and prospects, and from using Gallagher's confidential and proprietary information even though the damages from such conduct may be readily ascertainable. The arguments Defendants did raise either are not relevant to the remaining issues before the Court or not supported by the facts or applicable law. (In fact, Defendants relied on law which is not citable and a declaration that contains blatantly false information).

Had Defendants researched the law, they would have discovered that the information Gallaghers seeks to protect is a trade secret. They also would have discovered that non-solicitation provisions like those contained in De La Torre's are legally enforceable. And they would have learned that their conduct has caused (and will cause) Gallagher irreparable harm justifying a preliminary injunction. For these reasons, Gallagher respectfully requests the Court to reject the arguments (contained in or implied) in Defendants' Opposition to enter a preliminary injunction enjoining Defendants from using Gallagher's confidential and proprietary information and from soliciting its clients and/or prospects until such time as the Court has finally decided Gallagher's claims.

## II. PERTINENT FACTS[1]

### A. Gallagher's Federal First Program

Reading Defendants' Opposition, one would assume that Gallagher did nothing more than put on insurance benefits seminars. While Gallagher does, in fact, run numerous educational seminars, that aspect of the Federal First program is just the tip of the iceberg. By

---

[1]/Plaintiff incorporates by reference herein the facts set forth in its moving papers.

1

Plaintiff's Reply to Defendants' Opposition to Motion for Preliminary Injunction;
Case No. 07 05495 VRW

way of background, Gallagher's "Federal First™" program is a federally trademarked brand used to provide supplemental insurance and financial services to federal employees nationwide. The program is designed to offer supplemental benefits and programs beyond that provided by their employers' plan. The program, as developed by Gallagher, consists of more than just educational seminars, but would not exist without (a) a participating carrier to underwrite the program; (b) a third party administrator; (c) a protected website exclusive to the Federal First program; (d) member support. All of these components are vital to a program such as Federal First. (Declaration of Norbert Chung, In Support of Gallagher's Reply, ¶ 4-5).

Not any carrier would be willing to participate in a plan like Federal First. Because of Gallagher's national platform, reputation and goodwill in the industry, and the number of participants it was able to bring to the carrier, in addition to the promise of a third party administrator to handle all of the costly details, management and administration of the program, Federal First's™ current carrier agreed to participate. Moreover, the protected website specifically designed for the Federal First™ program offers members and prospective members full access and information on the available benefits, in addition allowing any interested individuals to sign up on line. In 1991, Gallagher began working in the federal marketplace with a Group Long Term Disability program, sold under the name Federal Employees Group Long Term Disability, later rebranded as Federal First,™ hence the program was designed and implemented in the industry prior to De La Torre's hire.

In order to distinguish itself from its competitors, Gallagher identifies insurance company partners which can provide the best suite of services to its (Gallagher's) clients. Gallagher also negotiates with its partners to obtain preferred pricing and benefits for its clients, based on the number of members Gallagher is able to bring to the program and its national platform. (Chung Decl., ¶ 8).

### B. Gallagher's Modest Market Share And Clients

Gallagher has four primary client organizations who participate in the Federal First™ program, and six prospective clients and endorsers. Gallagher's endorser, the Federal Law Enforcement Officers Association ("FLEOA"), who had previously committed to signing up for

2
Reply to Opposition to Preliminary Injunction; Case No. 07 05495 VRW

Gallagher's new Life Program, which was scheduled to roll out in Fall 2007, was improperly solicited by Defendants. Defendant De La Torre had access to and serviced FLEOA and John Bottone, FLEOA's Vice President – Membership Benefits, using Gallagher's confidential and proprietary information during his employment at Gallagher. AETNA, Gallagher's carrier for Federal First™ recently received a broker of record letter for FLEOA, naming Andreini as the broker of record, indicating that Andreini and De La Torre – not Gallagher – are FLEOA's brokers and have the authority to contract with them for insurance coverage, that was previously provided by Gallagher. FLEOA's estimated number of eligible members is 22,000. The projected loss to the Company from this account is $30,000 to $50,000 a year in new revenue. (See Declaration of David Brown ("Brown Decl. - Reply") In Support of Reply, ¶ 3).

In addition, De La Torre has utilized Gallagher's confidential and proprietary information to unfairly target existing clients and members. The National Council of Bankruptcy Clerks ("NCBC") has also voted to move their insurance and benefits business from Gallagher to Andreini, based on De La Torre's misrepresentation that there would be no change in services offered under Andreini's helm, or in premiums. NCBC has an estimated 10,000 eligible members in its group. About 69% of the Federal First™ enrollment comes from NCBC. (Brown Decl – Reply, ¶ 4.)

While Gallagher believes that the Federal First™ suite of benefits is the best in the industry, and the program is the only one of its kind, its clients make up less than 5% of the total marketplace of federal employees. The loss of business from FLEOA and the NCBC is roughly 63% of Gallagher's Federal First™ business and will result in an estimated loss to Gallagher of at least $750,000.00 per year in business. Currently, Gallagher believes there are over eight hundred thousand federal employees in the United States. (Brown Decl. – Reply, ¶ 5.)

Gallagher's Federal First™ program is able to offer the members of federal employer organizations the best products and best prices, on a group, not individual basis. (Chung Decl., ¶ 8) There is no known program in the federal market that combines the administration, marketing, and website and member support comparable to those provided by Federal First. (Id.)

3

Reply to Opposition to Preliminary Injunction; Case No. 07 05495 VRW

Notably, De La Torre's declaration lacks any reference to his working with federal employer organizations or volunteer groups, like Gallagher's clients, before joining Gallagher. This is because De La Torre, prior to his employment with Gallagher, sold insurance on an individual – not on a group platform – as sold by Gallagher.[2] (See De La Torre Declaration in Opposition to Request for Restraining Order, ¶ 4, lines 14-27; Brown Decl. - Reply, ¶ 6)

### C. De La Torre's Employment with Gallagher and Post-Employment Restrictions

#### 1. The Executive Agreements' Confidentiality and Non-Solicitation Provisions

Defendants' opposition fails to make any mention of the fact that in October 1998, as a condition of, and as consideration for his employment, De La Torre's was required to, and did, sign Gallagher's Executive Agreement (the "Executive Agreement"). Under the terms of the Executive Agreement (in addition to the terms of the Employee Handbook and Gallagher's Code of Ethics, among other agreements), De La Torre was prohibited from using or disclosing Gallagher's confidential and proprietary information, from soliciting any of Gallagher's clients or prospective clients, and from placing or accepting their insurance requirements.

Specifically, Exhibit A, the Executive Agreement provides, in part:

> **Paragraph Five**: The Executive recognized that, by virtue of his employment by the Company and to assist him in the solicitation, production and servicing of accounts, **he will be granted otherwise prohibited access to confidential and proprietary data of the Company which is not known either to its competitors or within the insurance agency and brokerage business generally and which has independent economic value to the Company.** This information… includes, but is not limited to: data relating to the Company's unique marketing and servicing programs, procedures and techniques; business management and personnel strategies; **the criteria and formulae used by the Company in pricing its insurance products … the structure of pricing of special insurance packages that the Company has negotiated with various underwriters; lists of prospects; the identity, authority and responsibilities of key contacts at Company accounts;…highly sensitive details concerning the structure, conditions and extent of their existing insurance coverages;** … he will not, at any time during his employment by

---

[2] /Based on De La Torre's declaration, he gave presentations to federal employers, but did not sell insurance to federal employer group organizations, like Gallagher's clients.

the Company, divulge such Confidential Information or make use of it for his own purposes or the purposes of another.

**Paragraph Six.** The Executive recognizes that by virtue of his employment by the Company, he will be afforded numerous and extensive resources to assist him in the solicitation, production and servicing of accounts… and agrees that all efforts that he expends in this regard shall be for the permanent benefit of the Company….

Paragraph Thirteen. A.    The Executive recognizes the highly sensitive nature of the Confidential Information … and acknowledges the Company's legitimate interest in safeguarding same from disclosure. … the Executive agrees that, for a period of two (2) years following the termination of his employment…he will not divulge the Company's Confidential Information or make use of it for his own purpose or the purpose of another. …and agrees that for a period of two (2) years following the termination of his employment …he will not, directly or indirectly, solicit… any existing Company account or any actively solicited prospective account of the Company for which he performed any of the foregoing functions during the two-year period immediately preceding such termination, …[3] (Emphasis added.)

2.    The Fourteen Day Notice Period Provision In The Executive Agreement

Defendants' Opposition also fails to mention the fact that the Executive Agreement contained a mutual fourteen (14) day Notice Period. Pursuant to this provision, De La Torre agreed to and was required to give Gallagher fourteen (14) days written notice to terminate the Executive Agreement. He also agreed to return to Gallagher all literature, correspondence, memoranda, reports, summaries, manuals, proposals, contracts and other documents of any kind which relate in any way to Gallagher's business, including all materials which comprise or refer to Gallagher's confidential and proprietary information.[4]

After receiving De La Torre's resignation, Gallagher demanded that he comply with the Executive Agreement, the confidentiality requirements contained therein and the Notice Period.[5]

---

[3]/See Declaration of David Brown, ¶ 14, Ex. A, p. 1, 3.)

[4]/See Complaint, ¶ 54; Brown Decl., ¶ 15.

[5]/Contrary to De La Torre's assertion, David Brown never ordered him to leave the Gallagher offices after he submitted his letter of resignation. In fact, on October 15, 2007, De La Torre agreed to meet with Brown on October 18, 2007, to go through De La Torre's accounts pursuant to the fourteen day Notice Period in the Executive Agreement, but De La Torre reneged. At all times, De La Torre was subject to the confidentiality provisions of the Executive Agreement, in addition to the "winding down" provisions provided under the Notice Period. Gallagher never waived these provisions, and emphasized the need for De La Torre to comply with these requirements in email correspondence between Brown and De La Torre, and between Jim Tixier and De La Torre. (Brown Decl. – Reply, ¶ 7).

5
Reply to Opposition to Preliminary Injunction; Case No. 07 05495 VRW

De La Torre initially agreed to meet with Gallagher on October 18, 2007, but he reneged without explanation.[6]

### D. Gallagher Took Significant Steps to Protect Its Proprietary and Confidential Information

As set forth exhaustively in its moving papers, Gallagher treats information related to its business, marketing and clients as confidential and proprietary information. Of import to the remaining issue before the Court, Gallagher maintains a large database of confidential information regarding its current and prospective clients.[7]

Instead of submitting evidence to the contrary, Defendants (in a factually unsupported and conclusory manner) simply argue otherwise. Despite De La Torre's (bare) assertion, Gallagher's confidential and proprietary data is not known either to its competitors or within the insurance agency and brokerage business generally. As is obvious from the fact that the parties are fighting over who can use it in, the information has independent economic value. Gallagher has taken significant steps to protect this information through employment agreements, like the Executive Agreement signed by De La Torre, the Code of Business Conduct and Ethics, its Privacy Policy, its Electronic Information Policy, and the use of passwords to gain access to the computers and systems.[8]

### E. De La Torre's Misappropriation of Gallagher's Confidential and Proprietary Information and Questionable (or False) Statements To The Court Regarding His Conduct

At the November 5, 2007 hearing, Defendants' counsel represented that De La Torre had returned all materials and documents relating to Gallagher and Federal First.™ In his declaration, De La Torre echoed his attorney's statement and confirmed that he "did not take any information belonging to Gallagher". Stated delicately, these statements are not trustworthy.

Unbeknownst to Gallagher, prior to resigning his employment, De La Torre accessed Gallagher's computer system and downloaded over one thousand files of confidential and

---

[6]/See Brown Decl., ¶¶ 20, 27; Ex. F, I, J.

[7]/See Declaration of David Brown, In Support Of Preliminary Injunction, ¶ 8 – 11 (previously filed with the court).

[8]/See Declaration of David Brown, In Support Of Preliminary Injunction, ¶ 11, Ex. A – D.

1  proprietary documents. A forensic scientist hired by Gallagher has determined that on October
2  14, 2007, the day before De La Torre resigned he accessed and copied 150 files from Gallagher.[9]
3  The forensic scientist also discovered that on July 3, 2007 between 2:44 and 2:51 p.m., 1117 files
4  were accessed and likely copied.[10] The files included marketing budgets, client and program
5  business plans, among other files – all Gallagher property.
6        This evidence directly contradicts Defendants' representations to the Court that De La
7  Torre "did not take any information belonging to Gallagher." It also renders Defendants'
8  stipulation that they would not use or disclose any of Gallagher's confidential information; that
9  they would return to Gallagher any confidential, proprietary, and trade secret information; and
10 that they would return to Gallagher all copies of files, data and information removed by De La
11 Torre incredibly hollow.[11] Indeed, to date, Defendants have not returned any of this information
12 to Gallagher.

### F. De La Torre's Subsequent Use of Gallagher's Confidential and Proprietary Information

      Using Gallagher's confidential and proprietary information, Defendants have improperly solicited the FLEOA and NCBC groups. As a result of Defendants' misappropriation of Gallagher's confidential and proprietary information and subsequent solicitation of Gallagher's clients, these organizations have submitted a change of broker of record letters. Gallagher estimates it will lose approximately $750,000.00 in annual revenue from these clients —a number which represents over 63% of its entire Federal First™ business. (Brown Decl. - Reply, ¶ 5).

### III. LEGAL ARGUMENT

      Although it is not evident from Defendants' Opposition, there are only three major issues remaining before the Court: (1) Are Gallagher's business and marketing plans and client and prospect information trade secrets (or confidential and proprietary information)?; (2) Is the non-

---

[9]/See Declaration of Lynell Phillips, ¶ 6-12.
[10]/Id.
[11]/See the Court's Order, wherein Defendants stipulated to sections (a) through (d).

7
Reply to Opposition to Preliminary Injunction; Case No. 07 05495 VRW

solicitation provision in De La Torre's Executive Agreement enforceable under applicable law?; and (3) Should the Court enjoin Defendants from soliciting Gallagher's clients and prospects, and from using Gallagher's confidential and proprietary information even though the damages from such conduct may be readily ascertainable? The answer in each instance is 'yes.'

### A. Gallagher's Client and Prospect Lists/Information Constitute Trade Secrets[12]

Defendants' Opposition failed to address Gallagher's position that its client and prospect lists are trade secrets and/or confidential and proprietary information.

Had Defendants' researched the issue, they would have discovered that customer lists (and related information) can qualify as trade secrets under the Uniform Trade Secret Act so long as the information (1) derives independent economic value, actual or potential, from not being generally known to the public or others persons who can obtain economic value from its disclosure or use; and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy. *MAI Systems Corp. v. Peak Computer, Inc.*, 991 F.2d 511, 516 (9th Cir. 1993) (*"MAI Systems"*). Further, "[r]easonable efforts to maintain secrecy have been held to include advising employees of the existence of a trade secret, limiting access to a trade secret on a 'need to know basis,' and controlling plant access." *Courtesy Temporary Serv. v. Camacho*, 222 Cal. App.3d 1278, 1288 (2d Dist. 1990).[13]

*MAI Systems* is instructive. In that case, the plaintiff asserted that its customer database was a valuable collection of data assembled over many years that allowed it to tailor its service contracts and pricing to the unique needs of its customers. After considering the nature of the information as well as the steps taken to protect its confidentiality, the Ninth Circuit held that the

---

[12] Defendants rely on *Metro Traffic Control Inc. v. Shadow Traffic Network*, 22 Cal.App.4th 853 (1994) to argue, in a blanket fashion, that Gallagher possesses no trade secrets. This case is inapplicable here. Gallagher's argument is not that De La Torre's method of conducting the educational seminars is a trade secret, but that Gallagher's client and prospect list, business and marketing plans and budgets, and client investment plans, which De La Torre misappropriated, is. Gallagher's reference to the educational seminar De La Torre conducted on October 30, 2007, was merely evidence that De La Torre was soliciting Gallagher's prospective client, the U.S. Bankruptcy Courts, that De La Torre serviced during the last two years of his employment with Gallagher, in violation of the Executive Agreement.

[13] See also *American Credit Indemnity Co. v. Sacks*, 213 Cal.App.3d 622, 630-631 (1989) relied upon by Defendants, which similarly held that the identity of customers constituted a trade secret.

---
8
Reply to Opposition to Preliminary Injunction; Case No. 07 05495 VRW

customer database did, in fact, qualify as a trade secret under the UTSA. *MAI Systems* at p. 521.

Specifically, the Ninth Circuit found that the customer database had potential economic value because it allowed its competitor (the defendant) to direct its sales efforts to those potential customers that were already using the plaintiff's systems and services, and further, that plaintiff took reasonable steps to insure the secrecy to this information, by having employees sign confidentiality agreements respecting its trade secrets, including the Customer Database. *Id. Hollingsworth Solderless Terminal Co. v. Turley*, 622 F.2d 1324, 1332 (9th Cir. 1980.) (finding that a list of plaintiff's customers may be a secret even when the general class of potential customers is obvious and readily accessible); *Forro Precision, Inc. v. International Business Machines*, 673 F.2d 1045 (9th Cir. 1982) (holding that the definition of trade secret is broad enough to encompass a list of customers).

This case is no different. There is sufficient evidence before the Court which demonstrates that Gallagher's client and prospect information, among other information, i.e., business and marketing plans and budgets, are trade secrets. This information has value, is not generally known to the public and is the subject of extensive time and resources to compile, and extensive efforts to maintain its secrecy. Gallagher rigorously protects is trade secret information by restricting access, and where access is allowed, requiring its employees to agree not to use and disclose such information unless for Gallagher business, for instance, by executing non-disclosure agreements, such as the Executive Agreement signed by De La Torre, the Code of Business Conduct and Ethics, its Privacy Policy, its Electronic Information Policy, and the use of passwords to gain access to the computers and systems.

Access to Gallagher's client/prospect lists – as Defendants have done – would give any competitor who acquired that information an unfair competitive advantage at Gallagher's expense. Simply put, a competitor would be able to take advantage of years of Gallagher's work (and resources) to use the information as a road map how to identify clients, bid for business against Gallagher, move business away from Gallagher and unfairly gain knowledge of the procedures which result in the delivery of services and specialized pricing.

It also is clear that Gallagher's related information (data relating to the Company's unique marketing and servicing programs, the criteria and formulae for group pricing, marketing and business plans and budgets, among others) constitute trade secrets as well, because Gallagher derives independent economic value from this information not being generally known to the public or its competitors, who can obtain economic value from it, and is the type of information Gallagher readily protects as secret information. *MAI Systems, supra,* 991 F.2d at 516; *Courtesy Temporary Service, Inc., supra,* 222 Cal.App. 3d at 1287 (finding information related to customer lists, billing rates, promotion and advertising, that competitors could not readily obtain, constitute trade secrets).

### B. Defendants Unlawfully Misappropriated And Used Gallagher's Confidential and Proprietary Information

Contrary to what his declaration provides (that he "did not take any information belonging to Gallagher"), De La Torre downloaded and copied thousands of Gallagher's files, including business and marketing plans and budgets, and client information.

When De La Torre resigned from Gallagher, he did more than merely announce his new affiliation with Andreini to Gallagher's clients (as Defense counsel contends). There is evidence that De La Torre solicited Gallagher's clients before the issuance of the temporary restraining order, and evidence that he continues to do so, in violation of his Executive Agreement and California law.[14]

Indeed, armed with this confidential and proprietary information, he began working for Andreini and immediately targeted and solicited Gallagher's major clients, suggesting that if they took their business to Andreini, that there would be no change in the services provided, trying to get them to switch their business from Gallagher to Andreini, and agreeing to contract with Gallagher's client's to provide insurance coverage, in breach of his Executive Agreement with Gallagher and the law.

---

[14] See Brown Decl. In Support of Ex Parte Application and Motion for Preliminary Injunction, ¶ 22-24, previously filed with the court on October 29, 2007.

Without a preliminary injunction, there is no doubt that he will continue to solicit all of Gallagher's clients:

> "Andreini and I refused to stipulate that [Defendants] would not solicit clients of Gallagher whose business I handled while working at Gallagher and that we would not place or accept insurance business from such clients."

(See De La Torre Decl., p. 2:10-13.)

### C. The Non-Solicitation Provision In The Executive Agreement Is Enforceable, and Does Not Violate B&P Code 16600 Because It Applies Only To A Limited, Narrow Segment Of The Market

Without substantive analysis or citation to law, Defendants appear to contend that the provisions of the Executive Agreement are violative of California Business and Professions Code section 16600.

Not all restraints on trade, however, are unenforceable under Business & Professions Code 16600.[15] *Campbell v. Board of Trustees*, 817 F.2d 499, 502 (9th Cir. 1987). Section 16600 "only makes illegal those restraints which preclude one from engaging in a lawful profession, trade, or business." *Id.*

When confronted with similar issues, the Ninth Circuit has repeatedly held that restrictive covenants are enforceable and do not violate Section 16600 when they are limited to a *limited, narrow segment of the market*. *IBM v. Bajorek*, 191 F.3d 1033, 1040 (9th Cir. 1999) (holding that the contract is valid, despite its restriction on competition, because the provision at issue excluded the employee from "one small corner of the market," and was limited only to working for competitors, for a six month period) ("*Bajorek*") [Emphasis added.]; *General Commercial*

---

[15]/Throughout their opposition, Defendants ignore Ninth Circuit precedent and instead rely heavily on California case law including *Edwards v. Arthur Anderson LLP*, 142 Cal.App.4th 603 (2006), to support their argument that the Executive Agreement's restrictive covenant is unenforceable and further, that the "Edwards' court disapproved of the 9th Circuit's "narrow restraint" exception" discussed above. The Court should note that the California Supreme Court has granted review of *Edwards* and, therefore, *Edwards* may not be cited per applicable Federal Rules of Appellate Procedure, the Federal Rules of Civil Procedure and/or the California Rules of Court.

In any event, Defendants' position is not supported by California law. Indeed, under California law, there are separate exceptions to the general rule against non-competition agreements: (1) when they protect trade secrets, and (2) when they are only partial restraints. *Corporate Express Office Products, Inc. v. Guelpen, et al.*, 2002 U.S. Dist. LEXIS *27642 (N. Dist. Cal.) ("*Corporate Express*") (enforcing non-solicitation agreement enjoining defendants from doing business with plaintiff's clients for a limited time period). Both exceptions exist here.

---

*Packaging, Inc. v. TPS Package Engineering, Inc.*, 126 F.3d. 1131, 1132-3 (9th Cir. 1997) (holding that contractual provision barring subcontractor from courting specific named customer, as opposed to entire trade or industry or significant portion thereof, did not violate California's prohibition against contracts in restraint of trade). The *Bajorek* court, held that the restrictive provision did not violate section 16600. *Bajorek, supra,* 191 F.3d at 1041.

  The present facts compel the same conclusion. In this case, the Executive Agreement signed by De La Torre effectively prevents him from doing business with a limited, narrow segment of the market: Gallagher's current and prospective clients, which make up less than five percent of the market. Given the potentially unlimited market for insurance sales, this restriction prevents De La Torre from doing business with an <u>extremely</u> <u>small</u> <u>percentage</u> of the potential market.

  Further, the non-solicitation period is limited for only two years. De La Torre is free to work for Andreini and they are free to compete against Gallagher. The restriction precludes them from soliciting only Gallagher's clients and prospects, whom De La Torre serviced for the last two years of his employment, for two years following his resignation. *See MAI Sys. Corp., supra,* 991 F.2d at 516. Further, Defendants have not shown any evidence that the restrictive provision would interfere with their lawful profession, trade or business. For these reasons, there is no reason to conclude that the non-solicitation provisions in the Executive Agreement are unenforceable.

  **D. The Extent Of Gallagher's Damages Are Unascertainable, Hence An Injunction Is Proper**

  Although Defendants' Opposition is silent on the issue (again), at oral argument, Defendants contended that injunctive relief was inappropriate in this case because Gallagher's damages would be readily ascertainable. This is not always correct.

  A preliminary injunction may only be granted when the moving party has demonstrated a significant threat of irreparable injury irrespective of the magnitude of the of the injury. *Simula, Inc. v. Autoliv, Inc.,* 175 F.3d 716 (9th Cir. 1999). A plaintiff must demonstrate immediate threatened harm. *Caribbean Marine Serv. Co., Inc. v. Baldridge,* 844 F.2d 668 (9th

1  Cir. 1988). A plaintiff also must demonstrate potential harm which cannot be addressed be
2  redressed by legal or equitable remedies following trial. *Campbell Soup Co. v. ConAgra, Inc.*,
3  977 F.2d 86 (3rd Cir. 1992).
4        That does not mean that injunctive relief is improper just because a plaintiff's expectant
5  damages may (or may not) be readily ascertainable. Indeed, of relevance to the instant case,
6  irreparable injury is presumed to exist where a defendant has expressed an intention to use or
7  continue to use a plaintiff's trade secrets. *Campbell Soup Co.*, 977 F.2d at 92-93. Irreparable
8  injury also exists where a plaintiff will lose substantial business as a result of the defendants
9  conduct. *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 932 (1975) (finding absent preliminary relief,
10 respondents would suffer a substantial loss of business and perhaps even bankruptcy, clearly
11 showing the existence of irreparable injury). And irreparable injury exists where a plaintiff is
12 facing a threatened loss of prospective customers or goodwill. *See e.g., Stuhlbarg Int'l Sales Co.,*
13 *Inc. v. John D. Brush & Co., Inc.*, 240 F.3d 832, 841 (9th Cir. 2001) (same); *Rent-A-Center, Inc.*
14 *v. Canyon Television & Appliance*, 944 F.2d 597, 603 (9th Cir. 1991) (same). Defendants
15 provide no evidence to the contrary.
16       All of these situations are present here. First, Defendants have made it abundantly clear
17 that they intend to continue using Gallagher's client and prospect information as well as its
18 marketing materials and business plans. Second, Gallagher has lost substantial business. After
19 De La Torre unlawfully misappropriated Gallagher's confidential and proprietary information, he
20 used that information to solicit NCBC and FLEOA, Gallagher's current and prospective client
21 and endorser, and obtain change of broker of record letter from them. (Decl. of James De La
22 Torre, p. 8, lines 2-9.) As a result of Defendants' actions, Gallagher has lost substantial business.
23 (As stated above, NCBC represents approximately 69% percent of Gallagher's Federal First
24 business). Third, Gallagher also faces a loss of its prospective customers if De La Torre were
25 allowed to continue to contact Gallagher's prospects. Fourth, and finally, Gallagher faces a loss
26 of goodwill. Not only have Defendants misappropriated Gallagher's confidential and proprietary
27 information, it has made misleading comments to Gallagher's customers and prospects regarding
28 its capabilities in the marketplace. In light of the above-mentioned authority, and because

Defendants failed to address this issue and/or failed to provide the Court with any authority to support their (apparent) argument, Gallagher contends that it has established a significant threat of irreparable injury which warrants a preliminary injunction.

That, however, is not the end of the analysis. Another reason exists for the Court to issue a preliminary injunction in this case. Given the fact that Gallagher's clients comprise of less than 5% percent of the relevant market, enjoining Defendants from soliciting Gallagher's clients would not restrict their ability to compete with over 95% of the market. In other words, Defendants would face very little (if no) harm if the Court were to grant Gallagher's request for a preliminary injunction. On the other hand, if the Court were to deny Gallagher's request, it could lose more of its clients and prospects and could continue to see its good will with its clients erode. Injunctive relief is the appropriate remedy.

## IV.  CONCLUSION

For the foregoing reasons, Gallagher respectfully requests the court grant its request for a preliminary injunction, and order that Defendants be enjoined from using its trade secrets, confidential and proprietary information and from soliciting its current and prospective clients, pursuant to Paragraph 13 of the Executive Agreement. Gallagher further orders that Defendants be required to comply with the fourteen day Notice Period required under Paragraphs seven to nine of the Executive Agreement.

DATED: November 14, 2007

SEYFARTH SHAW LLP

By_____
Althea V. Bovell
Attorneys for Plaintiff
GALLAGHER BENEFIT SERVICES, INC.