SEYFARTH SHAW LLP
Robert S. Niemann (SBN 087973)
E-mail: rniemann@seyfarth.com
Althea Bovell (SBN 200240)
E-mail: abovell@seyfarth.com
Krista L. Mitzel (SBN 221002)
E-mail: kmitzel@seyfarth.com
560 Mission Street, Suite 3100
San Francisco, California 94105
Telephone: (415) 397-2823
Facsimile: (415) 397-8549

Attorneys for Plaintiff
GALLAGHER BENEFIT SERVICES, INC.

## UNITED STATES DISTRICT COURT

### IN AND FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GALLAGHER BENEFIT SERVICES, INC., a Delaware Corporation,<br><br>　　　　　Plaintiff,<br><br>　　　v.<br><br>JAMES DE LA TORRE, an individual, ANDREINI & COMPANY, a California Corporation,<br><br>　　　　　Defendants. | Case No. 07 05495 VRW<br><br>**APPENDIX OF CALIFORNIA AUTHORITIES IN SUPPORT OF PLAINTIFF'S REPLY TO OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION**<br><br>Date:　　　　November 15, 2007<br>Time:　　　　2:30 p.m.<br>Courtroom:　　6<br>Honorable Vaughn R. Walker |

Plaintiff submits the following California authorities in support of its reply to opposition to motion for preliminary injunction:

| Exhibit | Citation |
|---|---|
| 1 | *American Credit Indemnity Co. v. Sacks*, 213 Cal.App.3d 622 (1989) |
| 2 | *Corporate Express Office Products, Inc. v. Guelpen, et al.*, 2002 U.S. Dist. LEXIS 27642 (N. Dist. Cal.) |
| 3 | *Courtesy Temporary Serv. v. Camacho*, 222 Cal. App.3d 1278, (2d Dist. 1990) |
| 4 | *Edwards v. Arthur Anderson LLP*, 142 Cal.App.4th 603 (2006)   **[This case, which is cited by defendants, is up for review]** |
| 5 | *Metro Traffic Control Inc. v. Shadow Traffic Network*, 22 Cal.App.4th 853 (1994) |

1

2   DATED: November 14, 2007                    SEYFARTH SHAW LLP

3

4                                               By _____
                                                        Robert S. Niemann
5                                                       Althea V. Bovell
                                                        Krista L. Mitzel
6
                                                Attorneys for Plaintiff
7                                               GALLAGHER BENEFITS SERVICES,
                                                INC.

8

9

10

11

12

13

14

15

16

17

18                       .

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 1

LEXSEE

**AMERICAN CREDIT INDEMNITY COMPANY, Plaintiff and Appellant, v. LOLA N. SACKS, Defendant and Respondent**

**No. B034560**

**Court of Appeal of California, Second Appellate District, Division Three**

**213 Cal. App. 3d 622; 262 Cal. Rptr. 92; 1989 Cal. App. LEXIS 882**

**August 29, 1989**

**SUBSEQUENT HISTORY:** [***1]
Respondent's petition for review by the Supreme Court was denied November 16, 1989.

**PRIOR HISTORY:**     Superior Court of Los Angeles County, No. C680698, Miriam A. Vogel, Judge.

**DISPOSITION:**     The judgment is reversed and the matter remanded to the superior court for reconsideration in accordance with the principles stated.  Sacks to bear costs on appeal.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff underwriter of credit insurance appealed an order of the Superior Court of Los Angeles County (California), which entered judgment in favor of defendant former employee, in an action by plaintiff alleging defendant's use of plaintiff's customer list was a protected trade secret.

**OVERVIEW:** Plaintiff, an underwriter of credit insurance, filed a complaint against defendant, a former employee of plaintiff, seeking injunctive relief, alleging defendant used plaintiff's customer list, a trade secret, to solicit plaintiff's clients. The trial court refused to enjoin defendant from using plaintiff's customer list as a trade secret and held that money damages provided an adequate remedy. Under the Uniform Trade Secret Act, <u>Cal. Civ. Code § 3426 et seq.</u>, the customer list constituted a trade secret. The right to announce a new affiliation, even to trade secret clients of a former employer, was basic to an individual's right to engage in fair competi-

tion. Defendant was endeavoring to obtain plaintiff's business. Therefore, as a matter of law, defendant's letter constituted a solicitation and merited judicial intervention. Trade secret status applied to information including names, addresses, and telephone numbers of customers.

**OUTCOME:** The judgment finding plaintiff's customer list and related information were trade secrets and that injunctive relief was not available was reversed because solicitation of customers by defendant constituted a misappropriation of plaintiff's trade secrets and plaintiff was entitled to injunctive relief. The action was remanded for reconsideration.

**CORE TERMS:** trade secret, customer list, customer, former employer, solicitation, policyholder, former employee, preliminary injunction, announcement, affiliation, misappropriation, renewal, route, unfair competition, injunction, personally, announce, serviced, solicit, premiums, laundry, credit insurance, secrecy, insurer, soliciting, telephone, receivable, expiration date, prevail, interim

**LexisNexis(R) Headnotes**

*Civil Procedure > Remedies > Injunctions > Preliminary & Temporary Injunctions*
[HN1]The decision to grant a preliminary injunction rests in the sound discretion of the trial court. A trial court will be found to have abused its discretion only when it has exceeded the bounds of reason or contravened the uncontradicted evidence. Further, the burden

213 Cal. App. 3d 622, *; 262 Cal. Rptr. 92, **;
1989 Cal. App. LEXIS 882, ***

rests with the party challenging the injunction to make a clear showing of an abuse of discretion.

*Civil Procedure > Remedies > Injunctions > Preliminary & Temporary Injunctions*
[HN2]Trial courts should evaluate two interrelated factors when deciding whether or not to issue a preliminary injunction. The first is the likelihood that the plaintiff will prevail on the merits at trial. The second is the interim harm that the plaintiff is likely to sustain if the injunction were denied as compared to the harm that the defendant is likely to suffer if the preliminary injunction were issued. By balancing the respective equities of the parties, the court concludes that, pending a trial on the merits, the defendant should or should not be restrained from exercising the right claimed.

*Governments > Legislation > Effect & Operation > Operability*
*Labor & Employment Law > Employment Relationships > Employment Contracts > Conditions & Terms > Trade Secrets & Unfair Competition > Trade Secrets*
[HN3]In the event of a conflict between prior case law and the statute, the Uniform Trade Secrets Act, Cal. Civ. Code § 3426 et seq., controls.

*Labor & Employment Law > Employment Relationships > Employment Contracts > Conditions & Terms > Trade Secrets & Unfair Competition > Trade Secrets*
*Trade Secrets Law > Factors > Definitions*
*Trade Secrets Law > Factors > Economic Value*
[HN4]The Uniform Trade Secret Act, Cal. Civ. Code § 3426 et seq., defines a trade secret as: information, including a formula, pattern, compilation, program, device, method, technique, or process, that: (1) Derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy. Cal. Civ. Code § 3426.1(d).

*Labor & Employment Law > Employment Relationships > Employment Contracts > Conditions & Terms > Trade Secrets & Unfair Competition > Former Employer's Customers*
*Labor & Employment Law > Employment Relationships > Employment Contracts > Conditions & Terms > Trade Secrets & Unfair Competition > Trade Secrets*
*Trade Secrets Law > Factors > Novelty*

[HN5]The nature of the information acquired by a salesman, the names, addresses and telephone numbers of policyholders, the amounts and types of insurance, due dates of premiums and amounts thereof, and particularly the renewal and expiration dates of policies in force, and the unique interest of the company in the information, places it in the category of the trade secret.

*Trade Secrets Law > Misappropriation Actions > Definitions*
*Trade Secrets Law > Misappropriation Actions > Elements > Acquisition*
*Trade Secrets Law > Misappropriation Actions > Elements > Improper Means*
[HN6]See Cal. Civ. Code § 3426.1(b).

*Contracts Law > Types of Contracts > Covenants*
*Labor & Employment Law > Employment Relationships > Employment Contracts > Conditions & Terms > Trade Secrets & Unfair Competition > Trade Secrets*
*Trade Secrets Law > Factors > Property Rights*
[HN7]Equity will to the fullest extent protect the property rights of employers in their trade secrets and otherwise, but public policy and natural justice require that equity should also be solicitous for the right inherent in all people, not fettered by negative covenants upon their part to the contrary, to follow any of the common occupations of life. Every individual possesses as a form of property, the right to pursue any calling, business or profession he may choose. A former employee has the right to engage in a competitive business for himself and to enter into competition with his former employer, even for the business of those who had formerly been the customers of his former employer, provided such competition is fairly and legally conducted.

*Labor & Employment Law > Employment Relationships > Employment Contracts > Conditions & Terms > Trade Secrets & Unfair Competition > Former Employer's Customers*
[HN8]Merely informing customers of one's former employer of a change of employment, without more, is not solicitation.

*Labor & Employment Law > Employment Relationships > Employment Contracts > Conditions & Terms > Trade Secrets & Unfair Competition > Former Employer's Customers*
*Trade Secrets Law > Ownership Rights > Customer Solicitation*

[HN9]The fact that an employee personally renders service to a customer of an employer is not determinative of the trade secret issue. Providing personal service to a customer whose identity is a trade secret does not thereafter render that customer fair game for solicitation. In fact, it is against those very employees who personally service customers that employers are most in need of protection.

*Labor & Employment Law > Employment Relationships > Employment Contracts > Conditions & Terms > Trade Secrets & Unfair Competition > Former Employer's Customers*
*Labor & Employment Law > Employment Relationships > Employment Contracts > Conditions & Terms > Trade Secrets & Unfair Competition > Trade Secrets*
[HN10]The right to announce a new affiliation, even to trade secret clients of a former employer, is basic to an individual's right to engage in fair competition. Therefore, the acquisition of trade secrets under circumstances giving rise to a duty to limit their use clearly allows for such an announcement.

*Labor & Employment Law > Employment Relationships > Employment Contracts > Conditions & Terms > Trade Secrets & Unfair Competition > Former Employer's Customers*
*Trade Secrets Law > Civil Actions > Remedies > Injunctive Relief > Threatened Misappropriation*
[HN11]The Uniform Trade Secret Act provides that actual or threatened misappropriation may be enjoined. Cal. Civ. Code § 3426.2(a).

*Civil Procedure > Remedies > Injunctions > Preliminary & Temporary Injunctions*
[HN12]The ultimate goal of any test to be used in deciding whether a preliminary injunction should issue is to minimize the harm which an erroneous interim decision may cause.

## SUMMARY:

## CALIFORNIA OFFICIAL REPORTS SUMMARY

In an action by an accounts receivable insurer seeking injunctive relief and a preliminary injunction against a former employee who had started her own business using plaintiff's customer list, the trial court denied plaintiff's application for a preliminary injunction. (Superior Court of Los Angeles County, No. C680698, Miriam A. Vogel, Judge.)

The Court of Appeal reversed and remanded. It held that the customer list and related information fell within the definition of trade secrets in the Uniform Trade Secrets Act (Civ. Code, § 3426 et seq.) because of the unique nature of the insurance and the product resistance which must be overcome before such insurance can be sold or renewed. It also held that plaintiff undertook reasonable efforts to maintain the secrecy, and that solicitation of customers by defendant constituted a misappropriation [***2] of plaintiff's trade secret within the meaning of the act. It held that in light of defendant's conduct, the trial court should have enjoined further unfair competition. (Opinion by Klein, P. J., with Danielson and Croskey, JJ., concurring.)

## HEADNOTES

## CALIFORNIA    OFFICIAL    REPORTS HEADNOTES
Classified to California Digest of Official Reports, 3d Series

**(1) Injunctions § 15--Preliminary Injunctions--Discretion.** --The decision to grant a preliminary injunction rests in the sound discretion of the trial court. It will be found to have abused its discretion only when it has exceeded the bounds of reason or contravened the uncontradicted evidence. The burden rests with the party challenging the injunction to make a clear showing of an abuse of discretion. In exercising this discretion, trial courts should evaluate the likelihood that the plaintiff will prevail on the merits at trial and the interim harm that the plaintiff is likely to sustain if the injunction is denied as compared to the harm that the defendant is likely to suffer if the preliminary injunction issues.

**(2) Unfair Competition § 7--Acts Constituting Unfair Competition--Use of Trade Secrets--What Constitutes--Insurer's Customer List.** --The customer list of an accounts receivable insurer was a trade secret under the Uniform Trade Secrets Act (Civ. Code, § 3426 et seq.), and at common law, where it constituted "information" which had potential economic value because it allowed a competitor to direct sales efforts to the elite 6.5 percent of those potential customers which had already evinced a predisposition to purchase credit insurance. The insurer took reasonable steps to insure the secrecy of the information as required by the act, including requiring employees to sign confidentiality agreements respecting the client list, expiration date of policies, lists of business leads, claims histories, and related client information.

**(3a) (3b) Unfair Competition § 7--Acts Constituting Unfair Competition--Use of Trade Secrets--Customer**

**List--Misappropriation--Former Employee.** --A former employee of an accounts receivable insurer misappropriated the insurer's trade secrets, a customer list, in violation of the Uniform Trade Secrets Act (Civ. Code, § 3426 et seq.), where she took the list with her when she left her employer and set up her own office and used the information in the list to solicit the business of the clients of her former employer that she had serviced.

**(4) Unfair Competition § 8--Actions--Equity--Trade Secrets.** --Equity will to the fullest extent protect the property rights of employers in their trade secrets and otherwise, but public policy and natural justice require that equity should also be solicitous for the rights inherent in all people, not fettered by negative covenants upon their part to the contrary, to follow any of the common occupations of life. Every individual possesses as a form of property the right to pursue any calling, business, or profession he may choose. A former employee has the right to engage in a competitive business for himself and to enter into competition with his former employer, even for the business of those who had formerly been the customers of his former employer, provided such competition is fairly and legally conducted.

**(5a) (5b) Unfair Competition § 7--Acts Constituting Unfair Competition--Use of Trade Secrets--Customer List--Former Employee--Announcing New Business.** --A former employee's duty under the Uniform Trade Secrets Act (Civ. Code, § 3426 et seq.), to limit use of a trade secret customer list, did not preclude a professional announcement of a new affiliation after she left her former employer to set up her own business. The right to announce a new affiliation, even to trade secret clients of a former employer, is basic to an individual's right to engage in fair competition.

**(6) Words, Phrases, and Maxims--Solicit.** --Solicit means to ask for with earnestness, to make petition for, to endeavor to obtain, to awake or excite to action, to appeal to, or to invite. It implies personal petition and importunity addressed to a particular individual to do some particular thing. It means to appeal to (for something); to apply to for obtaining something; to ask earnestly; to ask for the purpose of receiving; to endeavor to obtain by asking or pleading; to entreat, implore or importune; to make petition to; to plead for; to try to obtain.

**(7) Unfair Competition § 10--Actions--Damages and Injunctive Relief--Injunctive Relief--Preliminary Injunction--Trade Secret--Customer List--Former Employee.** --An accounts receivable insurer was entitled to a preliminary injunction against a former employee, under the Uniform Trade Secrets Act (Civ. Code, § 3426 et seq.), who had set up her own business in competition

with her former employer and was soliciting former clients through a customer list she took from her former employer. In addition to soliciting the customers by letter, she also telephoned each client to follow up on the letter and told clients of her possible departure when she met with them for renewal of their policies. She also provided information about, and acted as an intermediary for, another insurer on behalf of a highly lucrative client of her former employer which constituted nearly 30 percent of her own annual premiums. Given the aggressive manner in which the former employee chose to terminate her employment, the former employer likely would sustain continuing interim harm in the absence of an injunction and was likely to prevail on the merits at trial.

**COUNSEL:** Ervin, Cohen & Jessup, Allan Gabriel, Calvin E. Davis and Deborah A. Berthel for Plaintiff and Appellant.

Karns & Karabian and Lawrence Graze, Revere, Rykoff & Wallace, Frank Revere and Caroline Fowler for Defendant and Respondent.

**JUDGES:** Opinion by Klein, P. J., with Danielson and Croskey, JJ., concurring.

**OPINION BY:** KLEIN

**OPINION**

[*625] [**93] Plaintiff and appellant American Credit Indemnity Company (ACI) appeals an order of the trial court denying its application for a preliminary injunction against defendant and respondent, its former employee, Lola N. Sacks (Sacks), now doing business as LNS Insurance Services. [1]

> 1 An appeal may be taken from an order denying an injunction. ( Code Civ. Proc., § 904.1, subd. (f).)

The issue presented is whether, under the Uniform Trade Secrets Act (UTSA) ( Civ. Code, § 3426 et seq.), [***3] Sacks may solicit ACI policyholders she serviced during her employment, or whether she must limit the use of ACI's customer list to an announcement of new affiliation.

We hold the UTSA protects ACI's customer list as a trade secret, and Sacks's solicitation of ACI's clients constituted a misappropriation within the meaning of the UTSA, and should have been enjoined by the trial court.

Factual and Procedural Background

ACI is a national underwriter of credit insurance. This esoteric insurance is sold to manufacturers, wholesalers and certain service organizations which sell on

213 Cal. App. 3d 622, *; 262 Cal. Rptr. 92, **;
1989 Cal. App. LEXIS 882, ***

credit terms to other businesses, and is designed to pro-
tect an insured against excessive bad debts. As far as can
be discerned from the record, only three firms write this
type of insurance. ACI is a leader in the field, and in
1987 it had 42 offices which generated gross premiums
in excess of $ 56 million.

ACI estimates that although any company in the de-
scribed category of potential customers with annual
revenues in excess of $ 2 million might insure its ac-
counts receivable, only 6.5 percent actually do. ACI
claims it has captured more than half of this market.

[*626] Sacks became an ACI agent on February 5,
1979. [***4] She formerly had worked in the toy indus-
try and had been an ACI policyholder. By 1987, Sacks
had become a top ACI agent. She personally serviced 43
of the 136 Los Angeles office policies. Although some
of these policies had been "inherited" by Sacks when
other ACI agents left the office, she had been the respon-
sible salesperson on the majority. Some of the leads
which resulted in policies [**94] written by Sacks had
been provided by ACI; others Sacks had developed.

On March 4, 1988, Sacks resigned from ACI. She
sent a letter dated March 7, 1988, to each of the ap-
proximately 50 ACI policyholders she personally had
serviced. It stated: "After almost fifteen years as both an
agent and policyholder, I have left [ACI] and am very
pleased to announce the formation of an independent
insurance agency. [para.] I shall continue to specialize in
Credit Insurance but will now primarily be representing
Fidelity and Deposit Company of Maryland [F&D], who
[sic] is offering companies a very interesting alternative
to the types of policies being written by both [ACI] and
Continental. If you would like to learn more about the
[F&D] policy, I will be happy to discuss it in detail with
you when you are [***5] ready to review your ongoing
credit insurance needs at renewal time. [para.] In the
meantime, ACI will assign a new agent to your policy. If
I can be of assistance to you during the transition period
or answer any questions for you at any time, please do
not hesitate to call me. [para.] I have really enjoyed our
past association and hope we don't lose touch!"

a. ACI's complaint allegations.

On March 23, 1988, ACI filed a verified complaint
against Sacks seeking injunctive relief which alleged
Sacks had used ACI's "'Trade Secrets'" to solicit ACI's
clients. [2] The complaint defined as "'Trade Secrets'" its
client list, the expiration dates of ACI policies, lists of all
leads for potential business, claims histories, and other
information concerning the special needs of clients. ACI
alleged it required its employees to sign confidentiality
agreements with respect to this information.

2    In addition to injunctive relief, ACI's com-
plaint sought return of personal property, imposi-
tion of a constructive trust, an accounting and
damages for misappropriation of trade secrets,
unfair trade practices and competition, breach of
fiduciary duty, intentional interference with busi-
ness relations, and [***6] conversion.

The complaint further alleged that in the course of
discovery in another lawsuit (the Wixom action), Sacks
had received log books containing the names of ap-
proximately 3,000 ACI leads and clients maintained by
ACI from 1985 through October 1986. In that case,
Sacks had stipulated to a [*627] protective order as to
the log books. [3] ACI characterized the Wixom action as a
suit for defamation brought by Sacks against a former
ACI secretary.

3    The parties had agreed certain "proprietary
and confidential information belonging" to ACI
"consisting of log books of leads from August,
1983 through the present, [would] be used only
for the legitimate purposes of this [the Wixom]
litigation [and] [t]hat said material will not be
disclosed, discussed, copied, published, or made
available in any manner whatsoever to persons
other than the parties, their attorneys, and those
with a legitimate need to know in order to assist
in the prosecution or defense of this action and
cross-action."

b. Temporary restraining order (TRO) issued.

Based upon the allegations of the complaint, the trial
court issued a TRO which directed Sacks not to divulge,
make known or make any use of ACI's trade secrets and
[***7] not to solicit business from any person or entity
which had been an existing ACI client during the time
Sacks had been employed by ACI or any potential ACI
client Sacks had become aware of as a result of her ACI
employment.

c. Facts disclosed by subsequent discovery.

After issuance of the TRO, the parties conducted
expedited discovery which disclosed the following facts:
[4] Sacks first contemplated leaving ACI in approximately
April 1987. She began discussions with F&D in October
1987, and attended meetings at F&D's Baltimore head-
quarters in late January 1988. Sacks told F&D her ACI
policyholders represented approximately $ 800,000 in
annual premiums and "perhaps half of [those] policy-
holders [**95] might be interested in writing business
with" F&D.

4    The facts which are summarized hereafter are
based upon Sacks's deposition and affidavits filed

213 Cal. App. 3d 622, *; 262 Cal. Rptr. 92, **;
1989 Cal. App. LEXIS 882, ***

by ACI and Sacks in support of and opposition to issuance of the preliminary injunction.

In February 1988, Sacks signed a lease and installed phone service at her new office but averred "until the last day as an agent with ACI (March 4, 1988) I properly serviced all ACI policyholders including but not limited to submitting policy renewal applications [***8] and obtaining new business. Indeed, between January, 1988 and March 4, 1988, I obtained 18 renewal applications for ACI and obtained three new applications for ACI, . . ." (Italics deleted.)

Sacks told several ACI clients of her possible association with F&D at the time she met with them for the purpose of renewal of their policies. Of these clients, she advised at least two to stay with ACI even though the clients wanted to follow her, and the great majority of these policyholders renewed with ACI.

[*628] Sacks claimed the March 7th letter had been "carefully drafted . . . to refute any charge of wrongdoing that might be brought by ACI." Sacks pointed out the letter specifically suggested waiting until renewal time before making any change in coverage and assured the client that ACI would continue to service the policy.

Although Sacks also telephoned each client to which she had sent the March 7th letter in order to convey a personal communication of her departure, she denied soliciting business or discouraging continuation of coverage with ACI during those calls.

One major policyholder with which Sacks had discussed her new affiliation decided to change carriers to F&D. This policy, which [***9] expired on March 31, 1988, accounted for approximately $ 230,000 in annual premiums or almost 30 percent of the premiums Sacks generated. Sacks admitted she had provided information about F&D to this client in a manner which differed from her earlier practice with respect to competitors, and in fact, acted as an intermediary on behalf of the client with F&D. However, she also wrote a letter dated February 6, 1988, to ACI's home office, in accordance with a written ACI policy, which advised ACI management of competition from F&D on the renewal of this policy. The purpose of the letter was "to see if [ACI] would be willing to change any terms on the renewal in light of the potential competition."

On February 23, 1988, approximately one week after Sacks told this client she intended definitely to join F&D, the client told Sacks it would not renew the ACI policy but would place its business with F&D. Although Sacks at some point in the discussions had referred the client to an F&D agent, Sacks earned a commission on the issuance of the F&D policy. [5]

5 In declarations filed in opposition to the issuance of the preliminary injunction, the executive vice-president and the credit manager [***10] of the client both praised Sacks's professionalism and accountability. Each denied Sacks had incited the switch to F&D and claimed the change had come as a business response to ACI's high premiums and poor performance on accounts receivable which, pursuant to the ACI policy, had to be assigned to ACI for collection. The executive vice president stated "that if any reputable agent had approached us . . . with the F&D proposal and concepts, I would have determined to allow the ACI policy to lapse and to pick up the F&D policy . . . ."

Sacks admitted it is easier to renew a policy than to sell it in the first instance because a prospective client must be sold on the concept of credit insurance. Sacks renewed policies at a rate that ranged between 65 and 75 percent.

Sacks believed the sales leads produced by ACI belonged to ACI, but the sales leads she had developed belonged to her.

[*629] Regarding the log books, Sacks claimed the Wixom action, in addition to defamation, involved her claim ACI wrongfully had limited her acquisition of new accounts by depriving her of telephone leads. Sacks estimated the success rate on telephone leads at 20 percent. During her early tenure at ACI, Sacks had [***11] received 3 to 5 telephone leads per month which resulted in 10 to 12 new accounts per year. Sacks contrasted such leads with responses to direct mail which had a success rate of about 5 percent. Sacks claimed she had rarely received telephone leads after 1985.

[**96] d. *The trial court's ruling.*

After two oral hearings on the application for the preliminary injunction, the trial court indicated it would consider all the evidence, including the deposition testimony, and took the matter under submission. At the first such oral hearing, the trial court had stated the March 7, 1988, letter constituted a solicitation, but the trial court's written order concluded Sacks had a right to solicit the clients of her former employer with which she personally had become acquainted during the course of her employment.

The trial court also found the evidence did not support ACI's allegation of misappropriation of trade secrets. To the extent ACI's unfair competition claim had merit, the trial court held money damages provided an adequate remedy.

Contentions

213 Cal. App. 3d 622, *; 262 Cal. Rptr. 92, **;
1989 Cal. App. LEXIS 882, ***

ACI contends its customers list, policy expiration dates and related information constitute trade secrets. ACI asserts Sacks used these trade secrets [***12] to negotiate with F&D and to divert ACI business to F&D. Also, ACI claims the trial court ignored undisputed evidence which established Sacks wrongfully had solicited ACI clients, erred in finding money damages an adequate remedy, and improperly failed to enjoin Sacks from further solicitation of ACI clients.

Discussion

1. *Abuse of discretion standard governs review of grant or denial of preliminary injunction.*

**(1)** "The law is well settled that [HN1]the decision to grant a preliminary injunction rests in the sound discretion of the trial court. [Citations.] . . . [para.] A trial court will be found to have abused its discretion only when it has '"exceeded the bounds of reason or contravened the uncontradicted evidence."' [Citations.] Further, the burden rests with the party challenging [*630] the injunction to make a clear showing of an abuse of discretion. [Citations.] [para.] This court has traditionally held that [HN2]trial courts should evaluate two interrelated factors when deciding whether or not to issue a preliminary injunction. The first is the likelihood that the plaintiff will *prevail on the merits at trial.* The second is the *interim harm* that the plaintiff is likely to sustain if the [***13] injunction were denied as compared to the harm that the defendant is likely to suffer if the preliminary injunction were issued. [Citations.] . . . '"[By] balancing the respective equities of the parties, [the court] concludes that, pending a trial on the merits, the defendant should or . . . should not be restrained from exercising the right claimed . . . ."' [Citation.]" ( *IT Corp. v. County of Imperial* (1983) 35 Cal.3d 63, 69-70 [196 Cal.Rptr. 715, 672 P.2d 121], italics added.)

We review this record with these principles in mind.

2. *The ACI customer list constitutes a trade secret.*

a. *UTSA.*

The Legislature enacted the UTSA in 1984 and it became effective on January 1, 1985. [HN3]In the event of a conflict between prior case law and the statute, the UTSA controls. ( *American Paper & Packaging Products, Inc. v. Kirgan* (1986) 183 Cal.App.3d 1318, 1324 [228 Cal.Rptr. 713].)

The stated purpose of the UTSA is to provide "unitary definitions of trade secret and trade secret misappropriation, and a single statute of limitations for the various property, quasi-contractual, and violation of fiduciary relationship theories of noncontractual liability utilized at common law. The Uniform Act also [***14] codifies the results of the better reasoned cases concerning the

remedies for trade secret misappropriation." (Comrs. Prefatory Note to Uniform Trade Secrets Act, 14 West's U. Laws Ann. (1980) Trade Secrets 537, 538.)

[HN4]The UTSA defines a trade secret as "information, including a formula, pattern, compilation, program, device, method, technique, or process, that: [para.] (1) Derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure [**97] or use; and [para.] (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." (Civ. Code, § 3426.1, subd. (d).)

b. *Application here.*

**(2)** If the two-prong UTSA test is applied to the present situation, it must be concluded the ACI customer list is "information" which has [*631] potential economic value because it allows a competitor to direct sales efforts to the elite 6.5 percent of those potential customers which already have evinced a predisposition to purchase credit insurance.

Although a large number of firms could purchase credit insurance to protect their accounts receivable, most do not. Sacks admitted in [***15] her deposition a prospective client first had to be sold on the concept of credit insurance before an agent could attempt to sell a policy, and that 65 to 75 percent of policyholders renew.

Further, ACI took reasonable steps to insure the secrecy of this information as required by the UTSA. Sacks stipulated in the Wixom action that certain confidential information consisting of the subpoenaed log books with leads from August 1983 forward would be subject to a protective order. Also, ACI required its employees to sign confidentiality agreements respecting its client list, expiration date of policies, lists of business leads, claims histories, and related client information. [6] Thus, under the UTSA, the ACI customer list constitutes a trade secret.

> 6    Sacks's assertion she never signed such an agreement does not alter our analysis.

c. *Identical result under pre-UTSA case law.*

California courts protected retail delivery routes of customers as against a former employee for many years before enactment of the UTSA. (E.g., *Empire Steam Laundry v. Lozier* (1913) 165 Cal. 95 [130 P. 1180] [laundry route]; *Cornish v. Dickey* (1916) 172 Cal. 120 [155 P. 629] [bakery route]; *New Method Laundry Co. v. MacCann* (1916) 174 Cal. 26 [161 P. 990] [***16] [laundry route].)

This protection expanded to include customer lists of other types of businesses. (E.g., *Scavengers P. Assn.*

213 Cal. App. 3d 622, *; 262 Cal. Rptr. 92, **;
1989 Cal. App. LEXIS 882, ***

v. Serv-U-Garbage Co. (1933) 218 Cal. 568 [24 P.2d 489] [the salvage business]; Cal. Intelligence Bureau v. Cunningham (1948) 83 Cal.App.2d 197 [188 P.2d 303][the unique service of investigating charities to protect subscribers from fraudulent or unworthy solicitation]; Klamath-Orleans Lumber, Inc. v. Miller (1978) 87 Cal.App.3d 45 [151 Cal.Rptr. 1188 [the manufacture of load binders].)

In State Farm Mut. etc. Ins. Co. v. Dempster (1959) 174 Cal.App.2d 418 [344 P.2d 821], customer information nearly identical to that found here received protection. There, an insurance company sought to enjoin its former agents from interfering with policyholders the agents had serviced. The former agents had contacted policyholders at automobile insurance renewal time and had advised them not to renew with State Farm.

[*632] State Farm asserted trade secret status as to various information including "'the names, addresses and telephone numbers of policyholders, the amounts and types of insurance . . ., due dates of premiums and amounts thereof, . . ., and particularly the renewal and [***17] expiration dates of policies in force.'" ( State Farm Mut. etc. Ins. Co. v. Dempster, supra, 174 Cal.App.2d at p. 422.)

The State Farm court found [HN5]"the very recital of the nature of the information acquired by the salesman and the unique interest of the company in the information, places it in the category of the trade secret . . . ." ( State Farm Mut. etc. Ins. Co., supra, 174 Cal.App.2d at p. 426.)

We perceive no substantial difference between the information at issue in State Farm and this case. In fact, the list of ACI policyholders constitutes a more elite compilation than the automobile policyholders involved in State Farm and therefore is more deserving of protection.

[**98] Under either the UTSA or at common law, the ACI customer list is a trade secret.

3. Sacks's conduct constituted misappropriation of ACI's trade secrets.

(3a) Sacks contends her conduct merely invited business inquiry by announcing a new business affiliation and that this activity is not prohibited by the UTSA definition of misappropriation because such conduct falls within the common law right to compete fairly.

The UTSA defines misappropriation as: [HN6]"(1) Acquisition of a trade secret of another by a person who knows [***18] or has reason to know that the trade secret was acquired by improper means; or [para.] (2) Disclosure or use of a trade secret of another without express or implied consent by a person who: [para.] (A)

Used improper means to acquire knowledge of the trade secret; or [para.] (B) At the time of disclosure or use, knew or had reason to know that his or her knowledge of the trade secret was: [para.] (i) Derived from or through a person who had utilized improper means to acquire it; [para.] (ii) Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or [para.] (iii) Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; . . . ." (Civ. Code, § 3426.1, subd. (b), italics added.)

The portion of the definition which applies here is highlighted and proscribes "disclosure or use" of a trade secret, without express or implied consent, by a person who acquired knowledge of the trade secret under [*633] circumstances giving rise to a duty to maintain its secrecy or limit its use. Clearly, in the broadest construction of this definition, Sacks's letter to ACI policyholders constituted a "use" of the [***19] ACI customer list.

Restated in the terms of the UTSA definition of misappropriation, Sackscontends the UTSA cannot so limit the use of the ACI customer list as to usurp her right to announce a new business affiliation. We conclude the common law right to compete fairly and the right to announce a new business affiliation have survived enactment of the UTSA. However, Sacks's March 7 letter went beyond an appropriate professional announcement and constituted a solicitation of the ACI customer list.

4. The common law property right to compete fairly is unavailing to Sacks.

(4) [HN7]"Equity will to the fullest extent protect the property rights of employers in their trade secrets and otherwise, but public policy and natural justice require that equity should also be solicitous for the right inherent in all people, not fettered by negative covenants upon their part to the contrary, to follow any of the common occupations of life. [para.] Every individual possesses as a form of property, the right to pursue any calling, business or profession he may choose. A former employee has the right to engage in a competitive business for himself and to enter into competition with his former employer, [***20] even for the business of those who had formerly been the customers of his former employer, provided such competition is fairly and legally conducted." ( Continental Car-Na-Var Corp. v. Moseley (1944) 24 Cal.2d 104, 110 [148 P.2d 9], italics added, citing New Method Laundry Co. v. MacCann, supra, 174 Cal. 26.)

a. Free competition prevails in the absence of a trade secret customer list.

213 Cal. App. 3d 622, *; 262 Cal. Rptr. 92, **;
1989 Cal. App. LEXIS 882, ***

A seminal and frequently quoted case in this area is *Avocado Sales Co. v. Wyse* (1932) 122 Cal.App. 627 [10 P.2d 485]. There, an avocado salesman could not be enjoined from "canvassing and soliciting" ( *id.,* at p. 628) the fruit stands, markets, cafes and hotels he had called upon on behalf of his former employer because a list of *retail avocado sellers could not be viewed as confidential.* The court asked: "Could not any [avocado] salesman see at a glance where to attempt to sell his wares?" ( *Id.,* at p. 634.) That is, in the absence of any secret, there could be no trade secret.

Similarly, our Supreme Court has declined to protect the customers of a floor wax manufacturer or a janitorial service because "the names and addresses of persons, firms and corporations using the type [**99] of products sold [*634] by plaintiff [***21] are *commonly known to the trade,* and that they are called upon by salesmen for various companies." ( *Continental Car-Na-Var Corp. v. Moseley, supra,* 24 Cal.2d at pp. 108-109, italics added; *Aetna Bldg. Maintenance Co. v. West* (1952) 39 Cal.2d 198 [246 P.2d 11].)

Obviously, in the absence of a protectable trade secret, the right to compete fairly outweighs the employer's right to protect clients against competition from former employees. Also, even when a trade secret customer list exists, the common law cases acknowledged a right to announce a new affiliation as contrasted with a solicitation for patronage.

b.

**(5a)** *Sacks's duty under the UTSA to limit use of the ACI trade secret customer list did not preclude a professional announcement of a new affiliation.*

At common law, the boundary separating fair and unfair competition in the context of a protected customer list has been drawn at the distinction between an announcement and a solicitation.

**(6)** In the course of its discussion in *Aetna Bldg. Maintenance Co. v. West, supra,* 39 Cal.2d at pages 203-204, our Supreme Court noted the difference and stated the verb "'[s]olicit' is defined as: 'To ask for with earnestness, to make petition to, [***22] to endeavor to obtain, to awake or excite to action, to appeal to, or to invite.' [Citation.] 'It implies *personal* petition and importunity addressed to a particular individual to do some particular thing, . . .' [Citation.] It means: 'To appeal to (for something); to apply to for obtaining something; to ask earnestly; to ask for the purpose of receiving; to endeavor to obtain by asking or pleading; to entreat, implore or importune; to make petition to; to plead for; to try to obtain.' [Citation.]"

However, the *Aetna* court observed that "[m]erely informing customers of one's former employer of a change of employment, without more, is not solicitation. Neither does the willingness to discuss business upon invitation of another party constitute solicitation on the part of the invitee. Equity will not enjoin a former employee from receiving business from the customers of his former employer, even though the circumstances be such that he should be prohibited from soliciting such business. [Citations.]" ( *Aetna Bldg. Maintenance Co. v. West, supra,* 39 Cal.2d at p. 204.)

Although *Aetna* involved the customer list of a janitorial service which did not constitute a trade secret, the same rule [***23] has been applied where a trade secret list exists.

Illustrative of this principle is the case of *Theodore v. Williams* (1919) 44 Cal.App. 34 [185 P. 1014]. There, a laundry route driver, Adkins, left the [*635] employ of Anaheim Laundry and began to work in the area of his former route for another company. After Adkins apparently had solicited improperly along the route, Anaheim Laundry sought and obtained an injunction permanently barring such solicitation by Adkins.

When customers along the route refused to continue business with Adkins's replacement, Anaheim Laundry sought to cite Adkins for contempt for violation of the injunction. However, the evidence showed Adkins had done no more than drive along the route in a newly labeled truck, place an advertisement in a newspaper announcing his new affiliation, and pick up laundry only "where he had been previously requested personally by note or by telephone to call and get their work." ( *Theodore v. Williams, supra,* 44 Cal.App. at p. 39.) The court held such activity did not constitute solicitation.

Thus, even though the laundry route customer list deserved protection from *solicitation* by Adkins, the former employer could not prevent Adkins's [***24] *announcement* of new affiliation and subsequent receipt of trade on the route.

The most recent case to deal with the announcement rule is *Moss, Adams & Co. v. Shilling* (1986) 179 Cal.App.3d 124 [224 Cal.Rptr. 456], upon which the trial court relied in finding Sacks properly could solicit the ACI policyholders she personally had serviced.

[**100] *Moss, Adams,* involved departing employees of an accounting firm who announced the formation of a new accounting partnership to those clients the former employees had serviced on behalf of the firm. The trial court granted summary judgment in favor of the employees based upon the *Aetna* rule that [HN8]"'[m]erely informing customers of one's former employer of a change of employment, without more, is

not solicitation.' [Citations.  ]" ( *Moss, Adams & Co., supra*, 179 Cal.App.3d at p. 127.)

The announcement to the former employer's clients in *Moss, Adams* stated: "'John D. Shilling and Cynthia L. Kenyon, formerly with Moss Adams, are pleased to announce the formation of a new partnership: Shilling, Kenyon & Co.[,] Certified Public Accountants[,] Lloyds Bank Building[,] One Almaden Blvd., Suite 1110[,] San Jose, CA 95113[,] (408) 295-3822[.]'" ( *Moss, Adams & Co.* v. *Shilling, supra,* 179 Cal.App.3d at p. 127.)

The [***25] *Moss, Adams* court affirmed the trial court and cited the frequently quoted maxim that employees cannot "be compelled to 'wipe clean the slate of their memories.'" ( *Moss, Adams & Co., supra,* 179 Cal.App.3d at p. 129.) The *Moss, Adams*' court concluded: "(1) former employees cannot use trade [*636] secrets to announce a change of employment to the former employer's customers, (2) the names of clients to whom [the ex-employees] mailed announcements were known to them from personally providing accounting services and therefore were not trade secrets, . . ." ( *Moss, Adams & Co., supra,* 179 Cal.App.3d at p. 130.)

However, before the effective date of the UTSA, the announcement rule permitted former employees to *announce* a change of employment, even to individuals or firms on a protected trade secret customer list. [7] ( *Theodore* v. *Williams, supra,* 44 Cal.App. 34.)

> 7  Although the *Moss, Adams* decision postdates enactment of the UTSA, the conduct involved therein occurred before its effective date of January 1, 1985. ( Civ. Code, § 3426.10.)

Moreover, [HN9]the fact that an employee personally renders service to a customer of an employer is not determinative of the trade secret issue. Providing personal [***26] service to a customer whose identity is a trade secret does not thereafter render that customer fair game for solicitation. In fact, it is against those very employees who personally service customers that employers are most in need of protection.  Thus, the trial court's reliance on *Moss, Adams* was misplaced.

(5b) Notwithstanding the foregoing, we believe the *Moss, Adams* result, as opposed to the statement of its conclusion, is correct and survives the enactment of the UTSA. That is, [HN10]the right to announce a new affiliation, even to trade secret clients of a former employer, is basic to an individual's right to engage in fair competition. Therefore, the acquisition of trade secrets under circumstances giving rise to a duty to limit their use, as is the case here, clearly allows for such an announcement. To hold otherwise unnecessarily would contravene widely accepted and well-established business practices.

c. *Sacks's March 7, 1988, letter went beyond an announcement and amounted to a solicitation.*

(3b) Sacks claims the March 7 letter merely announced a change of employment.  Although the letter begins as an announcement of her departure from ACI and affiliation with F&D, it soon assumes [***27] a different tone.  Sacks informs ACI's customers of the interesting competitive alternative F&D offers as compared to ACI's policies.  She invites their inquiry about the F&D policy and indicates she would be happy to discuss it in detail when they are ready to renew.  She personally petitions, importunes and entreats ACI's customers to call her at any time for information about the better policies F&D can provide and for assistance during the agent transition period.

[*637] Phrased in the terms used in the *Aetna* definition, Sacks is endeavoring to obtain their business. Sacks, in a word, solicited.  [**101] Therefore, as a matter of law, Sacks's letter of March 7, 1988, constituted a solicitation.

5. *Money damages inadequate.*

(7) Determination of the solicitation issue in favor of ACI does not necessitate the further conclusion the trial court should have issued the preliminary injunction, especially after Sacks already had mailed the letter.  However, we conclude Sacks's conduct, considered in the aggregate, merited such judicial intervention.

[HN11]The UTSA provides that "actual or threatened misappropriation may be enjoined." (Civ. Code, § 3426.2, subd. (a).) [HN12]"The ultimate goal of any test to be used [***28] in deciding whether a preliminary injunction should issue is to minimize the harm which an erroneous interim decision may cause." ( *IT Corp.* v. *County of Imperial, supra,* 35 Cal.3d at p. 73.)

Here, in addition to soliciting the ACI customers by letter, Sacks also telephoned each client to follow up on the letter and told clients of her possible departure when she met with them for renewal of their policies.  She also mistakenly believed the sales leads she had developed while affiliated with ACI belonged to her.

Finally, and perhaps most importantly, she had provided information about, and acted as an intermediary for, F&D on behalf of a highly lucrative ACI client which constituted nearly 30 percent of her annual premiums.

The client's declarations to the contrary notwithstanding, Sacks essentially conceded she already had referred the client to an F&D agent and earned a commission on issuance of the F&D policy.  Sacks admitted her conduct with respect to this client had been different

213 Cal. App. 3d 622, *; 262 Cal. Rptr. 92, **;
1989 Cal. App. LEXIS 882, ***

than it had been in the past when a policyholder expressed an interest in a competitor.

Given the aggressive manner in which Sacks chose to terminate her employment, ACI likely will sustain continuing [***29] interim harm in the absence of an injunction. Further, based on our ruling that ACI's customer list is a trade secret, and that Sacks's letter amounted to a solicitation, ACI is likely to prevail on the merits at trial.

Therefore, the matter is remanded to the trial court to enable it to form injunctive relief consistent with the views expressed herein.

[*638] Conclusion

We conclude ACI's customer list and related information falls within the UTSA definition of trade secrets because of the unique nature of the insurance and the product resistance which must be overcome before this type of insurance can be sold or renewed. Also, ACI undertook reasonable efforts to maintain their secrecy. Solicitation of those customers by Sacks constitutes a misappropriation of ACI's trade secret within the meaning of the UTSA. In light of Sacks's conduct, the trial court should have enjoined further unfair competition.

The judgment is reversed and the matter remanded to the superior court for reconsideration in accordance with the principles stated. Sacks to bear costs on appeal.

# EXHIBIT 2

1 of 1 DOCUMENT

**CORPORATE EXPRESS OFFICE PRODUCTS, INC., Plaintiff, v. STEVE VAN GUELPEN, TOM ENNS, HARRY TORRES, MARY KAROL, KRISTY MONESKI, HALENDA CROCKER, JANIE GAZAY and LEROY DIAS, Defendants.**

**No. C 02-04588 WHA**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA**

*2002 U.S. Dist. LEXIS 27642*

**December 12, 2002, Decided
December 12, 2002, Filed**

**DISPOSITION:** Preliminary injunction granted.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff office products company moved to enjoin defendants, former employees, from taking certain actions in violation of agreements they signed with the company and moved to enjoin the former employees from soliciting existing company employees, doing business with customers they formerly serviced at the company, and using confidential information. The employees argued that the restrictive covenants were not enforceable.

**OVERVIEW:** The employees entered into a written non-solicitation agreement with the company. The non-solicitation agreement provided, in part, that during the course of their employment and any time thereafter, those employees would not directly or indirectly, use any trade secret or confidential information except as approved by the company. An injunction based on the employees' contract extended only until the end of the time period that was specified in the contract in relation to the employees' date of termination of employment. Thus, the court held that the employees were enjoined from soliciting company employees or doing new business with the customers they formerly were assigned to or took orders from while at the company until the period of their non-solicitation contract expired. This injunction was not intended to require the employees to sever any relationships with existing customers on orders already accepted. Nonetheless, if the employees merely contacted or solicited a potential customer that they were assigned to or took orders from while at the company, said employee had to decline to do business with such customer during the period of the injunction.

**OUTCOME:** The company's motion for an injunction was granted.

**COUNSEL:** [*1] For Corporate Express Office Products, Inc., a Delaware Corporation, Plaintiff: Peter D. Holbrook, Esq., McDermott Will & Emery, Irvine, CA; Chris C. Scheithauer, Esq., McDermott Will & Emery, Irvine, CA; Lisa Sattler Blackburn, McDermott, Will & Emery, Palo Alto, Ca.

For Steve Van Guelpen an individual, Defendant: Dov M. Grunschlag, Piper Rudnick LLP, San Francisco, CA.

For Tom Enns an individual, Defendant: Dov M. Grunschlag, Piper Rudnick LLP, San Francisco, CA.

For Harry Torres an individual, Defendant: Dov M. Grunschlag, Piper Rudnick LLP, San Francisco, CA.

For Mary Karol an individual, Defendant: Dov M. Grunschlag, Piper Rudnick LLP, San Francisco, CA.

For Kristy Moneski an individual, Defendant: Dov M. Grunschlag, Piper Rudnick LLP, San Francisco, CA.

For Halenda Crocker an individual, Defendant: Dov M. Grunschlag, Piper Rudnick LLP, San Francisco, CA.

For Janie Gazay an individual, Defendant: Dov M. Grunschlag, Piper Rudnick LLP, San Francisco, CA.

For Leroy Dias an individual, Defendant: Dov M. Grunschlag, Piper Rudnick LLP, San Francisco, CA.

For Halenda Crocker an individual, Counter-claimant: Dov M. Grunschlag, Piper Rudnick [*2] LLP, San Francisco, CA.

For Leroy Dias an individual, Counter-claimant: Dov M. Grunschlag, Piper Rudnick LLP, San Francisco, CA.

For Tom Enns an individual Counter-claimant: Dov M. Grunschlag, Piper Rudnick LLP, San Francisco, CA.

For Janie Gazay an individual Counter-claimant: Dov M. Grunschlag, Piper Rudnick LLP, San Francisco, CA.

For Mary Karol an individual Counter-claimant: Dov M. Grunschlag, Piper Rudnick LLP, San Francisco, CA.

For Kristy Moneski an individual Counter-claimant: Dov M. Grunschlag, Piper Rudnick LLP, San Francisco, CA.

For Harry Torres an individual Counter-claimant: Dov M. Grunschlag, Piper Rudnick LLP, San Francisco, CA.

For Steve Van Guelpen an individual, Counter-claimant: Dov M. Grunschlag, Piper Rudnick LLP, San Francisco, CA.

**JUDGES:** WILLIAM ALSUP, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** WILLIAM ALSUP

**OPINION**

**ORDER GRANTING IN PART PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

**INTRODUCTION**

In this breach of contract dispute, plaintiffs request a preliminary injunction to enjoin defendants, former Corporate Express employees, from taking certain actions in violation of agreements they signed with Corporate Express. [*3] Plaintiff moves to enjoin defendants from soliciting Corporate Express' employees, doing business with customers they formerly serviced at Corporate Express and using confidential information. Plaintiff argues that the restrictive covenants are not enforceable. This order **GRANTS** plaintiff's motion for a preliminary injunction, subject to conditions on the scope of relief.

**STATEMENT**

**1. BACKGROUND OF THE PARTIES.**

Corporate Express is in the office-products industry. Defendant Van Gueplen was the Northern California Zone President of U.S. Office Products Company ("USOP"), which Corporate Express acquired in 2001. Upon the acquisition, Van Guelpen served as the President of the San Francisco Zone for Corporate Express. Tom Enns was employed by Corporate Express as a Sales Manager. Defendants Karol, Moneski, Crocker, Gazay and Dias are all former sales representatives of Corporate Express. All of these defendants now work for Van Guelpen at Partner in Business dba myofficeproducts.com.

**2.    THE    EMPLOYEE-DEFENDANTS' OPERATIVE AGREEMENTS.**

Just before the acquisition of USOP, on March 30, 2001, employees Karol (formerly Melendez), Moneski, Gazay and Dias entered [*4] into a written non-solicitation agreement with USOP. Upon the acquisition, the agreements were assigned to Corporate Express. As consideration for the promises, Karol, Moneski, *Gazay* and Dias were each paid a significant amount of money based, in part, on the customers they serviced: Karol received $ 33,481; Moneski received $ 31,173; Gazay received $ 16,385; and Dias received $ 28,424. This consideration was paid into addition to the employees' regular wages (Shuur Decl. Exhs. D-G; Karol Dep. at 19-20, 33; Moneski Dep. at 64; Gazay Dep. at 38; Dias Dep at 19-20).

The non-solicitation agreements provided, in part, that during the course of their employment and any time thereafter, those defendants would not "directly or indirectly," "use, disclose or disseminate to any other person," any trade secret or confidential information except as approved by CE. The non-solicitation agreements defined trade secrets and confidential information to include "cost or pricing information, financial information, customer lists and customer or prospective customer information, customer contacts, customer proposals or agreements" (Schurr Decl. Exs. D-G).

The non-solicitation agreements further [*5] provided that for a period of six months after termination of employment for any reason, the defendants would not, directly or indirectly, solicit, "do business with," or "attempt to do business with" any customer whom they "contacted, solicited or serviced" while at Corporate Express and about whom they had confidential information or trade secrets. The agreements also preclude them from recruiting other Corporate Express employees.

Defendants Karol, Moneski, Gazay and Dias left Corporate Express in early July 2002 and joined myofficeproducts.com. The non-competition provisions of their agreements that last six-months will expire in early January, 2003.

At the hearing, plaintiff argued that a proper interpretation of defendants' agreement shows that the six-month period of the covenant runs from the date of enforcement of the covenant. Plaintiff contended that the date of such enforcement would be the date of this order, assuming that it granted plaintiff relief. Defendants maintained that the injunction should run only until the six-month time period from the date of their termination of employment expires. It seems reasonable that the "date that the covenant is deemed enforceable, [*6] " as that term was used in the non-solicitation agreements, was intended to mean the date the covenant *became* enforceable (Opp. Exh. B at 4).

To instead interpret the "date that the covenant is deemed enforceable" as the date upon which the Court issues an injunction (or TRO) would lead to an absurdity. Then plaintiff would be entitled to wait until almost six months after a defendant's termination and then enforce the covenant and receive another six months of benefit. Such an interpretation would be contrary to the express temporal provision of the covenant stated earlier in the contract (*id.* at 2). No contract provision should be interpreted in a manner that would render other provisions meaningless. *Ratcliff Architects v. Vanir Constr. Mgmt., Inc.,* 88 Cal. App. 4th 595, 602, 106 Cal. Rptr. 2d 1 (2001). This order holds that the injunction based on defendants' contract extends only until the end of the time period that was specified in the contract in relation to defendants' date of termination of employment.

In consideration for receiving stock options, defendants Enns and Crocker signed a written "Policy and Agreement regarding Trade Secrets." (Shuur Decl. Exhs. B, C). Only [*7] the lengths of the covenants differ: Enns' lasts for one year and Crocker's for two years. In each policy, the employee agreed, *sua sponte,* not to contact or solicit any Corporate Express customer or employee for the purpose of diverting business to a competing source and not to accept employment with any person, firm or corporation "whose products and or services compete with the contract stationer business of Corporate Express in any geographic market in which Corporate Express is then doing business or to Employee's knowledge, plans to do business."

Mr. Enns left Corporate Express in July 2002 and was hired by Van Guelpen as a sales manager for myofficeproducts.com. Mr. Crocker left Corporate Express in August 2002 and now works for myofficeproducts.com.

When Van Guelpen's employment with Corporate Express ended on September 4, 2001, Van Guelpen signed a "Separation Agreement" that he (a) would treat Corporate Express' customer information as trade secrets and would not use or disclose it to third parties; (b) would not, for twelve months, directly or indirectly so-

licit Corporate Express customers he did business with and about whom he had confidential information; and (c) [*8] would not, for twelve months, directly or indirectly recruit Corporate Express employees to leave Corporate Express (Schuur Decl. Ex. A). Van Guelpen received forty weeks severance (about $ 130,000) for his promises.

The duration of the non-compete in his Separation Agreement was twelve months following his separation date, which was September 4, 2001. Accordingly, the restraint already expired on September 4, 2002. Accordingly, there is no occasion to enforce Van Guelpen's agreement. Plaintiff is DENIED any relief with regard to restricting Van Guelpen's business activities.

## 3. PROCEDURAL POSTURE.

Plaintiff filed for a temporary restraining order and a preliminary injunction on October 25, 2002. On October 29, 2002, a hearing was held on the TRO. The Court ordered a temporary restraint, which would remain in place until December 5, 2002. [1] The TRO enjoined defendants, except Van Guelpen, from soliciting any customer they dealt with at Corporate Express, including by initiating contact or affirmatively seeking their business. If a customer contacted a defendant, however, that defendant was permitted to conduct new business with that customer. Furthermore, business in progress [*9] that was initiated by a former customer of a defendant (or arguably was initiated by the customer) was not enjoined. Discovery on the defendants' alleged breach of their agreement and briefing on the preliminary injunction also was ordered.

    1  The TRO was set to expire in two days from
    the TRO hearing unless plaintiff posted a $
    50,000 bond. Plaintiff did post the bond.

Plaintiffs now request a preliminary injunction that would require defendants to comply with their agreements and refrain them, for a limited period of time, from (a) soliciting Corporate Express employees, (b) "doing business" with the customers they formerly serviced at Corporate Express; or (c) using any confidential or trade secret information they acquired in connection with their employment at Corporate Express.

## ANALYSIS

## I. STANDARD FOR PRELIMINARY INJUNCTION.

To obtain a preliminary injunction, plaintiff must demonstrate either: "(1) a combination of probable success on the merits and the possibility of irreparable harm; [*10] or (2) that serious questions are raised and the balance of hardships tips in its favor." *A & M Records,*

Case 3:07-cv-05495-VRW    Document 20    Filed 11/14/2007    Page 19 of 33

Page 4
2002 U.S. Dist. LEXIS 27642, *

*Inc. v. Napster, 239 F.3d 1004, 1013 (9th Cir. 2001).* The required showing of irreparable harm decreases as the probability of success on the merits increases. *MAI Sys. Corp. v. Peak Computer, Inc., 991 F.2d 511, 516 (9th Cir. 1993).*

## II.    LIKELIHOOD    OF    SUCCESS    ON PLAINTIFF'S BREACH OF CONTRACT ACTION.

The parties do not dispute that most of the defendants currently are "doing business" with some of the customers they formerly serviced while at Corporate Express. The parties disagree primarily on whether California law would uphold the agreements at issue in this case. Thus this order must examine if the agreements are enforceable under California law.

Defendants maintain that the agreements are unenforceable under *California Business and Professions Code Section 16600.* Plaintiff contends that the agreements are enforceable because they are limited to a small segment of the market and do not preclude defendants from working for a competitor or otherwise engaging in their profession.

### A. What Types of Restrictive Covenants does *Section* [*11] *16600* Prohibit

Defendants contend that under California law the validity of non-solicitation clauses depends on whether the clause prevents the misappropriation of trade secrets. [2] Plaintiff claims that there are two separate exceptions to the general rule against non-competition agreements: (i) when they protect trade secrets, and (ii) when they are only partial restraints. This order holds that plaintiff is correct.

> 2    Defendants rely heavily on *Walia v. Aetna, Inc., 93 Cal. App. 4th 1213, 113 Cal. Rptr. 2d 737 (2001).* This case however, was depublished and is not citable as it has been superseded by a grant of review. Accordingly, this order does not consider *Walia* in its decision.

The Ninth Circuit has repeatedly held that restrictive covenants are enforceable and do not violate *Section 16600* when limited to a limited, narrow segment of the market. *IBM v. Bajorek, 191 F.3d 1033, 1040 (9th Cir. 1999)* (contract is valid, despite its restriction on competition, if the employee is barred [*12] from pursuing only a small or limited part of the business, trade or profession); *General Commercial Packaging, Inc. v. TPS Packaging Eng'g, Inc., 126 F.3d 1131, 1134 (9th Cir. 1997)* (contract may prevent former employee from doing business with a narrow segment of the market); *Campbell v. Board of Trustees, 817 F.2d 499, 502 (9th Cir. 1987)* (contract is enforceable where promissor is

barred from a small or limited part of the business, trade or profession).

Other federal district courts have examined this same issue and come to the same conclusion. In fact, two federal judges for the Central District of California have examined this issue with regard to agreements of Corporate Express employees. *Corporate Express Office Prods, v. Martinez, 2002 U.S. Dist. LEXIS 21310 (C. D. Cal. March 8, 2002)* (considering the same agreement signed by defendants Karol, Moneski, Gazay and Dias in this case and entering preliminary injunction prohibiting former employee from "doing business" with customers she formerly serviced at Corporate Express); *Corporate Express Office Prods. v. Coons, 2000 U.S. Dist. LEXIS 22243 (C.D. Cal. April 21, 2000)* [*13] (granting TRO against former employees because restrictive covenant did not violate *Section 16600*). Accordingly, this order holds that plaintiff is likely to succeed on its breach of contract claim if it can show that the restraints on "soliciting" and "doing business" are merely partial restraints. [3]

> 3    But see *Liberty Mutual Ins. Co. v. Gallagher & Co., 1994 U.S. Dist. LEXIS 18412, 1994 WL 715613 (N.D. Cal. 1994)* (acknowledging the partial restraint exception, but noting that recent caselaw holds that the validity of an *anti-solicitation* clause depends on whether the clause prevents the misappropriation of trade secrets).

### B. Do Defendants' Agreements "completely restrain" them from their professions

The non-solicitation agreements signed by defendants Karol, Gazay, Moneski and Dias effectively prevent the defendants from doing business with all of their former customers. Given the potentially unlimited market for "office products," however, the restriction prevents defendants from doing business with an extremely [*14] small percentage of the potential market. For instance, Gazay and Karol only serviced about 35 customers when they were employed by Corporate Express, Moneski about 25 customers, and Dias approximately 45-50 customers (Gazay Dep. at 18; Karol Dep. at 33-34; Moneski Dep. at 15; Dias Dep. at 21).

This order holds that the non-solicitation agreements are sufficiently narrowly-tailored restraints. They do not completely restrain defendants from pursuing their profession. This group of defendants is limited for only six months from soliciting or doing business with customers with whom they "contacted, solicited or serviced" while at Corporate Express. This group of defendants is free to work for a competitor and are free to compete against Corporate Express. They also are free to send a notice to their former customers announcing their new affiliation with myofficeproducts.com.

Enns and Crocker's "Policy and Agreement regarding Trade Secrets," however, was substantially more broad. The covenant would prevent these two defendants from working for *any* competitor that competes in Corporate Express' "geographic market." This restriction clearly does not merely limit the employees only [*15] from pursuing only a small or limited part of their trade. Corporate Express is a huge national firm with customers across the entire country. Accordingly, the agreement would prevent Enns and Crocker from competing in the office-products business anywhere in the United States.

This order finds that Enns and Crocker's agreements were not sufficiently narrow to fall within the partial restraint exception. It is likely that the agreements *do violate Section 16600*. Plaintiffs therefore cannot demonstrate a likelihood of success on the merits. *See Hilb, Rogal and Hamilton Ins. Servs. of Orange County, Inc. v. Robb, 33 Cal. App. 4th 1812, 1822-23, 39 Cal. Rptr. 2d 887 (1995)* (covenant not to compete that would prevent former employee from engaging in any competitive activities in Southern California for three years from his termination acts a complete bar to employee's engaging in his profession). Accordingly, plaintiffs have not shown a likelihood of success on their breach of contract claim against defendants Enns and Crocker and are not entitled to a preliminary injunction.

### III.  LIKELIHOOD  OF  SUCCESS  ON PLAINTIFF'S TRADE SECRETS CLAIM.

Plaintiff also seeks to prevent defendants [*16] from using any confidential or trade secret information they acquired in connection with their employment at Corporate Express. Accordingly, plaintiff must show a likelihood of success either that the non-disclosure provisions of defendants' agreements are enforceable and were breached or on its trade secret claim.

#### A. Applicable Law.

The non-solicitation agreements that defendants Gazay, Karol, Moneski and Dias signed included a non-disclosure provision. It stated that disclosure or unauthorized use of Corporate Express trade secrets or confidential information would cause irreparable harm. Their agreements defined "Trade Secrets" or "Confidential Information" to include "customer contacts."

Above, this order held that the covenant not to solicit or do business in defendants' non-solicitation agreement is likely to be enforceable under *Section 16600*. This non-disclosure provision's prescription against "use" of "customer lists" or "customer contact" information, however, is not likely to be enforceable. This is because the law is clear that a former employee has the right to announce a new affiliation to trade secret customers of a former client. *MAI Sys. Corp., 991 F.2d at 521*. [*17]

Accordingly, this order does not enjoin defendants from using their customer-contact information merely to contact those customers for the purpose of announcing their new affiliation. [4]

> 4    Because defendants have received benefit from the non-solicitation agreements in that they were paid compensation, this order may sever provisions of the agreement and uphold only *some* of the provisions. *Latona v. Aetna United States Healthcare, Inc., 82 F. Supp. 2d 1089, 1097 (C.D. Cal. 1999)*.

Nevertheless, plaintiff attempts to enjoin all of the defendants' use of its trade secrets under the *Uniform Trade Secrets Act*. Under this cause of action, plaintiff can show a likelihood of success only by showing that defendants "misappropriated" trade secrets. A "trade secret" is that which: (1) derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and (2) is the subject of efforts that [*18] are reasonable under the circumstances to maintain its secrecy." *Cal. Civil Code 3426.1(d)*. Misappropriation is the acquisition of a trade secret through improper means or disclosure of that information in violation of a duty to maintain its secrecy. *Cal Civil Code 3426.1(b)*. Customer lists may qualify as trade secrets that are protectable under the UTSA. *MAI Sys. Corp., 991 F.2d at 520-22.*.

Here, plaintiff has provided ample evidence demonstrating that it had trade secrets that it sought to protect. Plaintiff sought to protect its trade secrets by having all employees sign agreements that prevented the dissemination or use of Corporate Express's trade secrets, and explicitly and broadly defined trade secrets. *Morlife, Inc. v. Perry, 56 Cal. App. 4th 1514, 1522, 66 Cal. Rptr. 2d 731 (1997)* (employer's characterization of information as "trade secret" or "confidential" is an "important factor in establishing the value which was placed on the information"). Corporate Express actively pursues those who improperly use such information.

It also is clear that plaintiff's trade secrets (for instance, plaintiff's customer lists, customer contact information, cost or pricing information, [*19] supplier information, marketing materials, customer proposals) had economic value. Access to the information would allow a competitor to target businesses and purchase certain types of products without expending the costs of obtaining information as to that business' specific needs.

#### B. Evidence that Defendants Violated the Law.

Here plaintiff has provided adequate evidence to meet its burden to demonstrate that defendants breached the law. To show that defendants "misappropriated" trade

secrets, plaintiff must do more than merely demonstrate that the defendants announced their new affiliation to customer contacts -- it must show that the trade secret information was used to *solicit* customers. *Coons, 2000 U.S. Dist. LEXIS 22243, *27-28.*

Plaintiff has met its burden to demonstrate that defendants have solicited former customers. In fact, plaintiff demonstrated that defendant Karol misrepresented facts to the Court under oath at the TRO hearing when asked if she had *solicited* former customers. It also provided evidence that Karol violated the TRO by soliciting former customer Avigen after the TRO was in place. On October 30, 2002 -- one day after the [*20] TRO was put in place -- Karol provided Avigen marketing materials and asked if myofficeproducts.com would be allowed to competitively bid for its business (Karol Dep. at 57-60). Accordingly, plaintiff has demonstrated a likelihood of success on its misappropriation of trade secrets claim and defendants will be enjoined from further soliciting former customers by utilizing Corporate Express trade secrets.

### IV. LIKELIHOOD OF SUCCESS ON PLAINTIFF'S INTERFERENCE WITH ECONOMIC ADVANTAGE CAUSE OF ACTION.

To prevail on a claim for interference with prospective economic advantage, a plaintiff must demonstrate: (1) the existence of a prospective business relationship; (2) knowledge by defendant of the existence of that relationship; (3) intentional acts by defendant designed to disrupt that relationship; (4) actual causation; and (5) damages to plaintiff caused by defendant's conduct. *PMC, Inc. v. Saban Entertainment, Inc., 45 Cal. App. 4th 579, 595, 52 Cal. Rptr. 2d 877 (1996).*

Plaintiff has provided no evidence demonstrating the existence of a prospective business relationship that any of the defendants disrupted. Accordingly, it has not met its burden of showing a likelihood of success [*21] on this claim. No preliminary relief will be granted pursuant thereto.

### V. LIKELIHOOD OF SUCCESS ON PLAINTIFF'S UNFAIR COMPETITION CAUSE OF ACTION.

*California Business and Professions Code 17200, et. seq.*, prohibits unfair competition which means unlawful, unfair or fraudulent business practice. A "former employee's use of confidential information obtained from his former employer to compete with him and to solicit the business of his former employer's customers, is regarded as unfair competition." *Courtesy Temporary Servs., Inc. v. Camacho, 222 Cal. App. 3d 1278, 1292, 272 Cal. Rptr. 352 (1990).* Plaintiff must show that defendants "engaged in conduct that was wrongful by some

legal measure other than the interference itself." *PMC, Inc., 45 Cal. App. 4th at 602.* Such "wrongful conduct" includes "fraud, misrepresentation, intimidation, coercion, obstruction or molestation of the rival or his servants or workmen, or the procurement of the violation of the contractual relationship." *Ibid.* California law authorizes injunctive relief as a remedy for unfair competition. *Cal. Bus. & Prof. Code 17203.*

Plaintiff has not pointed to any evidence demonstrating wrongful [*22] conduct. Its motion for a preliminary injunction merely laid out the general legal standard for a violation of *Section 17200*, and stated that plaintiff has "a very strong chance of success" on its claim. Plaintiff's reply is replete of any mention of the unfair competition cause of action and relies solely on the contract claims for its prayer for relief. Accordingly, plaintiff has not met its burden of showing a likelihood of success on this claim. No preliminary relief will be granted pursuant thereto.

### VI. CORPORATE EXPRESS WILL BE IRREPARABLY HARMED IF DEFENDANTS ARE NOT ENJOINED.

If plaintiff shows a probability of success on the merits, a presumption of irreparable injury arises. *Cadence Design Sys., Inc. v. Avant! Corp., 125 F.3d 824, 826-27 (9th Cir. 1997).* Furthermore, intangible injuries, such as damages to a business' goodwill, may support a finding of irreparable injury. *Rent-A-Center, Inc. v. Canyon Television & Appliance, 944 F.2d 597, 603 (9th Cir. 1991).*

Plaintiff alleges that defendants' unlawful conduct causes Corporate Express to suffer customer losses, future sales, damage to long-term relationships with its customers, loss [*23] of referrals and loss of goodwill in the marketplace. This order agrees with the *Martinez* court that "such damages is difficult to quantify and, in this context, constitutes irreparable harm." *Martinez, 2002 U.S. Dist. LEXIS 21310, *13.* Additionally, the non-solicitation agreements that defendants Gazay, Karol, Moneski and Dias signed explicitly stated that non-disclosure and unauthorized use of the trade secrets would cause irreparable harm:

> As a result of these investments, the Company has developed and will continue to develop certain valuable Trade Secrets and Confidential Information specific to the Company's Business, the disclosure and unauthorized use of which would cause the Company great and irreparable harm.

(Opp. Exh. B at 1). "The facts recited in a written instrument are conclusively presumed to be true as between the parties thereto . . ." *Cal. Civil Code 662*.

Additionally, it is worth noting that as it effectuated its acquisition of USOP, Corporate Express paid defendants significant sums of money in exchange for the promises made in their agreements. Thus, defendants already have been paid specifically *not* to do exactly what they [*24] are doing during the limited time period of their covenants. They already have gotten the benefit to which they were entitled for signing their respective agreements.

## CONCLUSION

For the foregoing reasons, defendants Gazay, Karol, Moneski and Dias are ENJOINED from soliciting Corporate Express employees or doing new business with the customers they formerly were assigned to or took orders from while at Corporate Express, until the period of their non-solicitation contract expires. Thereafter, this injunction shall expire automatically.

This injunction is not intended, however, to require defendants to sever any relationships with *existing* customers on orders already accepted. Nonetheless, if defendants Gazay, Karol, Moneski and Dias merely has *contacted* or *solicited* a *potential* customer that they were assigned to or took orders from while at Corporate Express, said defendant must decline to do business with such customer during the period of the injunction.

Furthermore, all defendants are ENJOINED from using any confidential or trade secret information they acquired in connection with their employment at Corporate Express to *solicit* Corporate Express customers.

[*25] **IT IS SO ORDERED**.

Dated: December 12, 2002.

WILLIAM ALSUP

UNITED STATES DISTRICT JUDGE

# EXHIBIT 3

LEXSEE

**COURTESY TEMPORARY SERVICE, INC., Plaintiff and Appellant, v. LEONEL CAMACHO et al., Defendants and Appellants**

**No. B027238**

**Court of Appeal of California, Second Appellate District, Division Seven**

**222 Cal. App. 3d 1278; 272 Cal. Rptr. 352; 1990 Cal. App. LEXIS 854**

**August 15, 1990**

**PRIOR HISTORY:** [***1] Superior Court of Los Angeles County, No. C628981, Jerry K. Fields, Judge.

**DISPOSITION:** That portion of the order of the court denying Courtesy's petition for preliminary injunction against Employees from using Courtesy's confidential customer list and related information is reversed with directions to enter a new and different preliminary injunction in accordance with this opinion. In all other respects the judgment below is affirmed and the cross-appeal is dismissed. Costs on appeal are awarded to appellant Courtesy.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff, an employment agency, appealed from portions of an order of the Superior Court of Los Angeles County (California) denying a petition for a preliminary injunction against defendants, former employees, in an action alleging violations of the Uniform Trade Secrets Act, Cal. Civ. Code § 3426 et seq.

**OVERVIEW:** Plaintiff employment agency appealed from the denial of a petition for preliminary injunction to enjoin defendant former employees from using its confidential customer lists. Plaintiff filed the action alleging unfair competition and misappropriation of trade secrets in violation of the Uniform Trade Secrets Act, Cal. Civ. Code § 3426 et seq. The trial court enjoined defendants from soliciting or using plaintiff's employees. But while the court found defendants used the confidential customer lists to deceitfully steal customers of plaintiff, the

court held such lists were work product and not protectable trade secrets. The appellate court reversed, holding that the trial court erred in denying injunctive relief because such "work effort," or process of acquiring and retaining clientele, constituted protectable trade secrets under the statute.

**OUTCOME:** The court reversed that portion of the order denying a preliminary injunction and directed the trial court to issue injunctive relief barring defendants from using the confidential customer lists because plaintiff's "work effort" in compiling the clientele list constituted protectable trade secrets.

**CORE TERMS:** customer, trade secrets, customer list, temporary, confidential, unfair competition, protectable, former employees, preliminary injunction, payroll, misappropriation, unfair, proprietary, soliciting, solicit, secrecy, billing rates, branch office, expended, injunction, compiling, personnel, restraining order, former employer, readily ascertainable, injunctive relief, sophisticated, advertising, appealable, competitor

**LexisNexis(R) Headnotes**

*Civil Procedure > Remedies > Injunctions > Preliminary & Temporary Injunctions*
*Civil Procedure > Remedies > Injunctions > Temporary Restraining Orders*
*Civil Procedure > Appeals > Appellate Jurisdiction > Interlocutory Orders*

222 Cal. App. 3d 1278, *; 272 Cal. Rptr. 352, **;
1990 Cal. App. LEXIS 854, ***

[HN1]A trial court's order partially refusing a requested preliminary injunction is directly appealable. All orders granting or refusing either a temporary restraining order or a preliminary injunction are directly appealable.

*Labor & Employment Law > Employment Relationships > Employment Contracts > Conditions & Terms > Trade Secrets & Unfair Competition > Trade Secrets*
*Trade Secrets Law > Factors > Economic Value*
*Trade Secrets Law > Factors > Uniform Trade Secrets Act*
[HN2]Effective January 1, 1985, California adopted the Uniform Trade Secrets Act, Cal. Civ. Code § 3426 et seq., for appropriation of trade secrets. It defines a trade secret as information, including a formula, pattern, compilation, program, device, method, technique, or process, that: (1) Derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

*Labor & Employment Law > Employment Relationships > Employment Contracts > Conditions & Terms > Trade Secrets & Unfair Competition > Trade Secrets*
*Trade Secrets Law > Federal & State Regulation > Uniform Trade Secrets Act*
*Trade Secrets Law > Protected Information > Customer Lists*
[HN3]The legislative intent and better reasoned cases, which the Uniform Trade Secrets Act, Cal. Civ. Code § 3426 et seq., is meant to codify establish that a customer list procured by substantial time, effort and expense is a protectable trade secret.

*Trade Secrets Law > Factors > Business Use*
*Trade Secrets Law > Factors > Uniform Trade Secrets Act*
*Trade Secrets Law > Protected Information > General Overview*
[HN4]The definition of a trade secret under the Uniform Trade Secrets Act, Cal. Civ. Code § 3426 et seq., contains a reasonable departure from the definition that required that a trade secret be continuously used in one's business. The broader definition in Cal. Civ. Code § 3426 et seq. includes information that has commercial value from a negative viewpoint, for example the results of lengthy and expensive research which proves that a certain process will not work could be of great value to a competitor.

*Labor & Employment Law > Employment Relationships > Employment Contracts > Conditions & Terms > Trade Secrets & Unfair Competition > Trade Secrets*
*Trade Secrets Law > Civil Actions > Remedies > Injunctive Relief > General Overview*
*Trade Secrets Law > Protected Information > Customer Lists*
[HN5]It is the very "work effort," or process of acquiring and retaining clientele, that constitutes a protectable trade secret.

*Labor & Employment Law > Employment Relationships > Employment Contracts > Conditions & Terms > Trade Secrets & Unfair Competition > Trade Secrets*
[HN6]A list of customers or subscribers built up by ingenuity, time, labor and expense of the owner over a period of many years is property of the employer, and knowledge of such a list, acquired by an employee by reason of his employment, may not be used by the employee as his own property or to his employer's prejudice.

*Labor & Employment Law > Employment Relationships > Employment Contracts > Conditions & Terms > Trade Secrets & Unfair Competition > Trade Secrets*
*Trade Secrets Law > Protected Information > Customer Lists*
[HN7]If a customer list is acquired by lengthy and expensive efforts that, from a negative viewpoint, indicate those entities that have not subscribed to plaintiff's services, it deserves protection as a "trade secret."

*Trade Secrets Law > Factors > Definitions*
*Trade Secrets Law > Protected Information > Customer Lists*
*Trade Secrets Law > Protection of Secrecy > Reasonable Measures > Limited Access*
[HN8]Reasonable efforts to maintain secrecy have been held to include advising employees of the existence of a trade secret, limiting access to a trade secret on "need to know basis," and controlling plant access.

*Trade Secrets Law > Civil Actions > Remedies > Injunctive Relief > General Overview*
*Trade Secrets Law > Misappropriation Actions > General Overview*
*Trade Secrets Law > Protected Information > Customer Lists*
[HN9]The Uniform Trade Secrets Act, Cal. Civ. Code § 3426 et seq., specifically Cal. Civ. Code § 3426.7(a),

expressly provides that the statute does not supersede any statute relating to misappropriation of a trade secret, or any statute otherwise regulating trade secrets.

*Labor & Employment Law > Employment Relationships > Employment Contracts > Conditions & Terms > Trade Secrets & Unfair Competition > General Overview*
*Trademark Law > Federal Unfair Competition Law > False Advertising > Elements*
[HN10]See Cal. Bus. & Prof. Code § 17200.

**SUMMARY:**

**CALIFORNIA OFFICIAL REPORTS SUMMARY**

A temporary employment agency brought an unfair trade practices action against former employees who set up a competing agency and simultaneously applied for a preliminary injunction to prohibit the employees from soliciting any of the agency's customers that they serviced while employed at the agency; from soliciting or employing the agency's temporary labor force; and from using or disclosing any of the agency's confidential customer information. The trial court issued a preliminary injunction restraining the employees from soliciting or utilizing the agency's employees, but found that the agency's confidential customer list and related information was an unprotectable work product. (Superior Court of Los Angeles County, No. C628981, Jerry K. Fields, Judge.)

The Court of Appeal reversed that portion of the trial court's order denying the agency's petition for a preliminary injunction enjoining the employees from using the agency's customer list and related information with directions to enter an appropriate preliminary injunction, and otherwise affirmed. It held that the trial court erred in denying the petition for an injunction, since the agency's customer list was a protectable trade secret under the Uniform Trade Secrets Act (Civ. Code, § 3426 et seq.), and in failing to enjoin the employees' unfair business practices under Bus. & Prof. Code, § 17200 et seq. (enforcement of unfair competition statutes). (Opinion by Woods (Fred), J., with Lillie, P. J., and Johnson, J., concurring.)

**HEADNOTES**

**CALIFORNIA    OFFICIAL    REPORTS HEADNOTES**
Classified to California Digest of Official Reports, 3d Series

**(1) Appellate Review § 12--Decisions Appealable--Order Granting or Refusing Temporary Restraining Order or Preliminary Injunction.** --In a temporary employment agency's action against former employees who set up a competing agency, the trial court's order partially denying the agency's request for a preliminary injunction and refusing to enjoin the employees from using the agency's confidential customer list and related information to solicit the agency's customers was directly appealable. All orders granting or refusing either a temporary restraining order or a preliminary injunction are directly appealable.

**(2) Unfair Competition § 7--Acts Constituting Unfair Competition--Use of Trade Secrets--Confidential Customer List--Uniform Trade Secrets Act.** --In a temporary employment agency's action against former employees who set up a competing agency, the trial court erred in finding that the agency's customer list and related information stolen by the former employees did not constitute protectable trade secrets. The list fell within the definition of a trade secret under the Uniform Trade Secrets Act (Civ. Code, § 3426.1, subd. (d)) as information that derives an independent economic value from not being generally known to the public or other persons who could obtain economic value from its disclosure or use, and that is the subject of efforts that are reasonable under the circumstances to maintain its secrecy. The customer list was the product of a substantial amount of time, expense, and effort on the agency's part. Also, from a negative viewpoint, the list indicated those entities that have not patronized the business and for that reason as well was a protectable trade secret under the act. Moreover, the nature and character of the customer information, such as billing rates, key contacts, specialized requirements and markup rates were sophisticated information, irrefutably of commercial value, and not readily ascertainable to other competitors. The employees acquired commercially valuable information by appropriating the agency's customers, thereby saving themselves comparable efforts in screening businesses that declined the agency's services. Also, the information was not divulged to any persons outside the business, was given to employees only on a "need to know" basis, and was limited only to customers of the branch office in which an employee worked, and the employees were told of the confidential and proprietary nature of such information.

**(3) Unfair Competition § 7--Acts Constituting Unfair Competition--Use of Trade Secrets--Misappropriation of Confidential Customer List.** --In a temporary employment agency's action against former employees who set up a competing agency, the trial court erred in finding that an appellate court decision prohibited it from finding that the agency's customer list and

related information stolen by the former employees were a protectable trade secret. Unlike the decision mistakenly relied on by the trial court, in which there was disputed evidence as to whether the former employees being sued were given or had used confidential information, and in which there was no evidence as to the efforts expended in compiling its customer list or in maintaining its secrecy, the record in the agency's action supported a finding that the agency's former employees did not acquire the agency's customers by "the fruit of their own labor," but rather that they expended scant efforts on their own, and unfairly relied on the agency's efforts in compiling the customer list and related commercially valuable and not easily discoverable information. Using the agency's customer list, payroll records, and billing rates, they intentionally solicited the agency's customers, while still employed by the agency, in a successful attempt to injure the agency by diverting its customers to their competing business Such conduct was enjoinable as a patently unfair trade practice under the Uniform Trade Secrets Act ( Civ. Code, § 3426 et seq.).

**(4) Unfair Competition § 7--Acts Constituting Unfair Competition--Use of Trade Secrets-- Misappropriation of Confidential Customer List.** --In a temporary employment agency's action against former employees who set up a competing agency, the trial court erred in failing to enjoin the employees' unfair business practices under Bus. & Prof. Code, § 17200 et seq. Since the Uniform Trade Secrets Act ( Civ. Code, § 3426 et seq.) does not supersede any statute relating to misappropriation of a trade secret, even if the agency's customer list would not have qualified as a protectable trade secret under the act, the employees' unfair and deceptive practice in using the list to steal the agency's customers should have been enjoined under Bus. & Prof. Code, § 17200 et seq. (enforcement of unfair trade practices statutes). A former employee's use of confidential information obtained from his former employer to compete with him and to solicit the business of his former employer's customers is unfair competition.

**COUNSEL:** Thomas M. Regele for Plaintiff and Appellant.

Arthur H. Lampel for Defendants and Appellants.

**JUDGES:** Opinion by Woods (Fred), J., with Lillie, P. J., and Johnson, J., concurring.

**OPINION BY:** WOODS

**OPINION**

[*1281] [**353] I.

Introduction

This is an appeal by Courtesy Temporary Service, Inc., hereinafter "Courtesy," from an order of the Los Angeles Superior Court partially denying Courtesy's motion for a preliminary injunction to restrain Leonel Camacho, Maria Camacho, and Bianca Alvarez, former employees of Courtesy, hereafter "Employees," from soliciting Courtesy's customers and/or utilizing or disclosing certain confidential proprietary information concerning such customers.

II.

Contentions

Courtesy contends [***2] that while in Courtesy's employ, Employees misappropriated Courtesy's confidential customer list, including such information as the volume of the customer's business, specific customer requirements, key managerial customer contacts and billing rates for use in Employees' competing business. Courtesy contends that Employees used such information to solicit, pirate and deceive Courtesy's customers, subjecting Courtesy to a substantial loss of business, all in violation of the law of the State of California against unfair competition, entitling Courtesy to injunctions and damages.

Employees contend that customer lists of temporary help agencies are not protected trade secrets, the court correctly determined that Employees could not be enjoined from contacting or dealing with Courtesy's customers, and that substantial evidence supports the finding that Courtesy's customers were developed from public sources.

As hereafter discussed we resolve all contentions against Employees, as being unmeritorious, and in favor of Courtesy.

[*1282] [**354] III.

Factual and Procedural Synopsis

A. *Facts*

Courtesy is a California corporation with four branch offices, one of which is located in Hacienda [***3] Heights, California. Courtesy is in the temporary employment business, providing temporary workers to various companies, primarily factories, warehouses and light industrial concerns, according to their specific needs. Courtesy actively recruits, interviews and hires people as its own employees and then assigns these employees to its customer companies requesting assistance. Courtesy maintains the employer-employee relationship and is therefore responsible for paying these employees.

Since its inception in 1969, Courtesy has expended a great deal of time, money and effort developing and servicing its clientele and recruiting its labor force. Courtesy employs a permanent sales force to seek out and secure new business and service Courtesy's established business. Courtesy supports its sales staff with print advertising, entertainment expense accounts and promotional gifts and items. As a result, Courtesy has been successful in developing and maintaining an advantageous, stable and continuous customer base.

In the course of its dealings with its customers, Courtesy became knowledgeable and experienced in its customers' operations and developed sophisticated customer information [***4] such as the key contacts within the customer's business, special needs and customer characteristics, workers' compensation information, billing rates, profit margins and other financial information. All of this information was the product of substantial time and expense, not generally known to the public nor readily ascertainable in the temporary employment industry. A list of Courtesy's customers, who have demonstrated their willingness to use temporary employees, is not available in a trade or public directory or any other source. In short, there is no source to determine which particular businesses might be seeking or utilizing temporary employees. Rather, Courtesy's customer names, specialized requirements and patronage were secured by screening a large number of such prospects, at considerable time, effort and expense to Courtesy.

Courtesy employs branch managers and personnel supervisors for each of its branch offices. A branch manager's duties include servicing customer accounts and soliciting new business. A personnel supervisor's duties consist of interviewing and screening employee applicants, filling customer job orders and distributing payroll checks to the employees.

[***5] [*1283] Defendant Leonel Camacho had been employed by Courtesy as its Hacienda Heights branch manager and sales representative for a total period of nine years until he quit on December 1, 1986, to open a competing business, Transworld Temporaries. Defendant Maria Camacho and Bianca Alvarez had been employed by Courtesy as personnel supervisors in the Hacienda Heights office for approximately six years and two years, respectively, until they quit to join Leonel Camacho at Transworld Temporaries. While in Courtesy's employ, Employees were paid a monthly commission based upon a percentage of the branch office's net monthly sales, in addition to their base salaries.

As part of their duties as branch manager and sales representative and personnel supervisors, respectively, Employees developed familiarity and friendly contacts

with Courtesy's customers and employees. In order that Employees might effectively carry out their employment duties, Courtesy necessarily revealed to Employees confidential and proprietary information regarding Courtesy's customers, including their sales volume, profit margins, special employment needs, particular likes and dislikes and pay rates and markups. [***6] Similarly, in the course of their employment at Courtesy, Employees necessarily acquired confidential knowledge regarding Courtesy's employees/labor force, including their names, addresses, job skills, past employment history and employment record with [**355] Courtesy's customers. At all times, Employees were aware of the confidential nature of this information and of Courtesy's reasonable efforts to ensure its secrecy.

By November 1986, and while still in Courtesy's employ, Employees admittedly planned the formation of a competing temporary employment business, Transworld Temporaries, and the transfer of all of Courtesy's preferred customers serviced by Employees to such competing business. Employees were keenly aware that Courtesy's long-standing, preferred customers would want to keep Courtesy's present temporary employees in their businesses because of their training and experience over the course of extended job assignments. Thus, Employees knew that the quickest and most effective way to appropriate Courtesy's more lucrative accounts and simultaneously establish their own labor force, was to pirate Courtesy's employees.

In furtherance of this scheme, in November 1986, while still [***7] employed at Courtesy, Employees began soliciting Courtesy's employees to join them in their soon-to-be-open competing business. Employees admittedly wrote and published a letter to Courtesy's customers and employees thanking them for their patronage, stating that their "*continual* support and cooperation" obliged Employees to "*further* improve," and asking them to "accept the best [Employees] have to offer from [their] *new location*." The "new [*1284] location" was the address of Employees' competing business, Transworld Temporaries. Employees' statements were intended, and were in fact understood by those who read them, to refer to Courtesy, implying that Courtesy had either relocated or was being taken over by Transworld Temporaries. When Courtesy's employees came into the Hacienda Heights office during the last week of November 1986 to pick up their weekly payroll checks, Employees handed this letter to such employees and directed them to pick up their paychecks at the new address in the future.

Employees were equally intent upon diverting all of Courtesy's preferred and valuable customers' business to Transworld Temporaries. During the course of his deposition, [***8] Camacho produced a document which he

222 Cal. App. 3d 1278, *; 272 Cal. Rptr. 352, **;
1990 Cal. App. LEXIS 854, ***

testified was a customer list which he prepared and used to solicit business for his new company. The first two pages of this list contain the names of all of Courtesy's major customers. In each instance, for a Courtesy customer, the list contains a person to contact in such company for temporary personnel needs. Employees admitted that this list was prepared while still in Courtesy's employ and that the names and information concerning Courtesy's customers on such list were obtained through Employees' employment at Courtesy. Employees' list also includes billing rates and/or markup percentages for Courtesy's customers and only Courtesy's customers. With one exception, Camacho admitted that he solicited the business of all of Courtesy's customers on behalf of Transworld Temporaries prior to Employees' leaving Courtesy's employ. In each such instance of solicitation, Employees admittedly utilized the confidential customer information acquired by Employees while in Courtesy's employ.

Immediately after resigning from Courtesy's employ, Employees obtained payroll information concerning Courtesy's employees for the week ended November 30, 1986, [***9] from Courtesy's preferred customers. Employees fully intended to use such payroll information to remunerate Courtesy's employees through their competing business, Transworld Temporaries, and thereafter bill Courtesy's customers for such temporary services.

Finally, utilizing Courtesy's confidential and proprietary information regarding the amount of business transacted by and between said customers and Courtesy, and Courtesy's mark up of these various accounts, Employees have solicited all of Courtesy's more valuable and preferred customers.

Courtesy's advantageous business relations with its customers are threatened to be, and have been, disrupted in that certain preferred customers have begun to use the services of Employees. Combined, Courtesy's [**356] subject customers account for nearly $ 1.5 million in annual sales. Courtesy's sales were immediately decreased by approximately 60 percent by Employees' [*1285] tactics. Although Employees claim to have solicited business from approximately 150 firms, at the end of their first month of business, Employees' new agency claimed only one customer which had not been a customer of Courtesy.

B. *Procedural History*

On December 16, [***10] 1986, Courtesy filed its complaint for injunctive relief and money damages for: (1) unfair competition and misappropriation of trade secrets -- violation of California Civil Code [1] section 3426 et seq.; (2) violation of California Business and Professions Code section 17200 et seq.; (3) tortious interference with prospective economic advantage; (4) breach of

confidential relationship; (5) breach of implied covenant of good faith and fair dealing; and (6) libel/business disparagement. Courtesy simultaneously applied for a temporary restraining order and order to show cause re preliminary injunction, enjoining defendants from (1) soliciting any customers of Courtesy serviced by Employees when employed at Courtesy; (2) soliciting or employing Courtesy's specified temporary labor force employees; and (3) utilizing or disclosing any confidential Courtesy customer information. The Honorable Robert Weil issued the temporary restraining order as requested.

   1   Unless otherwise noted, all references are to the Civil Code.

The [***11] preliminary injunction hearing took place on March 2, 1987, the Honorable Jerry Fields, judge presiding. At the hearing, the court found, based upon the evidence, that Employees had acted deceitfully, that they had stolen Courtesy's customers and employees and had even attempted to steal Courtesy's money. The court issued a preliminary injunction restraining Employees from soliciting or utilizing Courtesy's employees. However, despite having found Employees' acts to be "abhorrent" and "detestable" the trial court felt itself precluded by *American Paper & Packaging Products, Inc. v. Kirgan (1986) 183 Cal.App.3d 1318 [228 Cal.Rptr. 713]* from enjoining Employees' stealing of Courtesy's confidential customer list and related information and held such list to be unprotectable work product. This appeal and cross-appeal followed.

IV.

   Discussion

The trial court correctly found that Courtesy's customer list and related information are trade secrets in light of all of the circumstances before it. The trial court erred, however, in failing to correctly interpret and apply the [*1286] law. First, the court erred in relying upon *American Paper* in [***12] concluding that Courtesy's customer list and information do not constitute protectable trade secrets under section 3426 et seq. Second, *American Paper* is distinguishable from the facts in this case. Third, *American Paper* misconstrued California's trade secret statute and its legislative intent, and we decline to rely on the decision in this case. Finally, the court erred in not granting the requested injunctive relief under Business and Professions Code section 17200 et seq., a separate ground espoused by Courtesy.

A. [HN1]*The trial court's order, partially refusing Courtesy's requested preliminary injunction, is directly appealable.*

(1) All orders granting or refusing either a temporary restraining order or a preliminary injunction are directly appealable. ( Code Civ. Proc., § 904.1, subd. (f).)

B. *The trial court erred in finding that Courtesy's customer list and related information stolen by Employees did not constitute protectable trade secrets under the authority of "American Paper" and the Uniform Trade Secrets Act.*

At the preliminary injunction hearing, the trial court sarcastically found that Camacho represented the "American way" [**357] by being a "small person who [***13] saved his money and went into business on his own in an attempt to make a life for himself and his wife by *stealing, lying and cheating*." (Italics added.) The court labelled this the "worst case" wherein employees have been shown to be "deceitful," specifically finding that Employees stole Courtesy's customers. Despite these findings, the lower court felt itself precluded by *American Paper & Packaging Products, Inc. v. Kirgan, supra, 183 Cal.App.3d 1318*, from enjoining Employees' misappropriation of Courtesy's customer list and related proprietary information. However, neither *American Paper* nor the Uniform Trade Secrets Act (UTSA), section 3426 et seq., compels this result. This case involves a clear factual scenario of a customer list and related information constituting protectable trade secrets.

1. *Courtesy's customer list and related information satisfy the definition of trade secret contained in the Uniform Trade Secrets Act.*

(2) [HN2]Effective January 1, 1985, California adopted the Uniform Trade Secrets Act (§§ 3426-3426.10) for misappropriation of trade secrets. It defines a trade secret as "information, including a formula, pattern, [***14] compilation, program, device, method, technique, or process, that: [para.] (1) Derives independent economic value, actual or potential, from not being generally [*1287] known to the public or to other persons who can obtain economic value from its disclosure or use; and [para.] (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." (§ 3426.1, subd. (d).)

Measured by this two-prong test, the facts in the instant case conclusively establish that Courtesy's customer list and related information are protectable trade secrets. [HN3]The legislative intent and better reasoned cases, which the Uniform Trade Secrets Act is meant to codify, establish that a customer list procured by substantial time, effort, and expense is a protectable trade secret.

[HN4]The UTSA's definition of a "'trade secret' contains a reasonable departure from the Restatement of Torts (First) definition which required that a trade secret be 'continuously used in one's business.' *The broader*

*definition* in the proposed Act . . . includes information that has commercial value from a negative viewpoint, for example the results of lengthy and expensive research which proves that [***15] a certain process will *not* work could be of great value to a competitor." (Italics added and original italics.) (See legis. committee com., 12 West's Ann. Civ. Code, § 3426.1 (1990 pocket supp.) p. 108.)

The compilation by Courtesy of its list of customers was the result of lengthy and expensive efforts, including advertising, promotional campaigns, canvassing, and client entertainment. The court below, however, ruled that such "work effort" of Courtesy in compiling its customer list was "not any secret" entitled to protection and, on such erroneous basis, denied the injunction as to Courtesy's customer list. Contrary to the court's ruling, [HN5]it is this very "work effort," or process of acquiring and retaining clientele, that constitutes a protectable trade secret.

[HN6]A list of customers or subscribers "built up by ingenuity, time, labor and expense of the owner over a period of many years is property of the employer," and "'[k]nowledge of such a list, acquired by an employee by reason of his employment, may not be used by the employee as his own property or to his employer's prejudice.'" ( Greenly v. Cooper (1978) 77 Cal.App.3d 382, 392 [143 Cal.Rptr. 514].) [***16] Employees, by appropriating only those customers who, after Courtesy's efforts, chose to patronize Courtesy and saving themselves comparable efforts in screening those entities who declined Courtesy's patronage, have acquired commercially invaluable information.

This concept of "negative" research was emphasized in the case of *Hollingsworth Solderless Terminal Co. v. Turley (9th Cir. 1980) 622 F.2d 1324.* [HN7]If a customer list is acquired by lengthy and expensive efforts which, from a [*1288] negative viewpoint, indicate those entities that have *not* subscribed to plaintiff's services, it deserves [**358] protection as a "trade secret" under the act. According to *Hollingsworth*, even if the customers' names could be found in telephone or trade directories, such public sources "'would not disclose the persons who ultimately made up the list of plaintiff's customers.'" ( *Id.* at p. 1333.) It is the list of persons who actually purchase Courtesy's services that constitute confidential information.

Here, the evidence established that Courtesy's customer list and related information was the product of a substantial amount of time, expense and effort [***17] on the part of Courtesy. Moreover, the nature and character of the subject customer information, i.e., billing rates, key contacts, specialized requirements and markup rates, is sophisticated information and irrefutably of

commercial value and not readily ascertainable to other competitors. Thus, Courtesy's customer list and related proprietary information satisfy the first prong of the definition of "trade secret" under section 3426.1.

*2. Courtesy's efforts to maintain the confidentiality of its customer list satisfy UTSA's definition of trade secret.*

Courtesy's customer list also satisfies the second prong of the UTSA definition of "trade secret" in that it has been "the subject of efforts that are reasonable under the circumstances to maintain its secrecy." (§ 3426.1, subd. (d)(2).) [HN8]"[R]easonable efforts to maintain secrecy have been held to include advising employees of the existence of a trade secret, limiting access to a trade secret on 'need to know basis,' and controlling plant access." (See legis. committee com., 12 West's Ann. Civ. Code (1990 pocket supp.) p. 108.)

The unrefuted evidence in this case is that information regarding Courtesy's customers is not divulged [***18] to any persons outside the business. It is Courtesy's policy to divulge such confidential and proprietary information to its branch office employees, such as Employees, only as is necessary for them to effectively carry out their specific duties. The sales, customer and employee information for one branch office is not generally revealed to any other branch employees. As to any information revealed to such employees, the employees are told of the confidential and proprietary nature of such information. Access to such customer information was divulged to Employees only on an "as needed basis" to perform their duties and was limited to the branch office wherein Employees exclusively worked. Furthermore, Employees were advised of its confidentiality. These efforts satisfy the secrecy requirement of section 3426.1, subdivision (d)(2), and thus the customer list constitutes a "trade secret."

[*1289]  3. *The trial court erred in holding that American Paper precluded it from finding that Courtesy's customer list and related information are protectable trade secrets.*

(3) In denying Courtesy's requested injunction of Employees' use of Courtesy's customer list and related information, [***19] the lower court reasoned that the case of *American Paper & Packaging Products, Inc. v. Kirgan, supra,* 183 Cal.App.3d 1318, mandated the conclusion that Courtesy's customer information was not a protectable trade secret. A careful reading and analysis of *American Paper* reveals that it is factually inapposite to the instant case. *American Paper* held that customer lists can be protectable trade secrets under the UTSA, but that information generally known in the trade and already used by good faith competitors "is not a protectable trade secret and injunction should not issue." ( *Id.* at p. 1326.)

The *American Paper* court concluded that the plaintiff, a packing concern, had not presented sufficient evidence providing that its customer list was a trade secret and that names of manufacturer customers who require shipping supplies, while they may not be generally known to the public, would be readily ascertainable to other persons in the shipping business. (*Ibid.*) The compilation process that plaintiff had used was found to be "neither sophisticated nor [**359] difficult nor particularly time consuming." (*Ibid* [***20] .)

In *American Paper,* defendants, shortly after leaving plaintiff's employ, began working as salespersons for a competitor of plaintiff. Although plaintiff had alleged that its customer information was obtained by defendants from its records and files which had been provided to them prior to their termination, defendants denied that they were given information on any actual or potential customers by plaintiff. They alleged that any such customer lists were developed as "fruit of their own labor" by visiting industrial-zoned communities in their sales area, locating and compiling lists of manufacturing companies, making cold calls on such companies, and consulting phone directories. (183 Cal.App.3d at p. 1321.)

Contrary to the disputed testimony that defendants were given confidential information in *American Paper,* the record herein overwhelmingly supports a finding that Employees, using Courtesy's customer lists, payroll records, and billing rates, intentionally solicited Courtesy's customers while still in Courtesy's employ. Employees terminated their employment with Courtesy on December 1, 1986, and were operating their own competing business [***21] on the same day. Within two weeks of operation without any visits to industrial-zoned communities, canvassing, or "cold calls," Employees had misappropriated 60 percent of Courtesy's customers.

Whereas plaintiff in *American Paper* had preferred no evidence as to the efforts it expended in compiling its customer list or in maintaining its [*1290] secrecy, Courtesy, in the instant case, has detailed the substantial efforts it expended in acquiring its customers, including years of promotional and advertising campaigns. Whereas defendants in *American Paper* denied having been given any confidential customer information, Employees admitted having used Courtesy's customer lists and financial information to deliberately solicit Courtesy's customers while employed by Courtesy.

In his declaration in opposition to Courtesy's motion for preliminary injunction, Camacho admitted that he "jumped the gun" in soliciting Courtesy's customers while still employed by Courtesy. Camacho admitted having a list of potential clients, which included Courtesy's clients, and that he prepared the list from Courtesy's personnel roster a couple of weeks prior to leaving

Courtesy. He further testified [***22] that while employed by Courtesy, he had sent "proposal" packages to Courtesy's customers whose names he obtained from Courtesy's "payroll printout." Rather than merely announcing the opening of his own business, almost two weeks prior to the opening of his business, Camacho asked Courtesy's preferred customer, Plastron, about getting temporary employment business from them. Camacho admitted that he had submitted a proposal to Plastron. While still employed by Courtesy, Camacho submitted similar proposals to Courtesy's better customers, including Nutro Products, Lights of America, County Sanitation District, and Industry Deburring, among others.

Another "improper" method used by Employees to divert Courtesy's customers was to convert payroll records of various customers to Employees' own use. Camacho admitted to having requested and obtained from Courtesy's customers, after terminating his employment, weekly payroll reports of Courtesy's temporary employees for the week ending November 30, 1986, with the intent to "run a payroll" through his new agency, Transworld Temporaries, and to "pay [Courtesy's] employees for that work week through Transworld Temporaries."

Employees' solicitation [***23] has nourished their new enterprise. As of the end of December 1986, Transworld Temporaries had only invoiced one client that had not been a preferred customer of Courtesy. Such evidence supports the conclusion that Employees, unlike defendants in *American Paper*, did not acquire Courtesy's customers by "the fruit of their own labor" or through public sources, but rather they expended scant efforts of their own, and unfairly relied upon the efforts expended by Courtesy in compiling its customer list and related commercially valuable and not [**360] easily discovered information. The evidence further supports the conclusion that Employees, while still employed by Courtesy, used confidential customer information to not merely announce formation of their new business, but to actively solicit Courtesy's customers in a successful attempt to injure Courtesy by diverting [*1291] those customers to Employees' competing business. Such conduct, which was not shown in *American Paper*, is enjoinable as a patently unfair trade practice under the UTSA.

In summary, considering the admitted misappropriation of sophisticated, detailed customer information and active solicitation by Employees in [***24] the instant case, as contrasted with the independent efforts of the former employees and innocuous and readily ascertainable information at issue in *American Paper*, the trial court's refusal to grant injunctive relief was an abuse of discretion.

*C. The trial court erred in not enjoining Employees' unfair business practices under Business and Professions Code section 17200 et seq.*

**(4)** Finally, the court below erred in relying exclusively on section 3426 et seq. and *American Paper's* construction of that statute to deny Courtesy's claim under Business and Professions Code section 17200 et seq. [HN9]The UTSA, specifically section 3426.7, subdivision (a), expressly provides that the Act "does not supersede any statute relating to misappropriation of a trade secret, or any statute otherwise regulating trade secrets." Thus, even if Courtesy's customer list would not qualify as a "trade secret" under section 3426.1, the unfair and deceptive practices of employees in stealing Courtesy's customers should have been enjoined under Business and Professions Code section 17200 et seq.

In its complaint, Courtesy stated a cause of action under Business and Professions Code section 17200 for [***25] unfair competition, requesting injunctive relief and alleging, among other things, that by Employees' solicitation, piracy and deceit of Courtesy's customers, Courtesy was irreparably injured in its identity, reputation and goodwill, causing the loss of valuable customers, employees, and profits and threatening the complete destruction of its business.

Business and Professions Code section 17200 provides: [HN10]"As used in this chapter, unfair competition shall mean and include unlawful, unfair or fraudulent business practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by Chapter 1 (commencing with Section 17500) of Part 3 of Division 7 of the Business and Professions Code." Business and Professions Code section 17203 provides for injunctive relief against "[a]ny person performing or proposing to perform an act of unfair competition within this state."

In *Klamath-Orleans Lumber, Inc. v. Miller (1978)* 87 Cal.App.3d 458 [151 Cal.Rptr. 118], the court upheld a permanent injunction restraining [*1292] two former employees from soliciting their former employer's customers. Plaintiff, a manufacturer of load binders, had [***26] compiled a confidential customer list that contained such information as the creditworthiness and purchasing habits of each customer, and the defendants, the plaintiff's shop and office managers, had left plaintiff's employ to organize their own competing business and had written up plaintiff's customer lists from memory. The defendants then mailed advertising brochures to plaintiff's customers.

The court held that the defendants' actions constituted a breach of trust and misappropriation of confidential information. There was "substantial evidence to support the trial court's determination that plaintiff's knowledge was confidential and deserving of protection, and

222 Cal. App. 3d 1278, *; 272 Cal. Rptr. 352, **;
1990 Cal. App. LEXIS 854, ***

that defendants' ability to solicit both more selectively and more effectively was due to their extensive use of plaintiff's customer list -- a patent act of unfair competition." (87 Cal.App.3d at p. 466.) Indeed, the cases are legion holding that a former employee's use of confidential information obtained from his former employer to compete with him and to solicit the business of his former employer's customers, is regarded as unfair competition. (See, e.g., _Greenly_ v. [**361] _Cooper, supra, 77 Cal.App.3d 382, 391-392._) [***27]

V.

That portion of the order of the court denying Courtesy's petition for preliminary injunction against Employees from using Courtesy's confidential customer list and related information is reversed with directions to enter a new and different preliminary injunction in accordance with this opinion. In all other respects the judgment below is affirmed and the cross-appeal is dismissed. Costs on appeal are awarded to appellant Courtesy.